Samuel Dampt, #035970
Samuel@DentonPeterson.com
DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, Arizona 85213
Telephone: (480) 325-9900
Facsimile: (480) 325-9901
https://arizonabusinesslawyeraz.com

*Attorney for Defendant*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mitchell Taylor Button and Dusty Button,<br><br>Plaintiffs,<br>vs.<br><br>Nick Kingsley,<br><br>Defendant. | No. 2:25-CV-02619-PHX-SMB<br><br>**MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>(Assigned to the Honorable Susan M. Brnovich) |

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Nick Kingsley ("Kingsley") respectfully requests that the Court dismiss the First Amended Complaint (the "Amended Complaint") filed by Plaintiffs Mitchell Taylor Button ("Taylor") and Dusty Button ("Dusty")(collectively, the "Buttons") because the Buttons have not pled facts which, if true, would made it facially plausible that Kingsley acted with actual malice, that the Buttons experienced emotional distress, or that Kingsley's behavior was extreme and outrageous, which are all necessary elements of the Buttons' claims. In the alternative, Kingsley requests that the Court dismiss the Buttons' Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction, because the Buttons have not pled that they each have suffered in excess of $75,000.00 in damages. Furthermore, the Court may take judicial notice of

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW 1930 N. Arboleda Road, Suite 200 Mesa, AZ 85213

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

allegations asserted by the Buttons in other lawsuits that are referenced in their Complaint which further undermine the plausibility of their Complaint. Finally, Kingsley respectfully requests that the Court order the Buttons to pay Kingsley's attorney fees and costs because the Buttons filed the Complaint with the actual knowledge that their claims were groundless.

**I. <u>In order to state a claim upon which relief may be granted, the Buttons were required to include well-pled allegations of material fact in their Complaint that were sufficient, if true, to state a claim for relief that is plausible on its face.</u>**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Miller v. Sawant*, 18 F.4th 328, 336 (9th Cir. 2021) citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. All well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party. *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1095 (D. Ariz. 2022). However, the court need not accept legal conclusions couched as factual allegations. *Id.* Moreover, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*

**II. <u>The Buttons did not include well-pled factual allegations in their Complaint from which the Court could reasonably infer that Kingsley acted with actual malice.</u>**

**A. Actual malice is a necessary element of each of the Buttons' three claims because they are public figures.**

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures. *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1112 (D. Ariz. 2022). In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. *Id*. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. *Id*. In either case such persons assume special prominence in the resolution of public questions. *Id*.

In *Manzari v. Associated Newspapers Ltd.*, the Ninth Circuit found that a soft-core porn actress was "undoubtedly" a public figure, based on "news coverage related to her considerable success performing in and marketing online soft-core porn," statements in the complaint that "Danni Ashe is considered 'the most downloaded woman on the Internet' and that her image has 'graced the cover of the Wall Street Journal,'" her presence in several adult films, and high website traffic. *Humphries v. Button*, 2025 U.S. Dist. LEXIS 162472, *61-62 (D. Nev. Aug. 20, 2025)[1] quoting 830 F.3d 881, 888 (9th Cir. 2016). This was true even if "she is less of a household name than stars in other sectors of the entertainment industry." *Id.* quoting *Manzari*, 830 F.3d 881 at 888. The Ninth Circuit also noted that it had attributed public figure status with those with even less fame than Manzari. *Id.* referencing *Manzari*, 830 F.3d 881 at 888. For example, in *Leidholdt v. L.F.P. Inc*, the court had found that a woman was a public figure where she was "a founding member of the organization

[1] *See* unpublished decision attached as **Exhibit 1** for the Court's convenience.

Women Against Pornography, has given public speeches against pornography, and has debated its proponents in the national media." *Id*. quoting 860 F.2d 890, 892 (9th Cir. 1988).

In the First Amended Complaint, the Buttons alleged that Dusty was "a professional ballet dancer," that Taylor "was known within portions of the automotive industry," and that both experienced "professional recognition" before "prior publicity" "damaged" their professional relationships. First Amended Complaint, ¶ 10-12. The Buttons alleged that "Dusty generated substantial income through reputation-based sponsorships, appearances, teaching, brand relationships, and professional engagement, including approximately $10,000 for a single event and more than $200,000 in cumulative sponsorships and professional opportunities over time." First Amended Complaint, ¶ 17. Likewise, the Buttons alleged that, "Taylor generated substantial value through reputation-based automotive work, sponsorships, collaborations, events, builds, brand relationships, and professional opportunities." First Amended Complaint, ¶ 19. Assuming those allegations are true, the Buttons must be public figures, because like Danni Ashe and the plaintiff in *Leidholdt*, the Buttons are well-known in their particular industries and have been the subject of extensive media attention.

Furthermore, even if the Buttons are not general public figures, they are public figures as it relates to the Nevada Lawsuit. The Buttons alleged in their First Amended Complaint that the "2021 publicity" surrounding the filing of the Nevada Lawsuit was so pervasive as to cause them both "reputational destruction." First Amended Complaint, ¶ 17 and 19. The Buttons also alleged that they personally maintain a social media account in which they publicly discuss the Nevada Lawsuit. First Amended Complaint, ¶ 38-39. The Buttons became limited public figures when they were named as defendants in the widely publicized

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

Nevada Lawsuit, and continue to voluntarily inject themselves into discourse about the Nevada Lawsuit by publicly posting about the lawsuit online.

Even assuming the well-pled factual allegations in the First Amended Complaint are true, the Buttons are public figures.

**B. The Buttons have not alleged sufficient facts for the Court to infer that Kingsley had any way of knowing whether the Statements he allegedly made were false, or that Kingsley subjectively doubted their truth.**

Because the Buttons are public figures, to prevail on their defamation claims they must prove by clear and convincing evidence that Kingsley acted with actual malice, meaning that Kingsley realized his statements were false or he subjectively entertained serious doubt as to the truth of his statements. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984). In order to prevail on their false light or intentional infliction of emotional distress claims they must also prove that Kingsley acted with actual malice. *Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002) and *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988). However, the Buttons have not included any well-pled allegations in the Complaint from which the Court could reasonably infer that Kingsley made the Statements with actual malice.

The Buttons' claim that Kingsley knew that the Buttons were falsely accused in the Nevada Lawsuit or subjectively entertained serious doubt that they committed the misconduct at issue in that lawsuit is not facially plausible. Based on the Buttons' own allegations, Kingsley had good reason to believe that the allegations against the Buttons in the Nevada Lawsuit were true. When the Nevada Lawsuit was filed in 2021, the allegations made by the plaintiffs against the Buttons were so well known and believed by the public, that the Buttons

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

experienced "reputational destruction." First Amended Complaint, ¶ 17 and 19. Because Kingsley is a "citizen and resident of Arizona" that "participates in online automotive and social media communities, First Amended Complaint, ¶ 13, he did not have any personal knowledge of whether the allegations raised in the Nevada Lawsuit were true when the he allegedly made the Statements, but did know that the Nevada Lawsuit had been filed against the Buttons and that, after four years, the Buttons had still not convinced the District Court of Nevada to dismiss the claims. First Amended Complaint, ¶ 22. The Buttons have not alleged facts from which the Court can reasonably infer that Kingsley actually knew that the Statements were false or that Kinglsey subjectively had serious doubts about the truth of the Statements. Instead, the Buttons have alleged facts which support a reasonable inference that Kingsley genuinely, and reasonably, believed that the Statements were true in light of the ongoing Nevada Lawsuit.

The Buttons have not alleged well-pled facts necessary to state a claim for defamation, false light, or intentional infliction of emotional distress upon which relief may be granted and, thus, the Court should dismiss the Buttons' Complaint.

## III. <u>The Buttons did not include well-pled factual allegations in their Complaint from which the Court could reasonably infer that the Buttons suffered severe emotional distress as a result of Kingsley's purported Statements.</u>

The third prong of a claim for intentional infliction of emotional distress requires that the defendant's conduct actually caused severe emotional distress. *Thorp v. Home Health Agency*, 941 F. Supp. 2d 1138, 1140-1141 (D. Ariz. 2013). Because "severe emotional distress" is not readily capable of precise legal definition, Arizona courts apply a case-by-case

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

analysis with respect to these determinations. *Id*. A line of demarcation should be drawn between conduct likely to cause mere "emotional distress" and causing "severe emotional distress." *Id*. Crying, being stressed and upset, and having headaches is not enough to establish severe harm. *Id*. Shock, stress, moodiness, and estrangement from friends and coworkers is not severe. *Id*. Examples of "severe emotional distress" include experiencing a heart attack and nervous exhaustion, having a miscarriage, and suffering anxiety to the point of requiring hospitalization. *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1108 (D. Ariz. 2022).

In the First Amended Complaint, the Buttons alleged that they suffered the following emotional distress: "acute anxiety", "sleeplessness," "severe humiliation," "anger," "frustration, " impairment of his ability to focus on rebuilding work, "worsening fear," "panic," "acute humiliation," "mental anguish," "renewed fear regarding her personal and professional safety," "anxiety," and "trauma aggravation." First Amended Complaint, ¶ 52-53. The Buttons' alleged emotional distress is similar and, in some respects identical, to the examples of emotional distress that the Arizona District Court did not consider severe in *Wray v. Greenburg*. Consequently, their alleged emotional distress does not qualify as "severe emotional distress" under Arizona law.

Furthermore, it is not facially plausible that a few Statements made in comments on other people's Instagram posts, First Amended Complaint, ¶ 35, caused the Buttons severe emotional distress, when the Buttons have already suffered "reputational destruction" as a result of the wide-spread publicity regarding those same allegations raised in the Nevada Lawsuit, First Amended Complaint, ¶ 17 and 19, and are voluntarily continuing discourse

about the Nevada Lawsuit by publishing filings from the case on social media. First Amended Complaint, ¶ 39.

The Buttons did not state a claim for intentional infliction of emotional distress that may be granted, and their intentional infliction of emotional distress claim should be dismissed.

## IV. <u>The Buttons did not include well-pled factual allegations in their Complaint from which the Court could reasonably infer that Kingsley's purported actions were extreme and outrageous.</u>

A necessary element of the Buttons' intentional infliction of emotional distress claim is that Kingsley's actions were "extreme and outrageous." *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1232 (D. Ariz. 2019). To satisfy the "extreme and outrageous" element, a defendant's conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community. *Id*. at 1232-1233.

In this case, the Buttons have alleged that Kingsley left a few comments on Instagram in which he stated allegations made against the Buttons in the Nevada Lawsuit as if the allegations were true without acknowledging the Buttons' denial of the allegations. First Amended Complaint, ¶ 28-29. The Buttons admitted in the original Complaint that the Nevada Lawsuit was still ongoing after four years. Complaint, ¶ 2 and 5. It is not "extreme" or "outrageous" for someone to conflate their personal belief that allegations made in a lawsuit are true with personal knowledge that the allegations are true. Nor is it "extreme" or "outrageous" for someone to make a few comments online based on that conflation,

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW 1930 N. ARBOLEDA ROAD, SUITE 200 MESA, AZ 85213

especially when there has not been an adjudication on the merits with respect to the allegations. The parties are living in an age of online vigilantism where complete strangers will passionately advocate for alleged victims on social media, using the court of public opinion to hold alleged tortfeasors accountable for their alleged misconduct. It is not "extreme," but rather commonplace for someone to make statements online repeating allegations with the assumption that the allegations are true. It is also not outrageous in an era where a reasonable person knows to practice discernment when reading comments online, for someone to post a comment without a disclaimer that the poster did not personally witness the alleged misconduct.

The Buttons did not state a claim for intentional infliction of emotional distress that may be granted, and their intentional infliction of emotional distress claim should be dismissed.

## V. The Buttons did not include well-pled factual allegations in their Complaint from which the Court could reasonably infer that Statements directly and proximately caused the Buttons in excess of $75,000 in damages per plaintiff each.

In the Complaint, the Buttons alleged that this Court has subject matter jurisdiction over their claims pursuant to 28 U.S.C. § 1332(a)(1), but the Court does not have subject matter jurisdiction unless both Plaintiffs suffered more than $75,000 in damages each. While the Buttons included conclusory statements in their First Amended Complaint that each of their "individual damages are alleged in good faith to exceed $75,000," First Amended Counterclaim, ¶ 16 and 18, their Complaint is still subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(1), because upon the face of the Complaint, it is obvious that the suit cannot

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

involve the necessary amount. *Geographic Expeditions, Inc. v. Estate of Lhotka*, 599 F.3d 1102, 1106 (9th Cir. 2010).

The Buttons clarified in their First Amended Complaint that the reputational harm they suffered as a direct and proximate result of Kingsley's alleged Statements, versus reputational harm that they are suffering as a result of being named as Defendants in the Nevada Lawsuit, is speculative. Even though it has been over a year since the alleged Statements were made, the Buttons cannot identify any specific business relationship or opportunity that the Buttons have lost as a result of the alleged Statements. The Buttons do not know if the Statements actually caused them reputational harm, but instead allege that the Statements "foreseeably" caused them reputational harm. First Amended Complaint, ¶ 27 and 51. The Buttons also admitted that they do not know, but instead allege "on information and belief," that more than one person, other than them, saw the Statements before they were voluntarily deleted by Kingsley. First Amended Complaint, ¶ 44-45.

It is obvious from the face of the First Amended Complaint that the Buttons did not each suffer in excess of $75,000 in damages as a result of a few comments made online that were promptly deleted. The Buttons have not included well-pled allegations in their First Amended Complaint from which the Court could conclude that that the Buttons suffered any harm that was directly and proximately caused by the alleged publication of the Statements. Because the Buttons cannot prove that they each suffered $75,000 in damages, this Court does not have subject matter jurisdiction over this Complaint and should dismiss it.

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

**VI. <u>While not necessary in order to dismiss the Buttons' Complaint, the Court may take judicial notice of statements made by the Buttons in other lawsuits and a finding in the Nevada Lawsuit that further undermine the plausibility of their claims.</u>**

Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018) quoting Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* quoting Fed. R. Evid. 201(b)(1)-(2). Accordingly, a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. *Id*. But a court cannot take judicial notice of disputed facts contained in such public records. *Id.*

In this case, the Court does not need to take judicial notice of any facts in order to have sufficient grounds to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). However, it may be helpful to the Court to take judicial notice of the allegations made by the Buttons in the original Complaint and other litigation throughout the country, litigation that they specifically referenced in their original Complaint. Complaint, ¶ 14 and footnote 1. It may also helpful to the Court to take judicial notice that a finding by the Nevada District Court that is cited in the Buttons' original Complaint has since been reversed. Complaint, ¶ 25.

**A. The Buttons' statements about themselves in other lawsuits further shows that they are public figures.**

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

The Buttons' allegations in the First Amended Complaint show that they are at least limited-purpose public figures. However, the Court may take judicial notice of the fact that Dusty has described herself as: "a world-renowned ballet dancer," someone who has "has positively influenced hundreds of thousands of people nationally and internationally, including by performing and teaching in over 30 countries and across the United States", "someone who has "amassed nearly half of a million followers and subscribers," "arguably the most influential and well-respected name in the dance industry," "Red Bull's first ever (and only to date) ballet athlete, rendering global recognition in media and amassing an enormous following both on social media and worldwide," and someone who "has been published in media publications across the globe." *Button v. McCawley*, 2025 U.S. Dist. LEXIS 3634, *21-23 (S.D. Fla. Jan. 8, 2025)[2]; *Humphries v. Button*, 2025 U.S. Dist. LEXIS 162472, *58-59 (D. Nev. Aug. 20, 2025). *See* Exhibit 1.

The Court may also take judicial notice of the fact that Taylor has described himself as: "one of the world's most influential Ferrari and military vehicle designers and builders," someone who has "positively influenced hundreds of thousands of people nationally and internationally," someone who has "amassed nearly half of a million followers and subscribers" on Instagram, someone "with a large following both on social media and worldwide amassing millions of fans who idolized him and his work," and someone whose "work has been featured in numerous publications." *Button v. McCawley*, 2025 U.S. Dist. LEXIS 3634, *21-23 (S.D. Fla. Jan. 8, 2025); *Humphries v. Button*, 2025 U.S. Dist. LEXIS 162472, *58-59 (D. Nev. Aug. 20, 2025). *See* Exhibits 1 and 2.

---

2 *See* unpublished decision attached as **Exhibit 2** for the Court's convenience.

Finally, the Court can take judicial notice of the fact that the Buttons alleged in the Nevada Lawsuit that, "Together, Defendants were sponsored ambassadors [for] countless well-known companies." *Humphries v. Button*, 2025 U.S. Dist. LEXIS 162472, *59 (D. Nev. Aug. 20, 2025). *Id*.

The Buttons have taken the position in this lawsuit that they are not public figures, but they have consistently alleged facts that suggest otherwise in both this lawsuit and other lawsuits that they have filed. It is not plausible that two individuals that have allegedly influenced hundreds of thousands of people and amassed millions of fans are not public figures.

**B. The Buttons referenced a decision in their Complaint in the Nevada Lawsuit to support their position that they are not public figures, but that decision has since been reversed.**

In the Complaint, the Buttons included a conclusory statement that "The United States District Court for the District of Nevada has previously found that Plaintiffs are not public figures or even limited-purpose public figures…" Complaint, ¶ 25. However, this Court may take judicial notice of the fact that the District Court of Nevada has since reversed that finding, and instead determined that, as a matter of law, the Buttons are public figures. *Humphries v. Button*, 2025 U.S. Dist. LEXIS 162472, *61 (D. Nev. Aug. 20, 2025). *See* Exhibit 1.

**C. The Buttons have already accused other people of causing the Buttons the harm that the Buttons alleged that they suffered as a direct and proximate result of Kingsley's actions.**

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

As acknowledged by the Buttons in their original Complaint, ¶ 14, this lawsuit is one of many filed by the Buttons related to the Nevada Lawsuit. The Buttons filed a lawsuit against Madison Breshears ("Breshears") in May 2024, alleging that the Buttons "lost any and all business immediately and for the foreseeable future" as a result of Breshears' posts calling Dusty a "sexual predator" and accusing her of grooming young girls. *Button v. Breshears*, 2025 U.S. Dist. LEXIS 192039, *11 (S.D.N.Y. Sept. 26, 2025).[3] In July 2024, the Buttons filed a lawsuit against Sigrid McCawley ("McCawley"), alleging that the Buttons were harmed by fourteen defamatory statements made by McCawley to media outlets accusing the Buttons of "criminal behavior," serial abuse, "sex trafficking," and "shameless victim-blaming." *Button v. McCawley*, 2025 U.S. Dist. LEXIS 3634, *2-8 (S.D. Fla. Jan. 8, 2025). *See* Exhibit 2. Also in July 2024, the Buttons filed a lawsuit against the New York Times alleging that the Buttons had not been able to find any work because an article published by the newspaper. *Button v. N.Y. Times Co.*, 2025 U.S. Dist. LEXIS 180601, *15 (S.D.N.Y. Sept. 15, 2025).[4]

Finally, in March 2025, a mere four months before filing this lawsuit, the Buttons filed a lawsuit against Craig Lopresti ("Lopresti") alleging that Lopresti's January 27, 2025, comment caused the Buttons to be, "deprived or work, prospective contracts and repaired business relationships." *Button v. Lopresti*, 2025 U.S. Dist. LEXIS 268481, *6 (S.D. Cal. Dec. 31, 2025)[5], and prevented them from repairing their reputations that were "completely

---

[3] *See* unpublished decision attached as **Exhibit 3** for the Court's convenience.

[4] *See* unpublished decision attached as **Exhibit 4** for the Court's convenience.

[5] *See* unpublished decision attached as **Exhibit 5** for the Court's convenience.

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

destroyed by a false and defamatory global media campaign waged against them in May and June of 2021." *Id*.

It is not possible that the Buttons lost business relationships or opportunities as a result of a few social media comments made around May or June 2025, First Amended Complaint, ¶ 28 and 30, when as of May 2024 they had "lost any and all business immediately and for the foreseeable future," as of July 2024 they had not been able to find any work, and as of March 2025, they had been prevented from repairing their reputations. If the Buttons were already unable to repair their reputations in March 2025 because of Lopreseti's comment, then Kingsley's comments made "on or about January or February 2025," Complaint, ¶ 15, did not directly and proximately prevent the Buttons from repairing their reputations. Likewise, Kingsley's alleged comment in May 2025 could not have harmed the Buttons when their reputations were already in disrepair a mere four months earlier. The Buttons have not provided any explanation in the First Amended Complaint for how Kingsley's specific comments could have directly and proximately harmed them, when their reputations had already been destroyed by the Nevada Lawsuit, Breshears, McCawley, the New York Times, and Lopresti. Certainly, it is implausible that even if the Buttons could show how Kinglsey's comments specifically caused any material harm, how that harm could exceed $75,000 per plaintiff and thereby meet the jurisdictional requirements of this Court.

**D. The Court can take judicial notice that the Buttons deleted, but did not contradict, allegations from their original Complaint which further support this Motion.**

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

The Buttons chose to sign and file their original Complaint. By doing so, they affirmed the truth of the allegations contained in their Complaint. Fed. R. Civ. P. 11(b)(3). After the Buttons had the opportunity to review Kingsley's Motion to Dismiss their original Complaint they chose to delete language in the Complaint that was Kinglsey quoted in support of his Motion to Dismiss. However, the Buttons have not alleged that the deleted language is inaccurate or false. Consequently, the Court may take judicial notice that the Buttons made and affirmed those allegations.

The Buttons alleged in their original Complaint that Dusty was "an internationally recognized professional ballet dancer", Taylor was "widely recognized" "in the automotive industry", and both are defendants in a "widely publicized civil lawsuit." Complaint, ¶ 2, 8-9. The Buttons also acknowledged in their original Complaint that a "widely publicized civil lawsuit" was filed against them in the District Court of Nevada (the "Nevada Lawsuit") with "civil claims for $131,000,000.00" based on the exact same allegations raised by Kingsley in the statements he allegedly made which form the basis of the Buttons' Complaint (the "Statements"). Complaint, ¶ 2, 13, and 20. These allegations further show that the Buttons are public figures and must prove that Kingsley made the Statements with actual malice.

The Buttons' deleted allegations also show that they could not have suffered in excess of $75,000 in harm each as a direct and proximate result of Kingsley's alleged publication of the Statements. According to the Buttons, in or around May or June 2025, they discovered for the first time that Kingsley left a few comments on someone else's Instagram posts in January or February 2025, and in May 2025. Complaint, ¶ 15-16, and 23. The Buttons admitted that they promptly reached out to Kingsley after discovering the comments and he voluntarily

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

deleted the comments. Complaint, ¶ 23. The Buttons also acknowledged in the Complaint that Kingsley made the same allegations in his comments that were raised in the ongoing "widely publicized" Nevada Lawsuit which "completely destroyed" the Buttons' "lives, careers, and reputations" in 2021. Complaint, ¶ 2 and 5.

If their "lives, careers, and reputations" were already destroyed, and the allegations in the Nevada Lawsuit had already been "widely publicized," then the Statements were mere drops in an ocean of bad publicity. The Buttons did not even notice that the Statements had been made until around four months after most of the comments were posted. Complaint, ¶ 23. It is implausible that a few comments online could have caused the Buttons' in excess of $75,000 in reputational harm, especially since the Buttons have not been able to identify any specific relationship or opportunity they lost as a result of the Statements.

## VII. <u>The Court should award Kinglsey his attorney fees pursuant to A.R.S. § 12-349 and his costs pursuant to A.R.S. § 12-341.</u>

A.R.S. § 12-349(A) provides that the trial court "shall assess" reasonable attorney fees and costs against a party if the party "brings or defends a claim without substantial justification." "Without substantial justification" means that the claim or defense is groundless and not made in good faith. A.R.S. § 12-249(F). "Groundless" and "frivolous" are equivalent terms. *Walker v. Lipin*, 252 Ariz. 178, 183-184 (App. 2021). A claim is frivolous if the proponent can present no rational argument based upon the evidence or law in support of that claim. *Id*. A claim is not made in good faith if the party knows or should know that it is groundless, or is indifferent to its groundlessness, but pursues it anyway. *Santa Cruz Cnty. v. Audit USA*, 580 P.3d 537, 542 (App. 2025).

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW 1930 N. Arboleda Road, Suite 200 Mesa, AZ 85213

This lawsuit is based on the Buttons' allegation that Kingsley caused them reputational harm by posting comments in January and May 2025. First Amended Complaint, ¶ 43. But the Buttons knew when they filed their original Complaint that just four months earlier, they filed a lawsuit against Lopresti alleging that a comment made by Lopresti on January 27, 2025, caused the Buttons to be, "deprived or work, prospective contracts and repaired business relationships." *Button v. Lopresti*, 2025 U.S. Dist. LEXIS 268481, *6 (S.D. Cal. Dec. 31, 2025). *See* Exhibit 5. The Buttons also alleged that Lopresti's "power and influence online" intentionally prevented the Buttons from repairing their reputations. *Id*. The Buttons knew when they filed this lawsuit that Kingsley's comments could not have directly and proximately caused them the alleged harm when Lopresti's comment, which was made around the same time as Kingsley's comments, was the direct and proximate cause of their alleged harm.

The Buttons also knew when they filed this lawsuit that they are public figures and cannot prove actual malice by simply stating that Kingsley acted with actual malice or by alleging he knew the Buttons denied the allegations in the Nevada Lawsuit. More than six months before the Buttons filed this lawsuit, the Florida Southern District Court dismissed the Buttons' defamation claim against McCawley because the court held that the Buttons were public figures and that the Buttons did not set forth facts demonstrating that McCawley acted with actual malice in their complaint. *Button v. McCawley*, 2025 U.S. Dist. LEXIS 3634, *26 (S.D. Fla. Jan. 8, 2025). *See* Exhibit 2. Notwithstanding, when the Buttons filed this Complaint, the Buttons included a conclusory statement that Kingsley acted with actual malice, without alleging facts to support the statement. Complaint, ¶ 24. Then, when the

DPD DENTON PETERSON DUNN ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

Buttons amended the Complaint, the Buttons doubled down, alleging that Kingsley either knew that the Statements were false or had "subjective serious doubts about the truth of his accusations," because Kingsley allegedly published the Statements after seeing the Buttons' Instagram story denying the allegations in the Nevada Lawsuit. First Amended Complaint, ¶ 6, 42, and 63. The Buttons knew when they filed the First Amended Complaint, based on their experience in *Button v. McCawley*, that even if Kingsley knew that the Buttons deny the allegations in the Nevada Lawsuit, Kingsley did not know if the Buttons or the plaintiffs in the Nevada Lawsuit are telling the truth. Likewise, Kinglsey could have reasonably assumed that the Buttons were denying the allegations in the Nevada Lawsuit, not because they were false, but because the plaintiffs in the Nevada Lawsuit are seeking $131,000,000.00 in damages, Complaint, ¶ 13, and the Buttons have not alleged any facts which suggest Kingsley believed otherwise.

Finally, the Buttons knew when they filed the First Amended Complaint that their claims were groundless because the Buttons knew that the legal deficiencies identified in Kingsley's Motion to Dismiss the Complaint were not resolved in the First Amended Complaint. Instead of accepting that they could not fix the legal deficiencies in their Complaint and voluntarily dismissing their claims, the Buttons tried to save their lawsuit by deleting language in the Complaint that was quoted in Kingsley's Motion to Dismiss.

Because the Buttons' claims are groundless and they knew they were groundless when they filed their Complaint and First Amended Complaint, the Court should award Kingsley fees under A.R.S. § 12-349(A). The Court should also award Kingsley his costs pursuant to A.R.S. § 12-341 which states that, "the successful party to a civil action shall recover from

his adversary all costs expended or incurred therein unless otherwise provided by law," because Kingsley is the successful party to this civil action if the Court grants this Motion to Dismiss.

## VIII. Conclusion

Kingsley respectfully requests that the Court dismiss the Buttons' First Amended Complaint with prejudice and award him his attorney fees and costs.

RESPECTFULLY SUBMITTED this 23rd day of September, 2026.

**DENTON PETERSON DUNN, PLLC**

/s/ Samuel Dampt
Samuel Dampt
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213
*Attorney for Defendant, Nick Kingsley*

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. Arboleda Road, Suite 200
Mesa, AZ 85213

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of September, 2026, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mitchell Taylor Button and Dusty Button
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
worldofdusty@gmail.com

/s/ Shellie Gibson

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

**CERTIFICATE OF COMPLIANCE WITH LRCiv 12.1(c)**

I hereby certify that on the 13th day of August, 2026, I spoke with the opposing party over the phone to discuss the issues asserted in the motion and the parties were unable to agree that the pleading was curable in any part by a permissible amendment by the pleading party.

/s/ Samuel Dampt

# EXHIBIT 1

# EXHIBIT 1

# Humphries v. Button

United States District Court for the District of Nevada

August 20, 2025, Decided; August 20, 2025, Filed

Case No 2:21-cv-01412-ART-EJY

**Reporter**

2025 U.S. Dist. LEXIS 162472 *; 2025 LX 385313; 2025 WL 2421224

SAGE HUMPHRIES, GINA MENICHINO, ROSEMARIE DeANGELO, DANIELLE GUTIÉRREZ, JANE DOE 1, and JANE DOE 2, Plaintiffs, v. MITCHELL TAYLOR BUTTON and DUSTY BUTTON, Defendants.

**Prior History:** Humphries v. Button, 2022 U.S. Dist. LEXIS 43867, 2022 WL 744483 (Mar. 11, 2022)

**Counsel:** [*1] For Sage Humphries, Gina Menichino, Plaintiffs: Lindsey Ruff, Sabina Mariella, LEAD ATTORNEYS, PRO HAC VICE, Boies Schiller Flexner, New York, NY; Richard J. Pocker, LEAD ATTORNEY, Boies Schiller Flexner LLP, Las Vegas, NV; Sigrid McCawley, LEAD ATTORNEY, Boies Schiller Flexner, Fort Lauderdale, FL.

For RoseMarie DeAngelo, Plaintiff: Lindsey Ruff, Sabina Mariella, LEAD ATTORNEYS, Boies Schiller Flexner, New York, NY; Sigrid McCawley, LEAD ATTORNEY, Boies Schiller Flexner, Fort Lauderdale, FL; Richard J. Pocker, Boies Schiller & Flexner, LLP, Las Vegas, NV.

For Danielle Gutierrez, Jane Doe 1, Plaintiffs: Lindsey Ruff, Sabina Mariella, LEAD ATTORNEYS, Boies Schiller Flexner, New York, NY; Sigrid McCawley, LEAD ATTORNEY, Boies Schiller Flexner, Fort Lauderdale, FL; Richard J. Pocker, Boies Schiller Flexner LLP, Las Vegas, NV.

For Jane Doe 2, Plaintiff: Lindsey Ruff, Sabina Mariella, LEAD ATTORNEYS, PRO HAC VICE, Boies Schiller Flexner, New York, NY; Richard J. Pocker, LEAD ATTORNEY, Boies Schiller Flexner LLP, Las Vegas, NV; Sigrid McCawley, LEAD ATTORNEY, Boies Schiller Flexner, Fort Lauderdale, FL.

Mitchell Taylor Button, Defendant, Pro se, Myrtle Beach, SC.

Dusty Button, Defendant, Pro se, [*2] Myrtle Beach, SC.

Dusty Button, 54 - Counterclaim; 67 Amended Counter Claim, Counter Claimant, Pro se.

Mitchell Taylor Button, 54 - Counterclaim; 67 Amended Counter Claim, Counter Claimant, Pro se, Myrtle Beach, SC.

For Sage Humphries, 54 - Counterclaim; 67 Amended Counter Claim, Counter Defendant: Lindsey Ruff, Sabina Mariella, LEAD ATTORNEYS, Boies Schiller Flexner, New York, NY; Richard J. Pocker, LEAD ATTORNEY, Boies Schiller Flexner LLP, Las Vegas, NV; Sigrid McCawley, LEAD ATTORNEY, Boies Schiller Flexner, Fort Lauderdale, FL.

Dusty Button, 67 - Amended Third Party Complaint, ThirdParty Plaintiff, Pro se.

Mitchell Taylor Button, 67 - Amended Third Party Complaint, ThirdParty Plaintiff, Pro se.

For Michael S. Humphries, 54 - Third Party Complaint; 67 - Amended Third Party Complaint, Micah L. Humphries, 54 - Third Party Complaint; 67 - Amended Third Party Complaint, ThirdParty Defendants: Sigrid McCawley, LEAD ATTORNEY, Boies Schiller Flexner, Fort Lauderdale, FL; Sabina Mariella, PRO HAC VICE, Lindsey Ruff, Boies Schiller Flexner, New York, NY; Richard J. Pocker, Boies Schiller Flexner LLP, Las Vegas, NV.

**Judges:** ANNE R. TRAUM, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ANNE R. TRAUM

## Opinion

ORDER ON MOTIONS FOR SUMMARY [*3] JUDGMENT

(ECF Nos. 437, 452, 457, 474, 461, 514, 516)

Plaintiffs bring claims stemming from alleged sexual abuse by Defendants Mitchell Taylor Button and Dusty Button, who deny any abuse and bring counterclaims alleging defamation. Plaintiffs have brought various state and federal claims against Defendants for sex trafficking, forced labor, involuntary servitude, sexual exploitation of a minor, battery, assault, false imprisonment, intentional infliction of emotional distress, and breach of fiduciary duty. Defendants have brought counterclaims against several Plaintiffs for defamation, related to statements published in media articles.

Before the Court are Plaintiffs' motion for summary judgment on Defendants' defamation counterclaims (ECF No. 437), and Defendants' motion for summary judgment on Plaintiffs' claims (ECF No. 452). Also before the Court are Plaintiffs' motion to supplement their motion for summary judgment (ECF No. 457), and Defendants motion for judicial notice of compliance with court orders (ECF No. 474), motions to supplement their motion for summary judgment (ECF Nos. 461, 514), and motion to strike (ECF No. 515.) For the reasons stated below, the Court grants in part [*4] Plaintiffs' motion for summary judgment and grants Plaintiffs' motion to supplement. The Court denies Defendants' motion for summary judgment, denies as moot Defendants' motion for judicial notice, grants Defendants' first motion to supplement, and denies Defendants' second motion to supplement and motion to strike.

## I. BACKGROUND

The claims in this case primarily arise out of allegations of sexual abuse and assault by six Plaintiffs. Plaintiffs Jane Doe 2, Danielle Gutiérrez, Rosemarie DeAngelo, and Gina Menichino, allege that they were sexually abused between by Mr. Button between 2006 and 2011, when they were minors and he was their dance teacher. Jane Doe 1 alleges that she met Mr. and Ms. Button as a minor while dancing at a company affiliated with the company Ms. Button danced for Boston, and that she was subsequently invited to their apartment and raped by Mr. and Ms. Button in 2014. Sage Humphries alleges that as an adult, she was coerced into a sexual relationship with Mr. and Ms. Button, which included instances of sexual abuse.

### A. Allegations and Evidence of Sexual Abuse

#### 1. Jane Doe 2

Jane Doe 2 alleges that she was sexually assaulted by Mr. Button around 2006, when she was a [*5] minor and he was her dance teacher. Payment records submitted by Defendants indicate that Mr. Button was paid $1,000 in 2006 by Centerstage Dance Academy, for what he alleges was a workshop. (ECF No. 447-5.) The records indicate that in 2007-2009, Mr. Button was paid for teaching much more regularly. (*Id.*)

Jane Doe 2 testified in her deposition that at a sleepover, Mr. Button came inside a bedroom she was in, closed the door, laid down on top of her, and touched her above and below her underwear while putting his tongue in her mouth. (ECF No. 464-30.) Therapy notes from an interview in 2018 state "15 molested by dance teacher," and describes Mr. Button coming into a room Jane Doe 2 was in at a sleepover, getting on top of her, and kissing her. (ECF No. 464-31.) The notes also state that Mr. Button "shunned her over time," "put her in back of dances," and he had "threaten[ed] her with suicide." (*Id.*) Therapy notes from 2021 also state that she was "molested by a dance teacher at 15. Didn't speak about it till age 25." (ECF No. 464-32.) In connection with the investigation Ms. Menichino initiated, Jane Doe 2 provided a statement to police in 2018, which recounts Mr. Button coming into [*6] a bedroom at a sleepover, laying down next to her, kissing her, and touching her vagina. (ECF No. 462-27 at 21.)

Dr. Raghavan's expert report states that Jane Doe 2 was molested around 2006/2007 when she was about 16 or 17. (ECF No. 464-33 at 2.) The report states, "[i]t is thus my professional opinion to a reasonable degree of psychological certainty that the sexual abuse by TB in the context of coercively controlling abuse affected Jane Doe 2's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (*Id.* at 6.) The report also states that she found Jane Doe 2's reported history to be believable based on her interviews, as well as "Jane Doe 2's scores on the SIRS-2 and the TSI-2 both strongly support a narrative that is not malingered." (*Id.* at 8.)

Mr. Button denies all allegations of abuse by Jane Doe 2. His declaration states "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

**2. Danielle Gutiérrez**

Plaintiff Danielle Gutiérrez alleges that she was manipulated into a sexual [*7] relationship with Mr. Button around 2007, when she was 17 and Mr. Button was her dance instructor. She alleges that the relationship involved physical, sexual, and emotional abuse. (ECF No. 221 at 9-12.) Ms. Gutiérrez testified at her deposition to physical abuse such as being pushed, shoved, and slapped; having her hair pulled; receiving a bloody nose and bruised lip. (ECF No. 462-15.) She testified that Mr. Button once pinned her against the wall and held a knife to her throat. (*Id.*) She also testified that Mr. Button forced her to have sex with him, and they began having sex when she was 17. (*Id.*) In communications to third parties in 2010 and 2011, Ms. Gutiérrez described her relationship with Mr. Button as "abusive (physically, mentally, emotionally);" that the abuse "led to bruises nose bleeds and a busted lip"; that he was violent with her; and that he hit her. (ECF Nos. 462-16, 462-17, 462-18). In communications to a third party, she stated, "worst I got from him was that he gave me a bloody lip from elbowing me." (ECF No. 444-6 at 4.)

Therapy notes from 2011 state that Ms. Gutiérrez had been in an abusive relationship with her ex-boyfriend where she felt "controlled and manipulated," [*8] that he was "physical aggressive," and had "received a bruised and bloody nose." (ECF No. 464-12 at 5.) The notes also state that "she felt like he was a "con artist" in the sense that he completely lied about their relationship and cheated on multiple women including herself." (*Id.*) In connection with the investigation Ms. Menichino initiated, Ms. Gutiérrez provided a statement to police in 2018, which described physical abuse occurring "more than 15 times," that she "felt pressured to have sex" with Mr. Buttons, and that they first had sex when she was 17. (ECF No. 462-27 at 20.) The police report and expert report indicate that they broke up in 2010, and that Mr. Button "cut all contact with her" and that Mr. Buttons "blocked her and all the other girls from the studio." (ECF Nos. 464-13 at 2, 21; 462-27.)

Dr. Raghavan's expert report states, "[i]t is my professional opinion to a reasonable degree of psychological certainty that the years of coercively controlling captive abuse by TB lead to severe mental health issues in 2010/2011 and these effects remain in powerful ways." (ECF No. 464-13 at 3, 8.) Dr. Raghavan's report also states that she found Ms. Gutiérrez's history to be believable [*9] based on her interview as well as her scores on the TSI-2, the SIRS-2, and another test, the PAI-2, which "indicated genuine responding." (*Id* at 9-10.) Mr. Button denies all allegations of abuse by Ms. Gutiérrez. His declaration states, "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

**3. Rosemarie DeAngelo**

Ms. DeAngelo alleges that she was sexually assaulted by Mr. Button around 2007, while she was a minor and he was her dance teacher. Ms. DeAngelo testified in her deposition that Mr. Button insisted that they go into a private bedroom, closed the door, kissed her, put his hand under her shirt, touched her through her pants, and put her hand on his penis. (ECF No. 464-34.) Ms. DeAngelo's therapy records from 2017 indicate that at that time, she denied having experienced sexual, physical, or emotional abuse. (ECF No. 444-7.) When asked about this at her deposition, Ms. DeAngelo stated that "I didn't realize that what had happened to me was considered sexual abuse until very recently." (ECF No. 464-32 at 4.)

Dr. Raghavan's expert [*10] report states "[i]t is thus my professional opinion to a reasonable degree of psychological certainty that the sexual abuse and coercive control by TB affected RAD's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (ECF No. 464-35 at 7.) The report also states that Ms. DeAngelo's "scores on the PAI-2, SIRS-2, and TSI-2 all support credible reporting," and that "her emotional and physical responses during the interview were consistent with the experiences she relayed." (*Id.* at 8.)

Mr. Button denies all allegations of abuse by Ms. DeAngelo. His declaration states, "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

**4. Gina Menichino**

Plaintiff Gina Menichino alleges that Taylor Button sexually abused her in 2010, at age 13 when he was her dance teacher. Among her allegations are that Mr. Button digitally penetrated her and solicited child pornography from her. Ms. Menichino testified at her deposition that Mr. Button touched her under blankets, penetrated her with his [*11] finger, and that they exchanged sexual photos and videos. (ECF No. 462-22 at 8.) However, at another time in her deposition Ms. Menichino stated that Mr. Button had not coerced her into sending "naked photos" of herself to him. (ECF No. 444-5 at 5.) Ms. Menichino also denied in her testimony that Mr. Button controlled her social media. (*Id.* at 12.) Emails to a third-party that Ms. Menichino had in 2019 state that "when I was a kid, 13, my dance teacher who was in his late 20's was the first man I ever submitted to." (ECF No. 462-25 at 3.) The emails also state that "I suppose I did have a crush on him at first," "I really fell head over heals [sic] for him," and "I think the BDSM attracts me because ultimately of him. In a way i [sic] think it could fill what me and him never finished." (*Id.* at 2, 3.)

Therapy records from 2017, 2019, 2020, and 2021 discuss "sexual abuse" and "rape" by a dance teacher, reports of being assaulted between 12-14 years old, and other discussions about sexual abuse. (ECF Nos. 464-16, 464-17, 464-18, 464-19, 464-20.) Ms. Menichino made a police report in 2018 which stated that Mitchell Moore (Taylor) touched her vagina on two occasions, made her touch his [*12] penis, would text her sexual things, and that they sent videos of themselves masturbating to one another. (ECF No. 462-27 at 14-15.) The case was "cleared by exception,"

with notes indicating that while there was probable cause to move forward, the state could not meet the high standard of proof to file criminal charges because "v is now 22," "no witnesses, no physical evidence," other "v's not cooperative," and "suspect lawyered up." (*Id.* at 40.)

Plaintiffs submitted an expert report of Dr. Chitra Raghavan, whose report concluded, "It is thus my professional opinion to a reasonable degree of psychological certainty that the sexual abuse by TB in the context of coercively controlling abuse affected GM's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (ECF No. 464-21 at 3, 8.) Dr. Raghavan's report also states that based on her interview, "GM's emotional and physical responses during the interview were consistent with the experiences she relayed," and that the results of two tests she conducted—a test of malingering (the SIRS-2) and a "focused sensitive assessment of trauma" (the TSI-2), Ms. Menichino's scores "both strongly [*13] support a narrative that is not malingered." (*Id.* at 11.)

Mr. Button denies all allegations of abuse by Ms. Menichino. His declaration states "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

**5. Jane Doe 1**

Jane Doe 1 alleges that she was raped by Mr. and Ms. Button in 2014, when she was a minor. Therapy records and interrogatory responses indicate that Jane Doe 1 would have been 16 or 17 in 2014. (ECF No. 444-9 at 48, 70). Jane Doe 1 alleges that she met Ms. Button while dancing for Urbanity Dance, a company that rented space from Boston Ballet, where Ms. Button worked; Jane Doe 1 was accepted into the Urbanity Dance Summer Institute in 2014. (ECF Nos. 221 at 16; 462-41.) Ms. Button's declaration states that she joined the Boston Ballet in 2012, where she was promoted to principal in 2014. (ECF No. 462-6.) Ms. Button was terminated from Boston Ballet in 2017. (ECF No. 462-7.) Email correspondence indicates that Urbanity Dance used space for classes at Boston Ballet during 2014. (ECF No. 462-43.) Urbanity Dance social media posts [*14] and email correspondence indicate that Dusty Button taught classes for Urbanity in 2013, 2015, and 2016 (ECF Nos. 462-44, 462-45, 462-46.)

Jane Doe 1 alleges that she was raped in Mr. and Ms. Buttons' apartment, in a room with a mattress on the floor and what appeared to be guns hanging on the wall. (ECF No. 221 at 17.) She testified at her deposition of the assault, saying that that "she pinned me down when you penetrated me," (referring to Mr. and Ms. Buttons), and that she said stop "multiple times." (ECF No. 464-22 at 9, 10.) she also stated, that "I believe I was drugged and I was not in my body. And that there was a gun held to my head and that I was raped." (ECF No. 464-23 at 4.) In therapy records from 2013 and 2017, Jane Doe 1 denied having experienced sexual assault or abuse. (ECF No. 444-9 at 35, 44.) However, 2021 therapy records indicate that Jane Doe 1 had a history of emotional and sexual abuse, with a note stating "rape @ 15 years old" and "wife assisted." (ECF No. 464-24 at 36.) Dr. Raghavan's expert report states "[i]t is my professional opinion to a reasonable degree of psychological certainty that a sexual assault occurring sometime in

2014/2015 affected Jane Doe [*15] 1's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (ECF No. 464-29 at 3.) The report also states that "Jane Doe 1's scores on the SIRS-2 and the TSI-2 both strongly support a narrative that is not malingered." (*Id.* at 8.)

Defendants submitted evidence that the apartment they owned which contained the "gun room" (a room full of airsoft guns) was constructed in 2015, and they entered into a lease agreement in January of 2015. (ECF No. 444-9 at 59-68.) Mr. and Ms. Button denies all allegations of this sexual assault against Jane Doe 1. Mr. and Ms. Buttons' declarations state that neither of them "have ever met Jane Doe 1 nor have we ever been inside of the same building as her... she has never been in our home," and that they have never "touched her much less sexually assaulted her." (ECF No. 471-14 at 4, 8.)

**6. Sage Humphries**

Plaintiff Sage Humphries alleges that in 2017, she was coerced, as an adult, into a sexual relationship with Mr. and Ms. Buttons, which included instances of sexual abuse. Neither party disputes that the three of them were in a sexual relationship. Text messages between the three of them during this [*16] period indicate a romantic relationship; for example, texts from Ms. Humphries to Mr. Button read, "I am so in love with you Taylor," and he responds, "You have all of me still I promise." (ECF No. 444-4 at 5.) Text messages between all three of them include phrases like "I am completely falling in love with both of you" and "we love you, and you have 100% of us." (*Id.* at 11.) According to Ms. Humphries' affidavit in August of 2017, at the end of April 2017, the couple "said I was their 'girlfriend' and started to push sexual acts on me." (ECF No. 444-4 at 15.) Text messages from Ms. Humphries' mother to her on May 17, 2017, indicated that she was concerned about the relationship, stating "they are not your masters" and "I love you sage but this situation is destructive to you...[a]nd not healthy." (*Id.* at 25; *see also* ECF No. 466-2 text messages between Ms. Humphries and her mother.) Ms. Humphries responded that "this is my choice" and "[n]obody is controlling my life." (*Id.* at 26.) According to the same affidavit, on May 25, 2017, Ms. Humphries' parents showed up at the ballet in Boston and took her home to Southern California. (*Id.* at 16.) Ms. Humphries and the Buttons' continued [*17] to communicate throughout June and July (*Id.* at 28-60.) On July 8, 2017, Ms. Humphries sent a Snapchat message to one of the Buttons' saying that "My parents wanted me to call you today and end our relationship," with both of them because "they want me out of the threesome" and that she "may have to take a voicemail on your phone," because she "just need to make them think I'm ending it," but "[d]on't believe a word I say." (ECF No. 466-4 at 22-34.) The Buttons and Ms. Humphries continued to communicate romantic messages after this point. *See e.g.* ECF No. 466-6 at 10, ECF No. 444-4 at 28.)

On August 1, 2017, Ms. Humphries filed a complaint for protection from abuse in Massachusetts, indicating she had suffered abuse by Mr. Buttons. (*Id.* at 62.) On the complaint form, the boxes for "attempted to cause me physical harm," "caused me physical harm," and "placed me in fear of

imminent serious physical harm" are checked, but it appears that the box for "caused me to engage in sexual relations by force, threat, or duress" was not checked. (*Id.* at 62.) Ms. Humphries testified that the handwriting on the form is not hers, other than the signature. (*Id.* at 64.) Ms. Humphries testified in her [*18] deposition that Mr. Button "slammed me to the bed and violently penetrated me." (ECF No. 462-57 at 3.) Ms. Humphries discussed another occasion where Mr. and Ms. Button tied her up and assaulted her by touching her vagina, had sex next to her, and that she was "begging to be untied and crying." (*Id.* at 6.) In a 2017 affidavit, Ms. Humphries described the same incident. (ECF No. 462-58 at 3.) She also described an instance in which "Taylor came into the shower, bent me over and forced himself on me. I went limp, started crying and felt used and abused in that moment." (*Id.*) Ms. Humphries also stated that Mr. Button took over her Instagram and discouraged her from having relationships with friends, family members, and colleagues. (*Id.* at 2.) She also stated that in July 2017, Mr. Button "has threatened to kidnap me, throw me in the back of his car, take me to a rented warehouse that he got in advance, suspend me from the ceiling, fuck me until I was uncomfortable, and put a cloth over my mouth to make me pass out." (*Id.* at 4.) According to a 2018 police report, Ms. Humphries told police that Mr. Button first sexually assaulted her by penetrating her with his finger, after she had tried [*19] to push his hand away, in the living room after Ms. Button had fallen asleep. (ECF No. 462 at 7.) Her report recounted several other instances of sexual assault. (*Id.*) It also states that Mr. Button took over her social media accounts. (*Id.* at 12.)

Dr. Raghavan's expert report states "SH's experience of abuse with the Buttons and her subsequent painful recovery is most accurately viewed through a captive abuse trauma lens rather than as a series of individually abusive acts that she endured" and describes different "stages" of the Buttons' "coercive control" over Ms. Humphries. (*Id.* at 3, 17-26.) The report states "[i]t is my professional opinion to a reasonable degree of psychological certainty that the predatory entrapment followed by coercively controlling abuse and violent sexual assaults by the Buttons affected SH's mental health and quality of life at the time in severe and clinically significant ways," and that she believes Ms. Humphries' reported history to be believable based on her interview and "[h]er scores on the PAI-2, SIRS-2, and TSI-2 all support credible reporting of mental health symptoms and ways of relating." (*Id.* at 3, 9.)

Mr. and Ms. Button do not deny that they [*20] were in a relationship but deny allegations of sexual abuse towards Ms. Humphries. Mr. and Ms. Buttons' respective declarations state, "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4, 8.)

## II. Motions for Judicial Notice, to Supplement, and to Strike

### A. Motion for Judicial Notice of Compliance

Defendants filed a motion for judicial notice of compliance with court orders, notifying the Court of difficulties uploading exhibits to their January 6, 2025 filing, and regarding confusion about the date their opposition to Plaintiffs' motion for summary judgment was due. (ECF No. 474.) Plaintiffs responded, arguing that they do not dispute the timeliness of either submission. The Court finds that both submissions were timely and denies this motion as moot. (ECF No. 478.)

**B. Motions to Supplement**

Under Local Rule 7-2, "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause."

Defendants filed two motions to supplement their motion for summary judgment. (ECF Nos. 461, 514.) In the first [*21] motion, Defendants request to supplement the record with the second deposition transcript of Jane Doe 1. Defendants submitted correspondence indicating that they did not receive the transcript until January 10, 2025, after their motion for summary judgment was filed. (ECF No. 461-3.) The Court finds good cause to permit this supplementation and will grant the motion.

In the second motion, Defendants request to supplement the record with an order in *Button v. Lopresti*, Case No. 3:25-cv-00867-DMS-DDL, in the Southern District of California, as well as allegations of "procedural misconduct," "misuse of the judicial system," and "ethical breach(es)." (ECF No. 514.) The order in *Button v. Lopresti* is a screening order, granting the Buttons' IFP status and permitting them to proceed with defamation and other claims against the defendant. That order is unrelated to this motion, as are Plaintiffs' other allegations contained in the motion. The court therefore denies this motion to supplement.

Plaintiffs filed a motion for leave to submit supplemental authority in support of their motion for summary judgment. Courts "may grant leave to file supplemental authority 'for good cause.'" *Stallone v. Farmers Grp.*, Inc., No. 2:21-CV-01659-GMN-VCF, 2022 U.S. Dist. LEXIS 188945, 2022 WL 10091489, at *1 n.1 (D. Nev. Oct. 15, 2022) (quoting [*22] LR 7-2(g)). Plaintiffs' motion requests leave to submit a decision in *Button v. McCawley*, Case No. 0:24-cv-60911, in the Southern District of Florida. This order considered Defendant McCawley's motion to dismiss Plaintiffs' defamation claims, and in doing so, found that the Buttons were public figures. *Button v. McCawley*, No. 0:24-CV-60911, 2025 U.S. Dist. LEXIS 3634, 2025 WL 50431 (S.D. Fla. Jan. 8, 2025). While not precedential, this authority provides helpful guidance regarding the instant motion. "Good cause may exist when the proffered supplemental authority controls the outcome of the litigation, or when the proffered supplemental authority is precedential, or particularly persuasive or helpful." *Alps Prop. & Cas. Ins. Co. v. Kalicki Collier, LLP*, 526 F. Supp. 3d 805, 812 (D. Nev. 2021). The Court therefore grants Plaintiffs' motion.

**C. Motion to Strike**

Defendants filed a motion to strike a variety of evidence submitted by Plaintiffs in support of their summary judgment briefing, arguing that it is inadmissible. (ECF No. 516.) This motion was filed on July 29, 2025, just two days before oral argument was scheduled. Briefing on these motions was completed in February. Defendants have not shown good cause for why such a late filing, which adds new arguments, should be accepted. To the extent that Defendants seek to argue that specific evidence proffered by Plaintiffs is inadmissible, [*23] they may do so in a motion in limine prior to trial.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Importantly, "the court does not make credibility determinations or weigh conflicting evidence" at the summary judgment stage. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material [*24] fact. *Celotex*, 477 U.S. at 323. Once the moving party satisfies this burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists[.]" *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). For cross-motions for summary judgment, the Court considers each party's evidence without considering which motion provided the evidence. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### D. Statute of Limitations and Equitable Estoppel/Tolling

Defendants argue that the federal claims brought by Ms. Gutiérrez, Ms. DeAngelo, and Jane Doe 2 are barred because they were brought outside of the statute of limitations. Claims for sex trafficking (18 U.S.C. § 1591), forced labor (18 U.S.C. § 1589), and involuntary servitude (18 U.S.C. § 1591) have a ten-year statute of limitations for a civil remedy. 18 U.S.C. § 1595(c). If a victim was a minor, the statute of limitations begins to run when the minor turns 18. *Id.* It is undisputed that these three Plaintiffs brought their claims outside of the applicable statute of limitations. Plaintiffs argue that these claims should be subject to equitable estoppel and/or [*25] equitable tolling. Because these claims arise under federal law, federal common law governs the availability of an equitable estoppel or tolling defense. *See Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008); *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002); *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255, 136 S. Ct. 750, 193 L. Ed. 2d 652 (2016).

A court may equitably toll the statute of limitations for a claim when a plaintiff can demonstrate "(1) that they have been pursuing their rights diligently, and (2) that some extraordinary circumstance stood in their way and prevented timely filing." *Millia Promotional Servs. v. Arizona Dep't of Econ. Sec.*, 650 F. Supp. 3d 814, 825 (D. Ariz. 2023) (citing *Smith v. Davis*, 953 F.3d 582, 597-98 (9th Cir. 2020)). To show diligence, a plaintiff must show that they have "been reasonably diligent in pursuing [their] rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing [their] claim in federal court." *Smith*, 953 F.3d at 598-600. To show an extraordinary circumstance "courts are not bound by mechanical rules and should make a determination based on all of the facts of the case." *Millia Promotional Servs.*, 650 F. Supp. 3d at 825 (quoting *Smith*, 953 F.3d at 600) (internal quotation marks omitted). Summary judgment is improper if tolling of the statute of limitations requires the resolution of disputed factual issues. *Retail Clerks Union Loc. 648, AFL-CIO v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir. 1983).

Equitable estoppel "focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit." *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002). The Ninth Circuit considers several factors [*26] in assessing equitable estoppel: "(1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct, and (3) the extent to which the purposes of the limitations period have been satisfied." *Id.*; *Millia Promotional Servs. v. Arizona Dep't of Econ. Sec.*, 650 F. Supp. 3d 814 (D. Ariz. 2023). Equitable estoppel "may come into play 'if the defendant takes active steps to prevent the plaintiff from suing in time.'" *Johnson*, 314 F.3d at 414. Unless no facts are in dispute, the "question of estoppel is one of fact, thereby being inappropriate for the purposes of summary judgment." *Kendall v. Am. Hawaii Cruises*, 704 F. Supp. 1010, 1017-18 (D. Haw. 1989) (citing *Golden v. Faust*, 766 F.2d 1339, 1341 (9th Cir. 1985)).

Here, Plaintiffs argue that both equitable estoppel and equitable tolling apply. Specifically, they argue that the coercive effects of Mr. Button's alleged abuse, alleged threats made towards Plaintiffs, and misleading statements about the illegality of his alleged conduct warrant

tolling/and or estoppel. Courts have applied equitable estoppel or equitable tolling based on a range of this type of factual circumstance, such as misleading plaintiffs about claims, abuse that left the plaintiff incapacitated, or threats by a defendant [*27] towards a plaintiff.

For example, various courts have found that statute of limitations defenses may be subject to equitable tolling or estoppel where a defendant's actions mislead a plaintiff about their claims. *See Mueller v. Dep't of Pub. Safety*, No. CV 17-00571 HG-WRP, 2021 U.S. Dist. LEXIS 135166, 2021 WL 3056073, at *8 (D. Haw. July 20, 2021) (bench trial finding that under Hawaii law, which mirrors federal test, equitable tolling applied to plaintiff's claims related to sexual assault because the government's "lulling" of the plaintiff into inaction by providing incorrect information constituted extraordinary circumstances); *Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp. 3d 779, 799-800 (N.D. Cal. 2020) (equitable tolling applied under California law where an investigation into sexual misconduct made plaintiffs believe that the defendant did nothing wrong, created "self-doubt, blame, minimization, and uncertainty" and led them to believe they did not have a claim). The Ninth Circuit has also found that tolling was warranted in circumstances where abuse had extreme psychological effects on a plaintiff which prevented her from asserting her rights. *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999), *as amended* (Mar. 22, 1999) (sex discrimination claims were tolled as a matter of law where "repeated sexual abuse, rape, and assault she experienced left her severely impaired and unable to function in many respects," preventing her from asserting [*28] her rights.)

Finally, several courts have also found that threats and intimidation by a defendant can be sufficient to claim equitable estoppel under state laws. *See Meza-Perez v. Sbarro LLC*, No. 2:19-CV-00373-APG-NJK, 2020 U.S. Dist. LEXIS 260818, 2020 WL 12752817, at *2-3 (D. Nev. Dec. 16, 2020) (under Nevada law, threats and intimidation of Plaintiff created factual issue of whether defendants should be equitably estopped from bringing a statute of limitations defense); *Ateeq v. Najor*, 15 Cal. App. 4th 1351, 19 Cal. Rptr. 2d 320, 323-24 (Cal Ct. App. 1993), *as modified* (May 18, 1993) (threats of deportation by defendant sufficient for equitable estoppel under California law); *M.N.O. v. Magana*, No. CIV. 03-6393-TC, 2006 U.S. Dist. LEXIS 13042, 2006 WL 559214 (D. Or. Mar. 6, 2006) (threats of physical harm created jury issue regarding equitable estoppel under Oregon law).

This case law indicates that Plaintiffs' theories for equitable estoppel and/or tolling are legally viable; however, factual issues remain. As discussed below, the Court finds that Plaintiffs have raised genuine issues of material fact as to whether these three Plaintiffs' federal claims should be estopped and/or tolled.

**1. Jane Doe 2**

Jane Doe 2 alleges abuse as a minor. Jane Doe 2 turned 18 in 2008. (ECF No. 464-33.) She was thus required under 18 U.S.C. § 1595(c) to bring her claims by 2018. Jane Doe 2 brought her claims in December of 2021. (ECF No. 25.) Plaintiffs argue that Jane Doe 2's statute of limitations should be tolled and/or estopped because [*29] Mr. Button's abuse meant that she was

"psychologically not ready" to file her claims earlier, and that Mr. Button told her, as a minor, "it didn't matter because of the difference in our age." (ECF No. 464-30 at 3, 6-7.) Defendants argue that Mr. Button could not have prevented her from filing a lawsuit because they have not had contact since 2010 or 2011, when Mr. Button, according to Jane Doe 2's police report, "left the country and blocked everyone." (ECF No. 462-27 at 22.) They also argue that Jane Doe 2's 2018 police report undercuts her argument that she was too afraid to come forward. (*Id.*) In response, Plaintiffs point to Jane Doe 2's testimony that she was "afraid" to file a police report in 2018 but was able to do so because she "had the help of an organization that walked me through the process," and argue that civil lawsuits offer less protections than the criminal justice system. (ECF No. 464-30 at 6-7.) At oral argument, Plaintiffs also proffered that evidence of psychological consequences of abuse would support their tolling argument. Dr. Raghavan's expert report in this case details the psychological consequences of the alleged abuse on Jane Doe 2. (ECF No. 464-33.) [*30]

The Court finds that factual issues preclude summary judgment for Defendants based on the statute of limitations for Jane Doe 2's federal claims. Plaintiffs have brought forth evidence from which a reasonable trier of fact could find that Jane Doe 2's statute of limitations should be tolled due to the extraordinary circumstances of the psychological consequences of the alleged abuse and should be equitably estopped due to Mr. Buttons' alleged statements which mislead her as to the legality of his conduct. These factual issues include whether Jane Doe 2's testimony is credible, whether Mr. Button mislead Jane Doe as to the illegality of his conduct, and whether she was psychologically unable to bring a civil claim at an earlier time.

**2. Danielle Gutiérrez**

Ms. Gutiérrez alleges abuse as a minor. She turned 18 in 2008. (ECF No. 464-13.) She was thus required under 18 U.S.C. § 1595(c) to bring her claims by 2018. Ms. Gutiérrez brought her claims in September of 2021. (ECF No. 18.) Plaintiffs argue that Ms. Gutiérrez's claims should be tolled and/or estopped because of the effects of Mr. Buttons' alleged threats and intimidation towards her. Ms. Gutiérrez testified that "[t]here is a lot of fear around you, [*31] you know, after being mentally, physically, emotionally abused by you for so long with the combination of all the threats you made on my life, my family's life" and that he threatened to kill her and her family if she told anyone about the abuse. (ECF No. 462-15 at 20, 28.) Defendants argue that he could not have prevented her from coming forward because the expert report and police report state that in 2010, he "cut all contact with her" and "blocked her and all the other girls from the studio." (ECF Nos. 464-13 at 2, 21; 462-27.) Like Jane Doe 2, they also argue that her 2018 police report undercuts her argument that she was afraid to come forward. To this, Ms. Gutiérrez testified that she was at the time focused on criminal charges and "wasn't going to pursue damages on my own" until she saw that "there was something already in the works." At oral argument, Plaintiffs also proffered that evidence of psychological consequences of abuse would support their tolling argument. Dr. Raghavan's expert report details the psychological consequences of the alleged abuse on Ms. Gutiérrez. (ECF No. 464-13.)

The Court finds that factual issues preclude summary judgment for Defendants based on [*32] the statute of limitations for Ms. Gutiérrez's federal claims. Plaintiffs have brought forth evidence from which a reasonable trier of fact could find that her statute of limitations should be tolled due to the extraordinary circumstances of the psychological consequences of the alleged abuse and should be equitably estopped due to Mr. Buttons' alleged threats towards Ms. Gutiérrez and her family. The factual issues include whether Jane Doe 2's testimony is credible, and whether the psychological effects of the alleged abuse and/or threats prevented Ms. Gutiérrez from coming forward earlier.

**3. Rosemarie DeAngelo**

Ms. DeAngelo alleges abuse as a minor. She turned 18 in 2009. (ECF No. 464-35.) She was thus required under 18 U.S.C. § 1595(c) to bring her claims by 2019. Ms. DeAngelo brought her claims in September of 2021. (ECF No. 18.) Plaintiffs argue that her statute of limitations should be tolled and/or estopped because Mr. Button told her that his sexual conduct with her was not illegal because of the size of their age difference. At her deposition, Ms. DeAngelo testified, "I had trusted you and what you had told me that because of our age difference and there wasn't a large enough difference . . . [*33] I had understood it based on what you told me as this wasn't sexual abuse," and that "I was pressured, again, by a person in a position of power that I trusted to not say anything; that there was nothing to say, that there was nothing to report." (ECF No. 462-54 at 9.) Ms. DeAngelo also testified that she didn't realize that what had happened to her was sexual abuse until recently. (ECF No. 464-32 at 4.) Defendants argue that Mr. Button could not have prevented Ms. DeAngelo from coming forward because the last alleged coercive statement was in 2007/2008, and they have had no contact because the expert report states that sometime after 2008, Mr. Button blocked her from his phone. (ECF Nos. 462-54 at 9; 464-35 at 2, 12.) At oral argument, Plaintiffs also proffered that evidence of psychological consequences of abuse would support their tolling argument. Dr. Raghavan's expert report details the psychological consequences of the alleged abuse on Ms. DeAngelo. (ECF No. 464-35.)

Like the other two Plaintiffs, the Court finds that factual issues preclude summary judgment for Defendants based on the statute of limitations for Ms. DeAngelo's federal claims. Plaintiffs have brought forth evidence [*34] from which a reasonable trier of fact could find that her statute of limitations should be tolled due to the extraordinary circumstances of the psychological consequences of the alleged abuse and should be equitably estopped due to Mr. Buttons' alleged statements which mislead her as to the legality of his conduct. These factual issues include whether Ms. DeAngelo's testimony is credible, whether Mr. Button mislead her as to the illegality of his conduct, and whether the psychological effects of the alleged abuse prevented her from coming forward earlier.

For these reasons, the court denies Defendants' motion for summary judgment as to the statute of limitations for Jane Doe 2, Ms. Gutiérrez, and Ms. DeAngelo's federal claims.

### E. Inconsistent Statements and Contradictory Evidence

Defendants' primary argument is not that Plaintiffs have not brought forth evidence in support of certain elements of their claims, but rather, that Plaintiffs' statements are false or contradicted by other evidence in the record. As detailed above, each Plaintiff provided testimony regarding their alleged assaults, as well as therapy records, expert reports, and in some cases third-party communications which [*35] support their allegations. Defendants have brought forth evidence of contradictory statements in the record. Because the Court does not make credibility determinations nor weigh conflicting evidence, the Court finds that summary judgment is inappropriate on Plaintiffs' claims. The Court will briefly address Defendants' arguments with respect to each Plaintiffs' claims and why summary judgment is inappropriate.

#### 1. Jane Doe 2

The Defendants argue that the evidence in support of Jane Doe 2's allegations is contradictory because different evidence states that Jane Doe 2 was abused at different ages and/or years. For example, therapy notes from 2018 state that she was molested at 15 by a dance teacher, but Dr. Raghavan's expert report states that she was molested at 16 or 17 around 2006/2007. (ECF Nos. 464-31, 464-33 at 2.) Whether this renders Jane Doe 2's testimony as to her alleged assault not credible is a determination left to the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Defendants also argue that Mr. Button did not become a regular teacher at Centerstage Dance Academy until 2007, as evidenced by the fact that he only made $1000 for one workshop at Centerstage in 2006. (ECF No. 447-5.) The Court finds that this is again [*36] an issue of credibility or conflicting evidence, and that a rational juror could conclude that Mr. Button was teaching at Centerstage when Jane Doe 1 alleges she was assaulted.

#### 2. Danielle Gutiérrez

Defendants argue that Ms. Gutiérrez's therapy records and statements to third parties indicate that she is lying. First, they argue that her narrative is false because her therapy records indicate that she was not abused, but rather that she was angry about the breakup and Mr. Button cheating on her, pointing to therapy notes in which Ms. Gutiérrez expresses anger about the breakup and says that Mr. Button cheated on her. That Ms. Gutiérrez was upset about the breakup and/or cheating in her relationship, however, does not negate her testimony that she was abused. Second, Defendants argue that Ms. Gutiérrez is lying about the physical abuse she alleges because she made a statement to a third party stating, "worst I got from him was that he gave me a bloody lip from elbowing me." (ECF No. 444-6 at 4.) Even if this statement is somewhat contradictory to Ms. Gutiérrez's other statements about physical abuse, this is still a credibility determination to be made by the jury.

**3. Rosemarie DeAngelo** [*37]

Defendants argue that Ms. DeAngelo's therapy records are contradictory, pointing to Ms. DeAngelo's therapy records from 2017 in which she denied experiencing any sexual, physical, or emotional abuse. (ECF No. 444-7.) Ms. DeAngelo's testimony regarding this is that "I didn't realize that what had happened to me was considered sexual abuse until very recently." (ECF No. 464-32 at 4.) Again, Ms. DeAngelo's credibility in light of this contradictory evidence is a determination to be made by the jury.

**4. Gina Menichino**

Defendants first argue that Ms. Menichino should not be believed because she made a false police report in 2018, pointing to the fact that the case was "cleared by exception." (ECF No. 462-27.) However, this does not mean that the police found Ms. Menichino's testimony to be false. Rather, the report indicates it was cleared because while there *was* probable cause to move forward, the state could not meet the high standard of proof to file criminal charges because "v is now 22," "no witnesses, no physical evidence," other "v's not cooperative," and "suspect lawyered up." (*Id.* at 40.)

Defendants also argue that evidence shows that Ms. Menichino had a "delusional obsession" with [*38] Mr. Button, based on some of her statements to a third party in emails where she stated that she had a crush on him and that she "thinks the BDSM attracts me because ultimately of him." These statements do not disprove Ms. Menichino's claims, and once again raise if anything only an issue of credibility for the jury. Defendants further argue that Ms. Menichino's testimony contradicts itself and pointing to her denial that Mr. Button coerced her into sending "naked photos" of herself to him (ECF No. 444-5 at 5.) Other evidence suggests that there were sexual photos and videos exchanged. (See ECF Nos. 462-22; 462-27 at 14-15.) This is again an issue of credibility.

Finally, Defendants argue that Ms. Menichino directly contradicted her complaint when she denied that Mr. Button controlled her social media. (*Compare* ECF No. 444-5 at 12 with ECF No. 221 at 6.) While this statement does contradict the factual allegations in the complaint, whether Mr. Button controlled Ms. Menichino's social media is not essential to her claims, and in any event comes down to another issue of credibility.

**5. Jane Doe 1**

Defendants argue that evidence contradicts Jane Doe 1's version of events; namely, their statements [*39] that they have never met Jane Doe, as well as records indicating that the apartment in which they had the "gun room" did not exist until 2015, after at the time of the alleged rape in 2014. (ECF No. 444-9 at 59-68.) They also argue that Jane Doe 1's allegations are

contradicted because different evidence states that Jane Doe 2 was raped at different ages and/or years. For example, the complaint alleges that she was raped by the Buttons in 2014, as a minor; Ms. Raghavan's expert report states that Jane Doe 1 was raped in 2014/2015 (ECF No. 464-29 at 3); and therapy records state that she was raped at 15 years old (ECF No. 464-24 at 36). Based on therapy records and interrogatory responses, Jane Doe 1 would have been 16 or 17 in 2014. (ECF No. 444-9 at 48, 70.) Finally, Defendants argue that Jane Doe 1's therapy records from 2013 and 2017, where she denied having experienced sexual assault or abuse, show that her testimony regarding the alleged rape is false. (ECF No. 444-9 at 35, 44.)

The Court finds that there is a factual issue as to, if Jane Doe was assaulted by Defendants, when that alleged assault occurred and whether she was a minor. As to the argument that they have never met [*40] Jane Doe, a rational juror could find based on Jane Doe 1's testimony as well as records indicating that Jane Doe 1 and Ms. Button may have danced in the same building in Boston during the period when the alleged rape occurred. (*See* ECF Nos. 462-43, 462-44, 462-45, 462-46.) Defendants' other arguments about contradictory evidence and testimony raise credibility issues not appropriate for summary judgment.

### 6. Sage Humphries

Defendants argue that Ms. Humphries allegations of abuse are false, pointing to evidence supporting a narrative that the three of them were in a consensual romantic relationship; that Ms. Humphries' family "kidnap[ped]" her by taking her to California against her will, and that Ms. Humphries afterwards continued to pursue Defendants via phone messages, even after staging a "fake break up" to appease her parents. (See ECF No. 443 at 24-25.) While a reasonable juror could conclude from the record that Ms. Humphries was in a romantic relationship with the Buttons based on text messages and her own testimony, whether this relationship was consensual or included instances of physical and emotional abuse is an issue of fact for the jury.

Defendants also argue that Ms. Humphries [*41] allegations are false because she has filed false police reports and lied to police on several occasions, as well as that she has ulterior motives for filing this lawsuit. They also point to Ms. Humphries' abuse prevention form from 2017, where the box for "caused me to engage in sexual relations by force, threat, or duress" was not checked, which they say contradicts her allegations. (ECF No. 444-4 at 62.) As discussed above, issues of contradictory statements and alleged "lies" are credibility determinations for a jury to decide. The same is true for Defendants ulterior motives theory.

## F. Expert Report

Defendants argue that Dr. Raghavan's expert report should be stricken because she was not provided with the entire record, only some evidence, which makes her assessment biased (such as evidence where Plaintiffs contradicted their claims). However, as Plaintiffs point out, this argument goes to weight and credibility, not admissibility. "[A]n argument that an expert should

have addressed different evidence 'at best, goes to the weight or credibility of [the expert's] analysis, not its admissibility.'" *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1033 (S.D. Cal. 2023) (quoting *Vaporstream, Inc. v. Snap Inc.*, No. 2:17-cv-220, 2020 U.S. Dist. LEXIS 4524, 2020 WL 2543814, at *7 (C.D. Cal. Jan. 10, 2020), and collecting cases). As discussed above, weight and credibility are issues [*42] for the jury, and not for the Court. *Soremekun*, 509 F.3d at 984. The Court therefore finds no reason to strike Dr. Raghavan's expert report as inadmissible.

**G. Damages**

Defendants argue that Plaintiffs never produced any proof of emotional distress or economic loss to support a claim of damages. However, as Plaintiffs point out, each Plaintiffs' testimony supports their claims of emotional distress, and they have submitted expert psychology and forensic accounting reports which detail each Plaintiff's emotional distress and economic damages. (ECF Nos. 464-2, 464-21, 464-13, 464-29, 464-33, 464-35, 464-36.) The Court finds these sufficient to create a genuine dispute of material fact as to damages.

**V. CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DEFAMATION**

Plaintiffs' motion for summary judgment on Defendants' defamation claims argues that the claims are barred as waived compulsory counterclaims and because Defendants failed to seek leave of court to file their amended counterclaims; the statements underlying the claims are protected by fair reporting privilege; Defendants are limited or general purpose public figures, and Defendants have presented no evidence of actual malice. Defendants' motion argues that summary judgment [*43] should be granted on their defamation claims because they are not public figures; the statements are not protected by fair reporting privilege; and the statements are false. For the reasons discussed below, the Court grants in part and denies in part Plaintiffs' motion for summary judgment and denies Defendants' motion for summary judgment.

**A. Nevada Law Applies to Defendants Defamation Counterclaims**

As a preliminary matter, Nevada law applies to Defendants' defamation claims. "A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Lazar v. Kroncke*, 862 F.3d 1186, 1194 (9th Cir. 2017) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001)). Nevada's choice-of-law principals are governed by Section 145 of the Restatement (Second) of Conflict of Laws in tort actions "unless another, more specific section of the Second Restatement applies to the particular tort." *General Motors Corp. v. Eighth Judicial Dist. Court of State of Nev.*, 122 Nev. 466, 134 P.3d 111, 116 (Nev. 2006). The Second Restatement uses a "most significant relationship" test to determine which state's law applies. In *Cornett v. Gawker Media, LLC*, a court in this district determined "Section 150 of the Second Restatement applies to multistate defamation and provides

that when, as here, 'a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the [*44] person was domiciled at the time, if the matter complained of was published in that state.'" No. 2:13-CV-01579-GMN-CW, 2014 U.S. Dist. LEXIS 175819, 2014 WL 7330940, at *7 (D. Nev. Dec. 19, 2014) (quoting Restatement (Second) of Conflict of Laws § 150(2) (1971)); *see also Newton v. National Broadcasting Co.*, 109 F.R.D. 522, 529 (D. Nev. 1985) (relying on Second Restatement to determine Nevada citizen's defamation claim was governed by Nevada law); *Laxalt v. McClatchy*, 116 F.R.D. 438, 450 (D. Nev. 1987) (same). Here, Defendants admit that they lived in Nevada when this case was filed, up until September of 2022; this means that they were domiciled in Nevada when each alleged defamatory statement was published. (ECF No. 231 at 20, 25.) Defendants do not argue that there is a more significant relationship with another state.[1] As such, the Court finds that Nevada law applies to their defamation claims.

**B. Procedural Background**

Plaintiffs filed their Second Amended Complaint on December 13, 2021. Defendants filed an Amended Counter-Complaint on August 12, 2022, which contained defamation claims against Ms. Humphries for statements made to Good Morning America in an interview on May 27, 2022, and statements made to Boston Magazine in an article published on August 2, 2022. (ECF No. 67.) The Court will refer to these claims as the "original counterclaims." The Court later granted Plaintiffs motion to file a Third Amended Complaint, filed on August 2, 2023. (ECF [*45] No. 221.) In response, Defendants filed a Motion to Dismiss and Amended Counter-Complaint, on August 23, 2023. (ECF No. 231.) This amended counter-complaint included several new defamation claims: (1) claims against Ms. Humphries and Ms. Menichino related to statements made to the New York Times in an article published on July 29, 2021; claims against Ms. Humphries for statements made to Pointe Magazine in an article published on December 1, 2021; claims against Ms. Humphries, Ms. Menichino, Ms. Gutiérrez, and Ms. DeAngelo for statements made to Cosmopolitan in an article dated April 5, 2022, and claims against Jane Doe 1 for statements made to the Daily Mail[2] in an article published on September 30, 2021.[3] The Court will refer to these claims as the "new counterclaims." Plaintiffs argued in their motion to dismiss that Defendants' counterclaims were waived as compulsory. The Court found that "the record is unclear as to when Defendants became aware of the facts underlying their new defamation counterclaims, and thus whether Defendants were required to bring the claims earlier," and

[1] This Court earlier rejected Defendants' argument that it lacks personal jurisdiction over them in Nevada. (*See* ECF No. 379 at 4-5.)

[2] Defendants' counter-complaint references this statement as being made to CNN, however, based on the attached exhibits, this statement was actually published in a Daily Mail article. See ECF No. 437-25 at 4-5.

[3] Defendants also argue that they alleged additional defamation in their countercomplaint. However, to plead a defamation claim, Defendants must point to the specific statement they allege is defamatory. *Ponder v. Wild*, No. 2:16-CV-2305-JCM-PAL, 2018 U.S. Dist. LEXIS 8038, 2018 WL 473003, at *3 (D. Nev. Jan. 18, 2018) (citing *Blanck v. Hager*, 360 F. Supp. 2d 1137 (D. Nev. 2005)), *aff'd*, 220 F. App'x 697 (9th Cir. 2007)). The other claims that Defendants reference are general allegations which fail to point to any specific statement or were made by third parties.

permitted Plaintiffs to raise the issue again at summary judgment. (ECF No. 379 at 13.) The Court now [*46] considers this argument.

### C. Compulsory Counterclaims

Plaintiffs argue that the new counterclaims raised in Defendants'/Counterclaimants' Amended Counter-Complaint filed on August 23, 2023, are compulsory counterclaims that were waived by not being brought in Defendants' original counter-complaint.

Under Federal Rule of Civil Procedure 13(a)(1), a compulsory counterclaim is "any claim that-at the time of its service-the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." A claim also must have matured at the time the pleading is first served to be compulsory. *Navarro v. Hamilton*, No. 5:16-CV-01856-CAS-SPX, 2017 U.S. Dist. LEXIS 38266, 2017 WL 10589992, at *1 (C.D. Cal. Mar. 15, 2017) (quoting *Procare Labs., Inc. v. Gull Labs., Inc.*, 50 F.3d 15, *2 (9th Cir. 1995)). *Lexington Ins. Co. v. Langei*, No. C12-1036 RSL, 2014 U.S. Dist. LEXIS 98179, 2014 WL 3563380, at *2 (W.D. Wash. July 18, 2014). A compulsory counterclaim is waived if not brought in response to the original pleading. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 470 n.1, 94 S. Ct. 2504, 41 L. Ed. 2d 243 (1974).

#### 1. Same Transaction or Occurrence

Defendants' counterclaims arise out of the same transaction or occurrence as the Plaintiffs' original claims. In *Pochiro v. Prudential Ins. Co. of Am.*, the Ninth Circuit held that defamation claims were compulsory counterclaims where "the allegedly defamatory statements are sufficiently related to subject matter of the original action," "the facts necessary to prove the two claims substantially overlap," and "the collateral [*47] estoppel effect of Prudential's victory in the first action would preclude the Pochiros from denying the truth of Prudential's statements." 827 F.2d 1246, 1251 (9th Cir. 1987). Other courts have applied this same logic to defamation claims related to claims brought in an underlying/original action. *Anspach v. Meyer*, No. CV-13-01877-PHX-DGC, 2014 U.S. Dist. LEXIS 11513, 2014 WL 345676 (D. Ariz. Jan. 30, 2014); *Neuropathy Sols., Inc. v. Mass. Bay Ins.* Co., No. SA-CV-220-1263-DOC-JDE, 2022 U.S. Dist. LEXIS 186838, 2022 WL 6589002 (C.D. Cal. Sept. 7, 2022).

Here, the allegedly defamatory statements are related to the subject matter of the original action—the alleged sexual, physical, and emotional abuse. As in *Pochiro*, the same facts are necessary to prove both Plaintiffs' original claims of abuse and assault, and Defendants' defamation claims. *See* 827 F.2d at 1251. Finally, if Plaintiffs prevail in this action and a jury determines the allegations are true, this would preclude Defendants from denying the truth of these statements. *See id.*

#### 2. Maturity

Whether a claim is mature for purposes of Fed. R. Civ. P. 13(a)(1) is synonymous with whether a claim has accrued for statute of limitations purposes. *United Factory Furnishings Corp. v. Alterwitz*, No. 2:12-CV-00059, 2012 U.S. Dist. LEXIS 81585, 2012 WL 2138115, at 3* (D. Nev. June 13, 2012); *Estavilla v. Goodman Grp., LLC*, No. CV 21-68-M-KLD, 2022 U.S. Dist. LEXIS 31751, 2022 WL 539192, at *11 (D. Mont. Feb. 23, 2022) (both citing *Cabrera v. Courtesy Auto, Inc.*, 192 F. Supp. 2d 1012, 1015 (D. Neb. 2002). Because claim accrual for the purposes of statute of limitations is governed by state law, Nevada law governs. *See Mitchell v. Nye Cnty.*, No. 2:20-CV-00086-APG-VCF, 2023 U.S. Dist. LEXIS 31767, 2023 WL 2242149, at *7 (D. Nev. Feb. 27, 2023) (applying Nevada law governing statute of limitations to defamation claim arising under Nevada law, citing *Felder v. Casey*, 487 U.S. 131, 151, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988) and *Guaranty Trust Co. v. York*, 326 U.S. 99, 109-10, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945)).

While it appears that in some jurisdictions, a defamation claim arises [*48] at the time of publication[4], in Nevada, such a claim accrues when it is discovered, or in other words, when a party knows or should have known of the facts. In Nevada, "there is a two-year statute of limitations on defamation claims, [and] a cause of action does not arise until the party discovers it." *Nutri Pharms. Rsch., Inc. v. Stauber Performance Ingredients, Inc.*, No. 2:20-CV-01041-KJD-DJA, 2021 U.S. Dist. LEXIS 252622, 2021 WL 6773089, at *3 (D. Nev. Mar. 3, 2021) (quoting *Lahren v. Nevada Sys. of Higher Educ.*, 124 Nev. 1486, 238 P.3d 831 (Nev. Sep. 18, 2008) (unpublished opinion)); *Mitchell*, 2023 U.S. Dist. LEXIS 31767, 2023 WL 2242149, at *7 (finding that defamation claim accrues under Nevada law when "the aggrieved party knew, or reasonably should have known, of the facts giving rise to the damage or injury" (quoting *G & H Assocs. v. Ernest W. Hahn, Inc.*, 113 Nev. 265, 934 P.2d 229, 233 (Nev. 1997) (per curiam)).

Plaintiffs argue that Defendants knew, or should have known, of the facts underlying all their new counterclaims at the time that they filed their original counter-complaint on August 12, 2022. Each article or interview was published before that date. Plaintiffs point out that knowledge of the facts of each publication can be attributed to Defendants because each article indicates some type of outreach to their then-attorneys. "Clients are 'considered to have notice of all facts known to their lawyer-agent.'" *Garcia v. Citicorp Tr. Bank FSB*, No. 2:09-CV-00054-JCM-GWF, 2009 U.S. Dist. LEXIS 94205, 2009 WL 3103793, at *1 (D. Nev. Sept. 23, 2009) (citing *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141-42 (9th Cir.1989)). The Court agrees with this contention. The New York Times and Cosmopolitan articles both contain statements indicating that an attorney [*49] for the Defendants actually received a communication from that news source. The New York Times article contains a statement "sent through a lawyer who is speaking for the couple, Ken Swarts." (ECF No. 437-24 at 6.) The Cosmopolitan article states, that "when reached by Cosmopolitan, [the Buttons'] attorney declined to provide additional comment." (ECF No. 437-28 at 5.) The Court finds that Defendants' legal counsel had knowledge of the fact that these

---

[4] *Morales v. Sprint Connect, LLC*, No. CV 18-2816-JFW(AGRX), 2018 U.S. Dist. LEXIS 90235, 2018 WL 2448466, at *4 (C.D. Cal. May 30, 2018) (under California law, defamation claim accrues at time statement is published); *Cusano v. Klein*, 264 F.3d 936 (9th Cir. 2001) (defamation claim accrues upon publication under *California* law).

publications were planning to publish articles about their clients. This knowledge is attributed to Defendants, who either knew or should have known of the articles about them published by these sources. Additionally, Plaintiffs point out that Defendants' original counterclaim filed August 12, 2022 mentions that an article about this case had appeared in the New York Times. (ECF No. 67 at 6.) Claims based on statements in these articles are therefore waived as compulsory counterclaims.[5]

The record is less clear as to knowledge of the articles published by Pointe Magazine and Daily Mail. The Pointe Magazine article states that "[a] lawyer for the Buttons, who have denied the allegations, did not respond to requests for comment." (437-27 [*50] at 3.) The Daily Mail article quotes statements that attorneys Swartz and Randazza made to other outlets and stated that it had "reached out to both McCawley and Randazza for statements." (ECF No. 437-25 at 5-6.) These statements do not necessarily indicate that the Buttons or their attorneys *actually* received notice of pending articles. However, the Court finds that based on the evidence before it, Defendants and/or their attorneys should have known of these claims at the time they filed their original counterclaims. These articles were published in September and December of 2021, and Defendants brought their original counterclaims in August of 2022. Defendants were clearly aware at that time that numerous media outlets had published articles about them at the time of the filing—including articles published *after* these were published (such as the GMA and Boston Magazine articles, published in 2022, and brought in the original counterclaim) The counter-complaint even states, "[t]hus far, prominent articles about this Nevada federal case have appeared in, among other publications, the Boston Globe, the New York Times, the Washington Post, CNN, Business Insider, and People Magazine," [*51] indicating that Defendants and/or their counsel were well aware of numerous other publications discussing this litigation and the accusations against them. (ECF No. 67 at 6.) Based on this record, Defendants and/or their counsel at the very least should have known about the statements in Pointe Magazine and the Daily Mail. The Court therefore finds that Plaintiffs waived their counterclaims based on statements in the New York Times, Cosmopolitan, Pointe Magazine, and Daily Mail articles. The Court grants summary judgment to Plaintiffs as to these claims.[6]

### D. Fair Reporting Privilege

The Court next considers whether the remaining defamation claims are barred because the underlying statements are protected by fair reporting privilege.

---

[5] Plaintiffs also argue that claims related to the New York Times article are barred by the statute of limitations. Because the Court finds that these claims are waived as compulsory counterclaims, the Court need not reach this issue.

[6] Plaintiffs also argue that Defendants' new counterclaims are barred because they were filed without leave of court. The Court addressed this argument at the motion to dismiss stage, stating, "[b]ecause the Court must liberally construe pro se parties' filings and the law regarding needing to seek leave of court in this situation is complicated, the Court will allow the counterclaims to proceed." (ECF No. 379 at 14.) The Court finds no reason to reconsider this argument at summary judgment.

"[T]he fair reporting privilege shields a defendant from liability for publication of defamatory content contained within reports of official actions regarding issues of public concern so long as the publication is a fair, accurate, and impartial summary of the underlying occurrence." *Wynn v. Associated Press*, 136 Nev. 611, 475 P.3d 44, 52 (Nev. 2020); *see also Adelson v. Harris*, 133 Nev. 512, 402 P.3d 665, 667 (Nev. 2017) (holding that "although the fair reporting privilege is most commonly asserted by media defendants, it extends to any person who makes a republication of a judicial [*52] proceeding from material that is available to the general public"). In order to receive the benefit of the fair reporting privilege, (1) it must be "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents and proceedings;" and (2) the statement must constitute a "fair and accurate" description of the underlying proceeding. *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739, 250 U.S. App. D.C. 346 (D.C. Cir. 1985). Nevada has adopted the *Dameron* test. *Adelson*, 402 P.3d at 668. The fair reporting privilege is "absolute" under Nevada law, meaning that it "precludes liability even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff." *Adelson*, 402 P.3d at 668 (quoting *Circus Circus Hotels*, 657 P.2d at 101, 104 (Nev. 1983). The Court will address each remaining statement in turn.

**1. Ms. Humphries' Statement on GMA**

In a Good Morning America ("GMA") segment, which aired on May 27, 2022, Ms. Humphries stated:

> [Taylor] suggested that we all watch a movie together. [The Buttons] thought we should all have one big group sleepover and bring the mattress out into the living room. I thought again that that was uncomfortable, so we just hung out we watched a movie and Dusty had fallen asleep. I was falling asleep and when I was [*53] falling asleep that was the first time that [Mitchell] violated me. And, you think that you're going to know to scream or to get up or to make a loud noise or do anything to stop it from happening, but I just froze and my body just tightened and I just waited for it to be over.

(ECF Nos. 231 at 44; 437-29.)

The GMA interview begins with the narrator describing "[a] GMA exclusive, the bombshell federal lawsuit." (ECF No. 437-29.) The narrator then begins interviewing Ms. Humphries. (*Id.*) A few questions in, the narrator states "Humphries alleged in the suit that as time went on, the Buttons manipulated and brutalized her and that they also sexually assaulted and verbally abused her." (*Id.*) She then asks, "[a]t what point do you say that the direction turned sexual?" (*Id.*) Ms. Humphries responds with the alleged defamatory statement. (*Id.*) The narrator then again references the lawsuit, stating, "[t]he lawsuit also alleges the Buttons forced Sage to live with them full-time and she wasn't allowed to speak to her parents without their permission . . ." (*Id.*)

This statement draws on, references, and corresponds with allegations made in the complaint, making it a fair and accurate representation [*54] of the proceeding.[7] The statement closely follows a description of Ms. Humphries allegation in the lawsuit, and is bookended by another mention of the lawsuit. While these four sentences are not specifically attributed to the lawsuit—for example, Ms. Humphries does not preface it with, "according to my complaint,"—the context of the statement makes it clear that the statement is "otherwise drawing upon official documents and proceedings." *Dameron*, 779 F.2d at 739. The entire segment was also framed as a "bombshell federal lawsuit" report. Given this context, the Court finds that Ms. Humphries statement was fairly and accurately attributed to the underlying lawsuit and is protected by fair reporting privilege.

**2. Ms. Humphries' Statements to Boston Magazine**

The article published by Boston Magazine on August 2, 2022, contains the following statements:

> [A]ccording to the lawsuit, the pair had sex with Sage whenever they wanted, without her consent.
>
> Sage states she had grabbed someone's phone to message Taylor via Snapchat, who, along with Dusty, was in Australia. According to the lawsuit, Taylor responded that he wanted to throw Sage in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from [*55] the ceiling, rape her, and leave her to die.
>
> When they were all back in Boston, Sage said, the couple barged in on her while she was showering and told her she was now their girlfriend. It was not posed as a question.

(ECF Nos. 231 at 45; 437-30.)

The first two statements are preceded by the phrase, "[a]ccording to the lawsuit..." (ECF No. 437-30.) These statements are therefore specifically attributed to the underlying lawsuit. They also fairly describe allegations made in the complaint.[8] These two statements are accordingly protected by fair reporting privilege.

The last statement is not directly or through context attributed to the lawsuit. The article begins with a mention of the lawsuit and a description of the New York Times story that immediately followed it. (ECF No. 437-30.) However, the next portion of the article, in which this statement lies, appears to the reader to be based on interviews with Ms. Humphries; it states "[o]ver several

---

[7] The Third Amended Complaint states, "One evening, Taylor placed a mattress in the living room and insisted that Sage and the Buttons all lay on it and watch a movie, with Taylor laying in the middle. At some point, Dusty pretended to fall asleep. Taylor then rolled over and began to sexually assault Sage." (ECF No. 221 at 19.)

[8] The Third Amended Complaint states that "the Buttons began having sex with Sage whenever they pleased," "Taylor regularly shoved Sage to the ground or on the bed and violently penetrated her without her consent," and "[o]n one occasion, Taylor told Sage via Snapchat that he wanted to throw her in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape Sage, 'and leave [her] there to die.'" (ECF No. 221 at 20-21.)

months, I spent hours listening to Sage tell her story" and describes several other sources the author spoke to. (*Id.*) It is also not apparent from the context of the article that this statement is attributable to the underlying proceedings. This [*56] specific statement sits several pages into the interview section, in a paragraph that begins with and "[t]hen Sage told me . . ." (*Id.*) The article attributes the statement to Ms. Humphries herself, and not the lawsuit, stating halfway through "Sage said . . ." (*Id.*) Thus, while the article mentions the lawsuit, the average reader would not necessarily know whether Ms. Humphries' statement is "quoting, paraphrasing, or otherwise drawing upon official documents and proceedings," because it appears to be attributed to an interview, and is not made near any reference to the lawsuit. *Dameron*, 779 F.2d at 739; *see also Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 537 (7th Cir. 1982) (application if privilege to entire article not appropriate where government documents were only used to verify some statements); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 n.41 (D.D.C. 2016), *aff'd*, 875 F.3d 709, 433 U.S. App. D.C. 167 (D.C. Cir. 2017) (fair reporting privilege did not extend to passages of chapter where official reports were not referenced or discussed and chapter was not "premised entirely on summarizing or discussing an official report"). The statement also does not appear to reflect an allegation made in the complaint, meaning that it is not a "fair and accurate" description of the legal proceeding. This statement is not protected by fair reporting privilege. *See Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87, 93-94 (D.D.C. 1991) (statements in article [*57] about judicial proceeding which fell outside of the actual judicial record were not protected under *Dameron*).

The Court therefore finds that Ms. Humphries' statements on GMA and two of her statements made to Boston Magazine are protected by the fair reporting privilege. As this is an absolute privilege under Nevada law, a claim cannot be maintained. *Adelson*, 402 P.3d at 668. The Court therefore grants summary judgment to Plaintiffs as to Defendants' defamation claims based on these statements.

**E. Defamation**

The Court will now analyze the merits of Defendants' remaining defamation claim for the last statement made by Ms. Humphries to Boston Magazine.

To establish a prima facie case of defamation, a plaintiff must prove: (1) a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *Wynn v. Smith*, 117 Nev. 6, 16 P.3d 424 (2001). Additionally, if the defamation plaintiff (here, Defendants) is a public figure, they must show that the statements were made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686, (1964); *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094, (1967). Plaintiffs argue that summary judgment should be granted as to Defendants' defamation claims because they are public figures and have failed to [*58] show actual malice.

**1. Public Figures**

General public figures are "those individuals who 'achieve such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts.'" *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 57 P.3d 82, 92 (Nev. 2002) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)). Public figures can include "artists, athletes, businesspeople, dilettantes, and anyone who is famous or infamous because of who he is or what he has done." *Cepeda v. Cowles Mags. & Broad., Inc.*, 392 F.2d 417, 419 (9th Cir. 1968). Whether defendants are public figures "is a question of law." *Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1070 (C.D. Cal. 2002), *aff'd on other grounds*, 339 F.3d 1119 (9th Cir. 2003).

Plaintiffs argue that Defendants, by their own admissions in this and other judicial proceedings, are public figures. Plaintiffs point to cases in which courts have considered a party's own allegations in determining if they are a public figure: *Peterson v. Gannett Co. Inc.*, 2020 U.S. Dist. LEXIS 70720, 2020 WL 1935520, at *6 (D. Ariz. Apr. 22, 2020) ("Pursuant to his own allegations, Plaintiff is a limited-purpose public figure."); *Resolute Forest Prods. Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1017 (N.D. Cal. 2017) ("Resolute's own allegations about their world-wide reach and influence, as well as the public nature of its work in forestry and sustainability, show that the company is a limited public figure for purposes of its participation in the forestry industry.").[9]

In this litigation, Defendants stated that "Defendant Taylor Button was a world-renowned Ferrari builder and designer," "one of the world's [*59] most influential custom Ferrari builders," "with a large following both on social media and worldwide amassing millions of fans who idolized him and his work." (ECF No. 231 at 4, 26.) His "work has been featured in numerous publications." (*Id.* at 27.) "Defendant Dusty Button was arguably the most influential and well-respected name in the dance industry," and "became Red Bull's first ever (and only to date) ballet athlete, rendering global recognition in media and amassing an enormous following both on social media and worldwide." (*Id.* at 4.) She "has positively influenced hundreds of thousands of people nationally and internationally, including by performing and teaching in over 30 different countries and across the United States," and "has been published in media publications across the globe" (*Id.* at 25, 26.) "Together, Defendants were sponsored ambassadors [for] countless well-known companies." (*Id.* at 5.)

---

[9] While Defendants' statements in other actions are not binding judicial admissions in this action, they are admissible and can be considered by the Court. "The Ninth Circuit has held that allegations in one case are not binding judicial admissions in a different case." *F.D.I.C. v. CoreLogic Valuation Servs., LLC*, No. SA CV 11-0704 DOC, 2011 U.S. Dist. LEXIS 131956, 2011 WL 5554324, at *8 (C.D. Cal. Nov. 14, 2011) (citing *Am. Passage Media Corp. v. Cass Comm'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir.1995) (holding that allegations from a complaint filed in one action were "admissible but not conclusive admissions" in a second action)); *see also Nuger v. Salke*, No. CV 14-08040-AB (JCX), 2015 WL 13655761, at *5 n.4 (C.D. Cal. Mar. 20, 2015). The Court will therefore consider these statements from other proceedings, but not as binding judicial admissions.

In other actions, Defendants have described themselves similarly. In one action, they alleged at the time of the events described, they each had half a million followers and subscribers on Instagram. (ECF No. 439-2 at 9-10.) Defendants also stated that their "names and likeness [*60] was their business and generated one hundred percent of their yearly revenue, and that and describe "their name brands, known as Dusty Button, Taylor Button, Mitch/Mitchell Button, Mitchell Taylor Button, "The Buttons", Button Built, Button Brand, Bravado by Dusty Button, Meisturwerk and Meisturwerk Machinen." (*Id.* at 9.) They stated in another action that Mr. Button has "been procured from global organizations for speaking engagements and commissions," and that Ms. Button "had over thirty fan pages created by other users." (*Id.* at 10, 31.)

Plaintiffs also point to media coverage of Ms. Button in particular, referencing articles in Ballet News, Dance Spirit, Boston Globe, Glamour, Dance Life, Pointe Magazine, Dance Magazine, Dance Informa, WBTW, and an Instagram post by Red Bull. (ECF Nos. 437-10 to 437-23.) An article in Dance Life states "you have an amazing following on social media!" (ECF No. 437-24.) An article in Dance Forma stated of Ms. Button, "[s]he is a choreographer, dance fashion line designer, car enthusiast, dedicated wife and an inspiration to young dancers everywhere," and called her social media presence "magnanimous." (ECF No. 437-21.) Dance Informa listed her as [*61] one of "10 Ballet Dancers to Follow on Social Media." (ECF No. 437-22.)

The Court finds that based on the evidence in the record, including Defendants' own statements in this case and others, they are public figures.[10] Ninth Circuit case law supports this finding. In *Manzari v. Associated Newspapers Ltd.*, the Ninth Circuit found that a soft-core porn actress was "undoubtedly" a public figure, based on "news coverage related to her considerable success performing in and marketing online soft-core porn," statements in the complaint that "Danni Ashe is considered 'the most downloaded woman on the Internet' and that her image has 'graced the cover of the Wall Street Journal,'" her presence in several adult films, and high website traffic. 830 F.3d 881, 888 (9th Cir. 2016). This was true even if "she is less of a household name than stars in other sectors of the entertainment industry." *Id.* The Ninth Circuit also noted that it had attributed public figure status with those with even less fame than Manzari. *Id.* For example, in *Leidholdt v. L.F.P. Inc*, the court had found that a woman was a public figure where she was "a founding member of the organization Women Against Pornography, has given public speeches against pornography, [*62] and has debated its proponents in the national media." 860 F.2d 890, 892 (9th Cir. 1988).

Similarly here, Defendants' own admissions and news articles in the record show that they were subject to significant media coverage. They also had a significant social media following, similar to high website traffic. Like the actress's fame within the softcore porn industry in *Manzari*, they describe Mr. Button "one of the world's most influential" custom Ferrari builders and "the most influential" name in the dance industry." (ECF No. 231 at 4, 26.) While not necessary to the Court's analysis, the Court also finds persuasive the opinion in a case filed by Defendants against

---

[10] Because the Court finds that Defendants are general public figures, it does not reach the question of whether Defendants are limited-purpose public figures.

attorney in this matter Sigrid McCawley in the Southern District of Florida. *Button v. McCawley*, No. 0:24-CV-60911, 2025 U.S. Dist. LEXIS 3634, 2025 WL 50431 (S.D. Fla. Jan. 8, 2025). In that decision, Judge Leibowitz found that the Buttons were public figures, based on much of the same information as in the record here, "from the face of the complaint." *Id.* at *8-9.

**2. Actual Malice**

Actual malice has been defined as "knowledge that it [the statement] was false or with reckless disregard of whether it was false or not." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 57 P.3d 82, 92 (2002) (citing *Sullivan*, 376 U.S. at 280.) "The question of actual malice goes to the jury only if there is sufficient evidence for the jury, by clear and convincing evidence, [*63] to reasonably infer that the publication was made with actual malice." *Id.* at 92.

The test for actual malice is a subjective one, focusing on what the defamation defendant believed. *Pegasus.*, 118 Nev. 706, 57 P.3d 82, 92 (2002); *Wynn v. Bloom*, No. 2:18-CV-609-JCM-NJK, 2020 U.S. Dist. LEXIS 263129, 2020 WL 13201530, at *4 (D. Nev. Mar. 4, 2020), *aff'd*, 852 F. App'x 262 (9th Cir. 2021). "The inquiry in 'actual malice' focuses largely on the defendant's belief regarding truthfulness of the published material rather than on the defendant's attitude toward the plaintiff." *Nevada Indep. Broad. Corp. v. Allen*, 99 Nev. 404, 664 P.2d 337, 344 (1983).

Plaintiffs argue here that allegations or evidence of falsity of the statements are not enough to show actual malice, because it is the speaker's beliefs about the falsity of the statement that matter at the actual malice inquiry. (ECF No. 437 at 41) (citing *Allen v. Sunbelt Commc'ns Co.*, No. 2:07-CV-1409-JCM-PAL, 2008 U.S. Dist. LEXIS 144604, 2008 WL 11452330, at *3 (D. Nev. Jan. 22, 2008) (evidence of actual falsity is not sufficient to show that defamation defendants knew of falsity before publication). Plaintiffs have each submitted a declaration attesting to their subjective belief that their statements were true.[11] Plaintiffs argue that Defendants have no evidence showing that Ms. Humphries or Jane Doe 1 did not subjectively believe their statements to be true, and that they are thus entitled to summary judgment because there is no evidence of actual malice.

The case law on which Plaintiffs rely generally addresses situations in which a reporter [*64] is sued for publishing a statement from another source. *See e.g. Allen*, 2008 U.S. Dist. LEXIS 144604, 2008 WL 11452330, at *3 (news outlet sued for publishing photographs alleged to be false). This is different from the issue here, where the individuals being sued are the individuals who made the initial statement *to* a reporter. Several cases have addressed the issue of showing actual malice in this situation, where the only people who would be witnesses to the alleged events underlying the statements are the plaintiff and defendants. In *Chastain v. Hodgdon*, No.

---

[11] Ms. Humphries and Jane Doe 1 have each submitted a declaration stating that, as to their allegedly defamatory statements: the statements are true, they subjectively believe the statements to be true, and "[t]o the best of my knowledge and belief, I did not provide any information to [the publication] beyond information that was already accessible in my complaint against Defendants." (ECF Nos. 437-4, 437-5.)

16-2087, 2016 U.S. Dist. LEXIS 128387, 2016 WL 5109944 (D. Kan. Sept. 20, 2016), a district court in Kansas addressed a defamation claim at the motion to dismiss stage based on a statement accusing the defendant of sexual assault. The court discussed the specific circumstances at issue here, where because plaintiff and defendant were the sole witnesses to the incident, their testimony about it goes to both falsity and actual malice:

> In an attempt to further clarify that difference, the court provides this hypothetical: Had plaintiff made a claim against a blog that republished defendant's Facebook post and stated that the blog writer must have known it was false because it never happened, defendant's argument would apply. There, plaintiff's claim that the events never happened does nothing [*65] to support that the blog writer knew the story was false when he wrote it, because the blog writer was not there. In this case, however, because defendant and plaintiff were the only two direct actors in events that either did or did not occur, plaintiff's claim of falsity supports both that the statement was false and that defendant necessarily knew it was false at the time she said it—because, according to him, it never occurred. Plaintiff's testimony, then, would be used for two purposes: (1) to show falsity, and (2) to show that defendant knew it was false, which is precisely the standard for actual malice.

*2016 U.S. Dist. LEXIS 128387*, [WL] at *2. The court then found that the plaintiff's testimony that the allegations were false were sufficient to plead actual malice.

The court in *Todd v. Lovecruft* similarly addressed a defamation claim based on allegations of sexual misconduct where "[t]he only evidence supporting either parties' claims are their declarations attesting to conflicting versions of their encounter." No. 19-CV-01751-DMR, 2020 U.S. Dist. LEXIS 2309, 2020 WL 60199, at *20 (N.D. Cal. Jan. 6, 2020). The court found that the conflicting testimony of plaintiff and defendant meant that the defamation plaintiff could show a prima facie case of prevailing on his defamation claim under the anti-SLAPP standard. [*66] *Id.* "This is because logically, if [a defamation defendant] is lying, [they] would have to know that their version of events is false because they personally experienced the encounter." *Id.*

Both cases suggest that, in circumstances such as this, evidence of falsity—in the form of contradictory testimony as to allegations of abuse—can also be evidence of malice. While these cases addressed the issue under a motion to dismiss standard (or similar in the anti-SLAPP motion), the court in *Tallman v. Miller*, No. 2:23-CV-1592-HL, 2025 U.S. Dist. LEXIS 23286, 2025 WL 444280 (D. Or. Feb. 10, 2025) (appeal docketed, No. 25-1382 (9th Cir. Mar. 5, 2025), relied on the reasoning in both *Chastain* and *Todd* using a motion for summary judgment standard. There, the defamation defendant had submitted evidence in the form of her declaration and a police report detailing her allegations against the defamation plaintiff. *2025 U.S. Dist. LEXIS 23286*, [WL] at *2. In response, the plaintiff had submitted a declaration which denied all allegations. *Id.* The court found that, because it does not make credibility determinations or weigh evidence at summary judgment, a reasonable jury could believe either party. *Id.* Defendant had therefore presented sufficient evidence of actual malice because "[i]f a jury believes [plaintiff], then [defendant] would appear to have known that the events were false [*67] because she

experienced them, and 'it is axiomatic that she wrote the narrative with actual malice, or actual knowledge that it was false.'" *Id.* (quoting *Chastain*, 202 F. Supp. 3d at 1222).

The same logic applies here. Ms. Humphries has submitted evidence, described in detail above, in support of her allegations of abuse, as well as a declaration as to her belief that her statements were true. Defendants have submitted declarations denying all allegations of abuse against all Plaintiffs, which includes Ms. Humphries. (ECF No. 471-14 at 4, 8.) As stated in *Tallman*, the court cannot make credibility determinations or weigh evidence on summary judgment; thus, a reasonable jury could believe either Plaintiffs or Defendants. *See* 2025 U.S. Dist. LEXIS 23286, 2025 WL 444280 at *2 (citing *Anderson*, 477 U.S. at 255). Like in *Tallman*, Defendants' denials of Plaintiffs' allegations are sufficient to create a factual issue as to actual malice. *See id.* The Court additionally notes that Defendants have presented other evidence which could tend to show that Ms. Humphries' allegations are untrue, such as evidence which contradicts her version of events or undercuts her credibility—as discussed *supra*, in section III.1.E.6 (finding that Defendants' evidence raised issues of fact and credibility as to allegations of sexual [*68] assault and abuse). This evidence also counsels against granting summary judgment on actual malice. The Court therefore denies Plaintiffs' motion for summary judgment as to Defendants' remaining counterclaims.

Plaintiffs also argued in their motion that if the Court finds factual issues as to actual malice, there are necessarily factual issues as to the "good faith" prong of the anti-SLAPP analysis under NRS 41.637(4). Because the Court denies summary judgment as to actual malice, this argument is moot.

## VI. CONCLUSION

It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 437) is GRANTED IN PART and DENIED IN PART in accordance with this order.

It is further ordered that Defendants' motion for summary judgment (ECF No. 452) is DENIED.

It is further ordered that Plaintiffs' motion to supplement (ECF No. 457) is GRANTED.

It is further ordered that Defendants motion for judicial notice (ECF No. 474) is DENIED AS MOOT.

It is further ordered that Defendants' motion to supplement (ECF No. 461) is GRANTED.

It is further ordered that Defendants' motion to supplement (ECF No. 514) is DENIED.

It is further ordered that Defendants' motion to strike (ECF No. 516) is DENIED.

Dated this 20th day [*69] of August 2025.

/s/ Anne R. Traum

ANNE R. TRAUM

UNITED STATES DISTRICT JUDGE

---

End of Document

# EXHIBIT 2

# EXHIBIT 2

# Button v. McCawley

United States District Court for the Southern District of Florida

January 8, 2025, Decided; January 8, 2025, Entered on Docket

CASE NO. 0:24-cv-60911-LEIBOWITZ/AUGUSTIN-BIRCH

**Reporter**
2025 U.S. Dist. LEXIS 3634 *; 2025 LX 124502; 2025 WL 50431

DUSTY BUTTON and MITCHELL TAYLOR BUTTON, Plaintiffs, v. SIGRID MCCAWLEY, Defendant.

**Subsequent History:** Motion denied by, Dismissed by, Motion denied by, As moot, Costs and fees proceeding at Button v. McCawley, 2025 U.S. Dist. LEXIS 100854, 2025 WL 1517348 (May 28, 2025)

Motion denied by Button v. McCawley, 2025 U.S. Dist. LEXIS 263999, 2025 WL 3682822 (July 8, 2025)

Magistrate's recommendation at Button v. McCawley, 2025 U.S. Dist. LEXIS 234737, 2025 WL 3682758 (Dec. 2, 2025)

Appeal dismissed by Button v. McCawley, 2026 U.S. App. LEXIS 9789 (Jan. 28, 2026)

**Counsel:** [*1] Dusty Button, Plaintiff, Pro se, Myrtle Beach, SC.

Mitchell Taylor Button, Plaintiff, Pro se, Myrtle Beach, SC.

For Sigrid McCawley, Defendant: Jason Harrison Hilborn, Florida Office of the Attorney General, PL01, The Capitol, Tallahassee, FL; Stuart Harold Singer, Boies Schiller & Flexner, Fort Lauderdale, FL.

**Judges:** DAVID S. LEIBOWITZ, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DAVID S. LEIBOWITZ

## Opinion

**ORDER**

**THIS CAUSE** is before the Court on Defendant Sigrid McCawley's ("Defendant" or "McCawley") Motion to Dismiss the Amended Complaint (the "Motion") [ECF No. 24], filed on July 26, 2024. *Pro se* Plaintiffs Dusty Button ("Dusty") and Mitchell Taylor Button ("Mitchell" or "Taylor") (collectively, "Plaintiffs" or "the Buttons") submitted a response to the Motion [ECF

No. 43], and Defendant submitted a reply [ECF No. 44]. The Court has reviewed the parties' arguments, the record, and the relevant legal authorities. For the reasons stated below, the Motion [ECF No. 24] is **GRANTED IN PART and DENIED IN PART**.

## I. BACKGROUND

On May 28, 2024, Plaintiffs filed their original Complaint in this action. [ECF No. 1]. On July 12, 2024, Plaintiffs filed an Amended Complaint (the "Complaint"), which is the subject of this Motion. [ECF [*2] No. 13]. This case arises from Sigrid McCawley's representation of her clients in a case against Plaintiffs filed in the District of Nevada. Plaintiffs now bring this suit against Sigrid McCawley, alleging that she transmitted and published intentionally false and defamatory statements about them in relation to the District of Nevada case. [*Id.* ¶ 2].

Plaintiffs bring this eight-count Complaint alleging the following: injurious falsehood (Count I), defamation per se (Count II), libel per se (Count III), slander per se (Count IV), intentional infliction of emotional distress (Count V), prima facie defamation (Count VI), civil conspiracy (Count VII), and defamation per quod (Count VIII). Defendant seeks dismissal of the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For background and convenience, what follows are the alleged defamatory statements.

### A. Fourteen Alleged Defamatory Statements

**Statement 1: McCawley's Statement to The New York Times - July 26, 2021**

*"This is a pair of perpetrators who are highly sophisticated, highly manipulative, and are continuing, which is exactly what my clients were concerned about,"* Sigrid McCawley said. [ECF No. 13 at 49-50].

**Statement 2: McCawley's Statements to The Boston** [*3] **Globe - September 29, 2021**

*"What you have here is the highest level of betrayal."*

*"You see the use of a famous female ballerina to coax these victims into a situation where they become prey for this serial abuser."*

*"In an instance like this, where you have a serial abuser, you often times see other women feeling empowered enough to come forward and say 'me, too.'"*

*"Each one of these ballerinas wants this abuse to stop."*

[*Id.* at 50-52].

**Statement 3: McCawley's Statement to CNN - September 30, 2021**

"*Taylor and Dusty Button can no longer use the dance world to perpetrate their criminal behavior against young girls. Brave women are now coming forward and saying this must stop."*

[*Id.* at 52-53].

**Statement 4: McCawley's Statement to The Daily Star - September 30, 2021**

*"Dusty and Mitchell promised to make her [Jane Doe 1] a star before abusing their power,"* Ms. McCawley said.

[*Id.* at 53-54].

**Statement 5: McCawley's Statements to Law.com - August 5, 2021**

*"That quote and that commitment rang true with her, because she had tried to pursue her perpetrators, she had a restraining order against them and tried to get into discussions with detectives and none of that had really come to fruition,"* McCawley said. [*4] *"She had sort of put it behind her and moved on, but just couldn't. So when she saw that episode, she said that hat was really a turning point for her and she picked up the phone and she called me."*

*"Ultimately, the goal of the majority of my clients is really to stop the predators, so it's just: how do we do that?"* McCawley said. *"It's really a beautiful thing to witness Sage and Gina and their strength in being able to come together and stand up against this perpetrator, who is still out there in the dance community, still has full access to young children. When you bring light to the abuse, people are actually more protected."*

*"That's really the saddest part of this work for me,"* McCawley said. *"I think we give them back some of themselves by bringing these actions, but we'll never get back the little girl who was 13 in that dance studio, and that's really heartbreaking."*

*"You have a dance teacher who is going to be physically close to the student just by the nature of the work that they're doing, and a student who wants to impress their teacher and be the best that they can be for that instructor,"* McCawley said.

*"McCawley said the litigation is likely to expand, as she's fielding [*5] calls from other women alleging they were victimized by the same perpetrators."*

[*Id.* at 54-59].

**Statement 6: McCawley's Statement to Cosmopolitan Magazine - April 5, 2022**

*"Perpetrators don't really change their playbook."*

[*Id.* at 59].

**Statement 7: McCawley's Statement to Good Morning America - May 27, 2022**

*"I am incredibly proud to be representing this group of survivors in the dance community as they battle for justice."*

[*Id.* at 60-62].

**Statement 8: McCawley's Statements to The Bleacher Report/NBC News and Yahoo.com - July 21, 2022**

*"Sage had a business relationship with Mr. Katz and there was never any sexual relationship between them. As is typical of abusers facing serious litigation, with four walls of facts closing in, the Buttons have filed counterclaims that distract from and distort the truth. Abusers often try to weaponize the allegations brought against them, and that's exactly what is happening here,"* she said. *"The counterclaims the Buttons have filed falsely and recklessly implicate others, including Daryl Katz, and are a factually unfounded attempt to portray the women they abused as liars."*

[*Id.* at 62-64].

**Statement 9: McCawley's Statements to The Daily Mail and Meaww.com - September** [*6] **28, 2022**

*The accusers' attorney Sigrid McCawley said in a statement, "As put forth in our complaint, Dusty and Taylor Button assaulted seven different dancers, including women who have chosen to make their claims anonymously. The Buttons' on-their-heels assertion now that seven different women made up detailed and harrowing accounts of abuse for fame is absurd."*

McCawley added, *"A judge in Boston granted Sage Humphries a permanent restraining order against the Buttons after hearing her testimony, and stated that he 'fully credited' her testimony making clear that he was satisfied 'beyond a reasonable doubt' that the Buttons' conduct amounted to abuse under the criminal laws. The Buttons are not only engaging in shameless victim-blaming, but they are also intentionally violating the Boston court's restraining orders, which mandated them to surrender information that they stole from Ms. Humphries' cell phone to the Boston Police Department. The Buttons are abusers of young vulnerable women who were in their sphere of influence as aspiring dancers and now the rule of law."*

[*Id.* at 64-71].

**Statement 10: McCawley's Statements to Cosmopolitan Online Magazine - March 7, 2023**

*The plaintiffs' counsel [*7] Sigrid McCawley, managing partner at Boies Schiller Flexner LLP and a leading victims' rights attorney, is eager for the trial to begin. "We look forward to putting the women's case before a jury, which will hear the facts of the abuse they suffered while pursuing their dreams as dancers and not the fiction the Buttons are peddling in an act of desperation," she told Cosmopolitan following a February hearing.*

[*Id.* at 71-72].

**Statement 11: McCawley's Statements on NBC Miami, "How Sigrid McCawley helped bring down Jeffrey Epstein" - January 29, 2024**

*"Most recently we're doing a case on some ballerinas that had been victimized, some of them with the Boston Ballet, so the work has been pro bono in this case, and the commitment of the firm has been astronomical."*

[*Id.* at 73-74].

**Statement 12: McCawley's Biography on the Boies Schiller & Flexner LLP Website - Date Unknown**

*"She is also presently representing pro bono a group of ballerinas in their efforts to hold their abusers accountable on sex trafficking charges."*

[*Id.* at 74-75].

**Statement 13: McCawley's Statements to Fox News - September 30, 2021**

*"They are no longer in a position to use the dance world and their professions to perpetrate criminal [*8] behavior against young girls aspiring to become great dancers," she told Fox News in a statement. "Brave women are now coming forward and saying they must be stopped. We are grateful their voices are being heard."*

[*Id.* at 76-77].

**Statement 14: McCawley's Statements to The Washington Post - October 1, 2021**

*"As often happens in these cases, once a survivor is strong enough to go public, you'll find other people who are familiar with the circumstances reach out," McCawley said in an interview Thursday. "I think we're going to see an avalanche of people going forward who have been exposed to these individuals and have been abused by them."*

[*Id.* at 77].

## II. LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual [*9] enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). "To survive a motion to

dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

When reviewing a motion under Rule 12(b)(6), as a general rule a court must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Off.*, 449 F.3d 1342, 1352 (11th Cir. 2006). "[T]he court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted).

The Court notes that *pro se* plaintiffs are generally held to a more liberal standard of pleading under the Federal Rules. The Court has a duty to "liberally construe a pro se litigant's assertions[.]" *See Sanders v. United States*, 113 F.3d 184, 187 (11th Cir. 1997) (cleaned up). Nevertheless, even *pro se* litigants must meet certain minimal standards of pleading. *Holsey v. Collins*, 90 F.R.D. 122, 128 (D. Md. 1981). The Court is not required to abrogate the basic pleading essentials or conjure up unpled allegations [*10] simply because a plaintiff is proceeding *pro se. See Haines v. Kerner*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); *Merritt v. Faulkner*, 697 F.2d 761 (7th Cir. 1983).

Through this lens, the Court considers the Motion.

## III. DISCUSSION

In support of her request for dismissal, Defendant advances five principal arguments: (1) the majority of the Buttons' defamation claims are time-barred; (2) Ms. McCawley's statements are inactionable matters of opinion; (3) the Buttons fail to plead facts sufficient to demonstrate actual malice; (4) the Buttons' remaining claims violate Florida's single publication/single action rule; and (5) because the Buttons' defamation claim fails and because Ms. McCawley's statements concern a public issue, Ms. McCawley is entitled to attorney's fees and costs under the mandatory fee-shifting provision in Florida's Anti-SLAPP statute. The Court will consider each argument in turn.

### A. Statute of Limitations

Defendant contends that nine of the alleged defamatory statements are time-barred. [ECF No. 24 at 13]. Florida law imposes a two-year statute of limitations on defamation claims, Fla. Stat. §

95.11(5)(h), the limitations period begins to run from the time the cause of action accrues, Fla. Stat. §

95.031, and a defamation cause of action accrues on the date of publication, Fla. Stat. § 770.07. Defendant notes that Plaintiffs' original [*11] Complaint was filed on May 28, 2024. [ECF No. 1]. Thus, Defendant argues that Statements 1 through 7, 13, and 14 are time-barred because they were made before May 28, 2022. [ECF No. 24 at 13].

This Court mostly agrees. In its November 8, 2024 Order, I held that even though the original Complaint was not filed until May 28, 2024, the Complaint was timely filed for statute of limitations purposes as to alleged defamatory statements that occurred on May 27, 2022, because May 27, 2024, was a legal holiday. [ECF No. 45 at 2-3]; *see Moorey v. Eytchison & Hoppes, Inc.*, 338 So. 2d 558, 559 (Fla. 2d DCA 1976) ("Where the last day of a limitation period falls on a Saturday, Sunday or legal holiday the period runs until the end of the next day which is neither a Saturday, Sunday nor a legal holiday.").

For the 14 sets of defamatory statements above the Court will consider those that Defendant claims are time-barred based on the statute of limitations for defamation claims. Statement 1 was published on July 26, 2021, so the Court agrees that it is time-barred. [ECF No. 13 at 49-50]. The set of statements in Statement 2 were published on September 29, 2021, so the Court agrees that Statement 2 is time-barred. [*Id.* at 50-52]. Statement 3 and Statement 4 were published on [*12] September 30, 2021, so the Court agrees that they are time-barred. [*Id.* at 52-54]. The set of statements in Statement 5 were published on August 5, 2021, so the Court agrees that Statement 5 is time-barred. [*Id.* at 54-59]. Statement 6 was published on April 5, 2022, so the Court agrees that it is time-barred. [*Id.* at 59].

Statement 7 was published on May 27, 2022. [*Id.* at 60-62]. As the Court previously held, the Complaint was timely filed for statute of limitations purposes as to alleged defamatory statements that occurred on May 27, 2022 [ECF No. 45 at 2-3], so Statement 7 is *not* time-barred.

The defamatory statements in Statement 13 were published on September 20, 2021, so the Court agrees that Statement 13 is time-barred. [ECF No. 13 at 76-77]. Lastly, Statement 14 was published on October 1, 2021, so the Court agrees that it is time-barred. [*Id.* at 77].

To the extent that Plaintiffs argue that the Court may apply the doctrine of equitable tolling, the doctrine of equitable estoppel, or the continuous wrong doctrine to toll the statute of limitations period, [ECF No. 43 at 11-14], those doctrines do not apply to this case. Thus, Statements 1 through 6, Statement 13, and Statement [*13] 14 are barred by the statute of limitations and must therefore be dismissed with prejudice. *See Rendon v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269, 1273 (S.D. Fla. 2019) ("If the time to comply with the statutory precondition has expired, the action should be dismissed with prejudice." (quoting *City of Coconut Creek v. City of Deerfield Beach*, 840 So. 2d 389, 393 (Fla. 4th DCA 2003))). Rule 15 of the Federal Rules of Civil Procedure states that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Despite this generally permissive approach, a district court need not grant leave to

amend where (1) "there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed"; (2) "allowing amendment would cause undue prejudice to the opposing party"; or (3) the "amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam). The basis for dismissal of Statements 1 through 6, Statement 13, and Statement 14 addressed by the Court—expiration of the statute of limitations—cannot be cured by amending the complaint. *See Norkin v. The Fla. Bar*, 311 F. Supp. 3d 1299, 1306 (S.D. Fla. 2018). Amendment here would be futile, so Statements 1 through 6, Statement 13, and Statement 14 of the Complaint are **DISMISSED WITH PREJUDICE**.

**B. Inactionable Matters of Opinion**

Defendant argues that all fourteen of Ms. McCawley's statements are inactionable matters of opinion, are protected by the fair comment doctrine, and are subject to a qualified [*14] privilege. [ECF No. 24 at 16]. Without citing any law, Plaintiffs argue in response that "[a]ttorney statements to the press are not covered by the fair comment doctrine when they contain excessive personal opinions, inflammatory language, unsubstantiated accusations, or information that could potentially prejudice a jury pool in an ongoing case; essentially, when the attorney goes beyond simply reporting factual information about the case and injects their own biased commentary." [ECF No. 43 at 14].

The Court will only consider Defendant's first argument—that all of Ms. McCawley's statements are inactionable matters of opinion. Defendant argues that "[e]ach of Ms. McCawley's statements is an opinion based on facts alleged in the publicly available Nevada Litigation and expresses her views about her clients' allegations and legal theories." [ECF No. 24 at 16]. The Court agrees for the following reasons.

"[S]tatements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). In other words, "[s]tatements of pure opinion are not actionable." *Blake v. Giustibelli*, 182 So. 3d 881, 884 n.1 (Fla. Dist. Ct. App. 2016). "Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth [*15] in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262 (citing *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1981)). "Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication." *From*, 400 So. 2d at 57; *Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. Dist. Ct. App. 1995).

Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court. *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 715 (11th Cir. 1985); *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006); *From*, 400 So. 2d at 56-57. When making this assessment, a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in

qualifying the statement. *Keller*, 778 F.2d at 717. It is also the court's function to determine "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." *Stembridge*, 652 So. 2d at 446 (quoting Restatement (Second) of Torts § 566, comment c).

Because the Court already determined that Statements 1 through 6, Statement 13, and Statement 14 were barred by the statute of limitations and thus dismissed with prejudice, the Court will focus [*16] its analysis here on Statements 7 through 12.

In Statement 7, Ms. McCawley states: "I am incredibly proud to be representing this group of survivors in the dance community as they battle for justice." [ECF No. 13 at 60]. Ms. McCawley's statement here is "based on facts which are set forth in the publication" and "which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262. Statement 7 was made in a Good Morning America interview that is clearly referring to the lawsuit in the District of Nevada, and the facts of that lawsuit are discussed in the interview and can be found on the District of Nevada case docket. Therefore, the Court finds that Statement 7 is pure opinion and thus protected by the First Amendment.

In Statement 8, Ms. McCawley states:

> Sage had a business relationship with Mr. Katz and there was never any sexual relationship between them. As is typical of abusers facing serious litigation, with four walls of facts closing in, the Buttons have filed counterclaims that distract from and distort the truth. Abusers often try to weaponize the allegations brought against them, and that's exactly what is happening here ... The counterclaims the Buttons have filed [*17] falsely and recklessly implicate others, including Daryl Katz, and are a factually unfounded attempt to portray the women they abused as liars.

[ECF No. 13 at 62]. Ms. McCawley's statement here is based on facts set forth in the Buttons' publicly available counterclaims and is also a "statement of pure opinion with respect to [Ms. McCawley's] subjective assessment of the merits" of the counterclaims in the District of Nevada litigation. *See Vibe Ener v. Duckenfield*, 2020 U.S. Dist. LEXIS 181407, 2020 WL 6373419, at *8 (S.D. Fla. Sept. 29, 2020). Statement 8, therefore, is pure opinion and is not actionable as a matter of law.

In Statement 9, Ms. McCawley states:

> As put forth in our complaint, Dusty and Taylor Button assaulted seven different dancers—including women who have chosen to make their claims anonymously. The Buttons' on-their-heels assertion now that seven different women made up detailed and harrowing accounts of abuse for fame is absurd.
>
> A judge in Boston granted Sage Humphries a permanent restraining order against the Buttons after hearing her testimony, and stated that he 'fully credited' her testimony making clear that

> he was satisfied 'beyond a reasonable doubt' that the Buttons' conduct amounted to abuse under the criminal laws. The Buttons are not only engaging in shameless [*18] victim-blaming, but they are also intentionally violating the Boston court's restraining orders, which mandated them to surrender information that they stole from Ms. Humphries' cell phone to the Boston Police Department. The Buttons are abusers of young vulnerable women who were in their sphere of influence as aspiring dancers and now the rule of law.

[ECF No. 13 at 64, 66-67]. Statement 9 references the complaint and a permanent restraining order issued by a judge, making it clear to the reader that Ms. McCawley is expressing her opinion on the merits of her clients' claims in the District of Nevada case. The Court thus finds that Statement 9 is a statement of pure opinion. *See Turner*, 879 F.3d at 1262 ("Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public."). Furthermore, Statement 9 is inactionable to the extent that it contains statements of fact that are "demonstrably true." *Vibe Ener*, 2020 U.S. Dist. LEXIS 181407, 2020 WL 6373419, at *8. Ms. McCawley is quoting a judge's statements on the record. Thus, Statement 9 is also not actionable.

In Statement 10, Ms. McCawley [*19] states: "We look forward to putting the women's case before a jury, which will hear the facts of the abuse they suffered while pursuing their dreams as dancers and not the fiction the Buttons are peddling in an act of desperation." [ECF No. 13 at 72]. Again, the reference to the case and a jury makes clear that Ms. McCawley is sharing her opinion about the merits of her clients' case in the District of Nevada. Therefore, the Court finds that Statement 10 is pure opinion, protected by the First Amendment, and not actionable.

In Statement 11, Ms. McCawley states: "Most recently we're doing a case on some ballerinas that had been victimized, some of them with the Boston Ballet, so the work has been pro bono in this case, and the commitment of the firm has been astronomical." [*Id.* at 73]. First, this statement does not even reference the Buttons directly. This statement is clearly referring to a publicly accessible case and thus is commentary based on facts that are publicly available. Thus, the Court finds that Statement 11 is not actionable under the law of defamation.

Lastly, Statement 12 is an undated quote from Ms. McCawley's law firm biography that does not mention the Buttons and is not something [*20] that Ms. McCawley stated. Her firm biography states: "She is also presently representing pro bono a group of ballerinas in their efforts to hold their abusers accountable on sex trafficking charges." [*Id.* at 74]. Like Statement 11, this statement is in express reference to ongoing legal proceedings that are publicly available. Thus, the Court finds that Statement 12 is not actionable under the law of defamation.

Based on the analysis above, the Court must dismiss Statements 7 through 12 as they fail to allege defamation. In an abundance of caution, and primarily because the Plaintiffs appear *pro se*, the Court dismisses these statements without prejudice to allow Plaintiffs a final opportunity to amend their Complaint (if they can) in accordance with this Order as to Statements 7 through 12 of the Complaint only.

### C. Defamation Claim

To establish a claim for defamation under Florida law, a plaintiff must demonstrate: (1) publication; (2) falsity; (3) knowledge or reckless disregard of falsity on a matter concerning a public figure, or negligence on a matter concerning a private person; (4) actual damages; and (5) that the statement is defamatory. *See Mennella v. Am. Airlines, Inc.*, 824 F. App'x 696, 701 (11th Cir. 2020) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). At issue here is whether [*21] the Buttons are public figures and must plead actual malice. Defendant argues that the Buttons are public figures and thus must plead actual malice to state a claim for defamation. [ECF No. 24 at 20]. Plaintiffs argue that they are not public figures and therefore do not need to plead actual malice. [ECF No. 43 at 14].

Whether Plaintiffs are public figures is a question of law for the Court. *Brewer v. Memphis Publ'g Co.*, 626 F.2d 1238, 1247 n.13 (5th Cir. 1980).[1] "An individual may qualify as a public figure either generally—that is one with such fame and notoriety that he will be a public figure in *any* defamation case—or for only 'limited' purposes, where the individual has thrust himself into a particular public controversy, and thus must prove actual malice in regard to certain issues." *Basulto v. Netflix, Inc.*, No. 1:22-CV-21796, 2023 U.S. Dist. LEXIS 167374, 2023 WL 7129970, at *39 (S.D. Fla. Sept. 20, 2023).

The Buttons are public figures from the face of the Complaint. In their Complaint, Plaintiffs state that "Plaintiff Dusty Button was a *world-renowned* ballet dancer who trained at the Jacqueline Kennedy Onassis School at the American Ballet Theatre in New York City," and that she "is best known for her work with the Boston Ballet" where she was a principal ballerina. [ECF No. 13 ¶¶ 28, 30]. Dusty Button "was Red Bull's first and only ballet athlete and has been published [*22] in media publications across the globe, positively influencing hundreds of thousands of people nationally and internationally, including by performing and teaching in over thirty different countries and across the United States." [*Id.* ¶ 31]. At the time of the events described in the Complaint, Plaintiff Dusty Button's Instagram account "amassed nearly half of a million followers and subscribers." [*Id.* ¶ 32]. Plaintiffs also state in their Complaint that "Plaintiff Mitchell Taylor Button ... was one of the world's *most influential* custom Ferrari and military vehicle designers and builders for seven years, approximately from 2014 - 2021, with his work having been published in media publications across the globe for his automotive design, builds and work in the industry." [*Id.* ¶ 34]. He "has positively influenced hundreds of thousands of people nationally and internationally and has been procured from global organizations for speaking engagements and commissions that continue to live on with his legacy today[.]" [*Id.* ¶ 35]. Plaintiffs also note that at the time of the events described in the Complaint, Plaintiff Taylor Button's Instagram account "amassed nearly half of a million followers [*23] and subscribers." [*Id.* ¶ 36]. Furthermore, the Buttons appear to concede the point that they are public figures by attempting to

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit held that all Fifth Circuit decisions issued before September 30, 1981 would become binding precedent in the Eleventh Circuit.

plead facts in support of the element of actual malice in their Complaint. *See Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1122 (S.D. Fla. 2021). As Defendant notes, the Buttons allege that Ms. McCawley's statements were made with "actual malice" on 23 occasions throughout the Complaint.[2]

Florida courts have found that individuals who "put [themselves] in the public arena" are public figures for defamation purposes. *Turner*, 879 F.3d at 1272; *see also Scholz v. RDV Sports, Inc.*, 710 So. 2d 618, 626 (Fla. Dist. Ct. App. 1998) (noting that he "drew public attention to himself and his employment status with the [professional team] when he met with newspaper reporters"). This Court has found that a doctor who described himself as "one of the world's most famous celebrity doctor" and who had 2.5 million followers on Instagram was considered a public figure. *See Rubinstein v. Ourian*, No. 20-21948-CIV, 2021 U.S. Dist. LEXIS 171799, 2021 WL 4134753, at *6 (S.D. Fla. Sept. 10, 2021). Here, Dusty Button describes herself as "a *world-renowned* ballet dancer" who has "positively influenc[ed] hundreds of thousands of people nationally and internationally" and who has "amassed nearly half of a million followers and subscribers" on Instagram at the time of the events described in the Complaint. [ECF No. 13 ¶¶ 28, 31, 32]. Mitchell Taylor Button describes [*24] himself as "one of the world's *most influential* Ferrari and military vehicle designers and builders" who has "positively influenced hundreds of thousands of people nationally and internationally" and "amassed nearly half of a million followers and subscribers" on Instagram at the time of the events described in the Complaint. [*Id.* ¶ 34, 35, 36]. Thus, the Court finds, based on *Rubinstein*, that the Buttons are public figures.

Because the Buttons are public figures, they must establish "actual malice" on behalf of the author or publisher in order to maintain a defamation action. *Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1984) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). Even if the Court only determined that the Buttons were limited public figures, "[b]oth types of public figures must prove that the defamatory statements were made with actual malice." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 945 n.9 (11th Cir. 2017). The Eleventh Circuit has held that the *Twombly/Iqbal* "plausibility pleading standard applies to the actual malice standard in defamation proceedings." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). Thus, to plead actual malice, the Buttons "must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *Sullivan*, 376 U.S. at 280). Importantly, this is [*25] a *subjective* test, focusing on whether the defendant "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Id.* at 702-03.

The Buttons' Complaint alleges actual malice in a purely conclusory manner. For example, the Complaint asserts that "[t]he defamatory statements made to the media and the press by Ms. McCawley *were*, and are *now* and *forever* false in their entirety, and were made by Defendant

---

[2] *See* ECF No. 13 ¶¶ 5, 15, 50, 104, 191, 422, 476, 485, 494, 502, 514, 522, 532, 540, 550, 558, 567, 575, 585, 593, 607, 615, 624.

with *actual malice* and/or with a *reckless disregard* for the truth given that Defendant knew her statements were patently and demonstrably false following her self-professed "*hundreds of hours of research and interviews*[.]" [ECF No. 13 ¶ 15]. This statement is a legal conclusion and, as such, does not satisfy the well-pleaded allegation requirement set forth in *Twombly*, 550 U.S. at 555 (holding that a plaintiff's grounds for relief must be based on factual allegations, not a formulaic recitation of the elements of a cause of action); *see also Iqbal*, 556 U.S. at 667-80 (quoting and citing *Twombly*); *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (quoting and citing *Iqbal* ).

There are other instances in the Complaint where the Buttons allege actual malice or reckless disregard for the truth, but they do not set forth *facts* demonstrating [*26] that Defendant acted in that way. Thus, the Complaint does not allege sufficient relevant facts to support a claim of actual malice. "A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint." *Michel*, 816 F.3d at 706.

To summarize, Plaintiffs may file a motion for leave to file a Second Amended Complaint with a copy of the Second Amended Complaint attached as to Statements 7 through 12, setting forth the facts that support this allegation, **no later than February 7, 2025**. Plaintiffs shall also submit a redline with their motion for leave to file a Second Amended Complaint that clearly indicates the changes between the First Amended Complaint and Second Amended Complaint. Failure to comply with this Order will result in the Court dismissing and closing this case. In considering how to amend their complaint, Plaintiffs are reminded that "[*p*]*ro se* litigants are subject to Rule 11 sanctions." *Martins v. Royal Caribbean Cruises, Ltd.*, 431 F. Supp. 3d 1355, 1365 (S.D. Fla. 2019). Even *pro se* plaintiffs are subject to sanctions for filing frivolous and vexatious complaints. *See, e.g., United States v. Barker*, 182 F.R.D. 661, 662-65 (S.D. Ga. 1998).

**D. Florida's Single Publication/Single Action Rule**

**(i) Defamation Per Se, Libel Per Se, Slander** [*27] **Per Se, Defamation Per Quod, and Injurious Falsehood Claims**

Defendant next argues that the Buttons' defamation per se, libel per se, slander per se, defamation per quod, and injurious falsehood claims fail under Florida's single publication/single action rule. [ECF No. 24 at 25]. Plaintiffs argue in response that Plaintiffs' actions do not arise from the same publication and that "Plaintiffs' claims against Ms. McCawley are not solely based on the statements on the face of the complaint but also on *actual knowledge* of other defamatory statements made by Sigrid McCawley which were not published in full[.]" [ECF No. 43 at 17].

Plaintiffs' arguments fail because the individual counts in the Complaint are nearly identical, and they do not distinguish that they are related to any different defamatory statements. [*See* ECF No. 13 ¶¶ 472-550, 568-85, 608-24]. Furthermore, the fact that Plaintiffs have knowledge of other

defamatory statements outside the face of the Complaint is not relevant because "[a] court's review on a motion to dismiss is 'limited to the four corners of the complaint.'" *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002)).

Florida's "single publication/single action rule does *not* permit multiple actions to [*28] be maintained when they arise from the same publication upon which a failed defamation claim is based." *Ovadia v. Bloom*, 756 So. 2d 137, 141 (Fla. Dist. Ct. App. 2000). "Thus, if the defamation count fails, the other counts based on the same publication must fail as well because the same privileges and defenses apply." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. Dist. Ct. App. 2002). Here, because the Buttons' defamation count fails, the Buttons' claims for defamation per se (Count II), libel per se (Count III), slander per se (Count IV), defamation per quod (Count VIII), and injurious falsehood (Count I) fail as well, and these counts must also be dismissed without prejudice under the single publication/single action rule. *See Stone v. Shafran*, 641 F. Supp. 3d 1344, 1366 (S.D. Fla. 2022) (dismissing additional counts for violating the single action rule).

**(ii) Intentional Infliction of Emotional Distress Claim**

Next, Defendant argues that the Buttons' intentional infliction of emotional distress ("IIED") claim also must also be dismissed under Florida's single publication/single action rule. [ECF No. 24 at 26]. In their response, Plaintiffs state "Ms. McCawley's statements published about the Plaintiffs nearly ended their lives and through there may be no supporting case law for a Plaintiff who nearly took their own lives due to an attorney's outrageous, false and defamatory [*29] statements made to the mass media; this case should set a precedent for those to follow[.]" [ECF No. 43 at 19].

This court will not accept Plaintiffs' invitation to create any new law here, and the well-established law in this area disposes of their argument. Florida's "single publication/single action rule does *not* permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based." *Ovadia*, 756 So. 2d at 141. "[A] plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992). That is what Plaintiffs are doing here. However, an IIED claim "must stem from outrageous conduct separate from the defamation[.]" *Ortega Trujillo v. Banco Cent. del Ecuador*, 17 F. Supp. 2d 1340, 1343 (S.D. Fla. 1998). As alleged, the Buttons' IIED claim does not stem from outrageous conduct separate from the defamation, and thus, the IIED claim (Count V) must be dismissed without prejudice as well. *See Stone*, 641 F. Supp. 3d at 1366 (dismissing additional counts for violating the single action rule).

**(iii) Civil Conspiracy Claim**

Finally with respect to the Complaint, Defendant argues that the Buttons' civil conspiracy claim must be dismissed because Florida law does [*30] not recognize civil conspiracy as a standalone tort, it violates the single publication/single action rule, and it fails to allege the scope of the conspiracy, its participants, and when the agreement was entered into. [ECF No. 24 at 26-27]. Plaintiffs argue that their "defamation claim does not fail and therefore, their claim of civil conspiracy succeeds," and "Ms. McCawley's collusion with the New York Times and other media outlets ... [is] the basis of their Civil Conspiracy claim and including collusion with her clients[.]" [ECF No. 43 at 19].

The Court need not consider all these arguments because Defendant is correct that "[i]n Florida, actionable civil conspiracy must be based on an existing independent wrong or tort[.]" *Dane St., LLC v. Nadeau*, No. 16-61565-CV, 2017 U.S. Dist. LEXIS 235561, 2017 WL 11643830, at *4 (S.D. Fla. Mar. 7, 2017). Since the count regarding the goal of the "conspiracy" (defamation) fails, the conspiracy count fails too. *See Perdomo v. Jackson Mem'l Hosp.*, 443 So. 2d 298, 300 (Fla. Dist. Ct. App. 1983). Furthermore, for much of the same reasons already stated the Buttons' civil conspiracy claim violates the single publication/single action rule because Ms. McCawley's alleged defamatory statements "cannot form the basis for the conspiracy claim because they also form the basis for the defamation and defamation per se claims." *Maletta v. Woodle*, No. 2:20-CV-1004-JES-MRM, 2021 U.S. Dist. LEXIS 89583, 2021 WL 1894023, at *6 (M.D. Fla. May 11, 2021). Accordingly, the civil [*31] conspiracy claim (Count VII) violates Florida's single action rule and must be dismissed without prejudice. *See Stone*, 641 F. Supp. 3d at 1366 (dismissing additional counts for violating the single action rule).

**E. Attorney's Fees and Costs Under Florida's Anti-SLAPP Statute**

Lastly, Defendant argues that she is entitled to mandatory attorneys' fees and costs under Florida's Anti-SLAPP statute. [ECF No. 24 at 24]. Plaintiffs argue that their Complaint "does not violate Florida's anti-SLAPP law including because the anti-SLAPP law is designed to protect citizens from lawsuits that are primarily intended to silence or intimidate them. This lawsuit is not intended to silence or intimidate Ms. McCawley[.]" [ECF No. 43 at 8].

Florida's Anti-SLAPP statute prohibits a person from filing a cause of action "against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue[.]" Fla. Stat. § 768.295(3); *see also* Fla. Stat. § 768.295(2)(a) (defining "[f]ree speech in connection with public issues" as "any written or oral statement that is protected under applicable law and ... is made in or in connection with a ... magazine article, musical work, news report, or other [*32] similar work"). The Anti-SLAPP statute also provides that "[t]he court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." Fla. Stat. § 768.295(4).

Upon review of the parties' arguments, the Court does not agree that Defendant is entitled to an award of fees and costs at this juncture because the Court has not addressed the merits of

Plaintiffs' claims, nor has the Court made the finding that Plaintiffs' lawsuit as a whole is without merit. *See Barbuto v. Miami Herald Media Co.*, No. 21-CV-20608, 2021 U.S. Dist. LEXIS 177120, 2021 WL 4244870, at *4 (S.D. Fla. Sept. 17, 2021); *cf. Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (affirming award of fees and costs under Florida Anti-SLAPP statute, where court determined that suit was without merit and arose out of protected First Amendment activity). Thus, Defendant's request for attorneys' fees and costs under Florida's Anti-SLAPP statute is **DENIED WITHOUT PREJUDICE**.

## IV. CONCLUSION

Accordingly, it is **ORDERED and ADJUDGED** that the Motion [**ECF No. 24**] is **GRANTED IN PART and DENIED IN PART**. Statements 1 through 6, Statement 13, and Statement 14 of the Complaint are **DISMISSED WITH PREJUDICE**. Statements 7 through 12 of the Complaint are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs may file a motion for leave to file a Second Amended Complaint with a copy [*33] of the Second Amended Complaint attached that addresses the issues the Court highlighted in this Order **no later than February 7, 2025**. Plaintiffs shall remove Statements 1 through 6, Statement 13, and Statement 14 from their Second Amended Complaint. Plaintiffs may only amend their claims as to Statements 7 through 12. Plaintiffs shall also submit a redline with their motion for leave to file a Second Amended Complaint that clearly indicates the changes between the First Amended Complaint and Second Amended Complaint. Failure to comply with this Order will result in the Court dismissing and closing this case. Defendant's request for attorneys' fees and costs under Florida's Anti-SLAPP statute is **DENIED WITHOUT PREJUDICE**.

**DONE AND ORDERED** in the Southern District of Florida on January 8, 2025.

/s/ David S. Leibowitz

DAVID S. LEIBOWITZ

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# EXHIBIT 3

# EXHIBIT 3

**Button v. Breshears**

United States District Court for the Southern District of New York

September 26, 2025, Decided; September 26, 2025, Filed

1:24-cv-03757-MKV

**Reporter**

2025 U.S. Dist. LEXIS 192039 *; 2025 LX 443162; 2025 WL 2771663

DUSTY BUTTON and MITCHELL TAYLOR BUTTON, Plaintiffs, -against- MADISON JANE BRESHEARS, Defendants.

**Prior History:** Button v. Breshears, 2024 U.S. Dist. LEXIS 181995, 2024 WL 4742622 (S.D.N.Y., Oct. 4, 2024)

Humphries v. Button, 2022 U.S. Dist. LEXIS 43867, 2022 WL 744483 (Mar. 11, 2022)

**Counsel:** [*1] Dusty Button, Plaintiff, Pro se, Myrtle Beach, SC.

Mitchell Taylor Button, Plaintiff, Pro se, Myrtle Beach, SC.

**Judges:** MARY KAY VYSKOCIL, United States District Judge.

**Opinion by:** MARY KAY VYSKOCIL

## Opinion

**ORDER & OPINION GRANTING MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge: Plaintiffs Dusty Button and Mitchell Taylor Button ("Taylor Button" and together with Dusty Button, "Plaintiffs" or the "Buttons"), proceeding *pro se*, assert several claims alleging that Defendant Madison Breshears ("Defendant") participated in a conspiracy to defame Plaintiffs and destroy their personal and professional lives. [ECF No. 17, ("AC") ¶¶ 1-19]. This action is one in a series of several suits brought by the Buttons against various parties associated with a lawsuit brought against them in Nevada District Court (the "Nevada Litigation"), including one other case previously before this Court.[1]

[1] *See Button v. New York Times*, No. 1:24-cv-05888-MKV, 2025 U.S. Dist. LEXIS 180601 (S.D.N.Y Sept. 15, 2025) (motion to dismiss case granted); *Button v. Lopresti*, No. 25-cv-867-DMS-DDL (S.D. Cal. August 20, 2025) (motion to dismiss pending); *Button v. Melcher*, 771 F. Supp. 3d 76, 80 (D. Mass. 2025) (motion to dismiss entire case granted); *Button v. Thonis*, No. 24-cv-220, 2025 U.S. Dist. LEXIS 69368, 2025 WL 1092636, at *5 (D.N.H. Apr. 11, 2025) (motion to dismiss entire case granted); *Button v. Humphries*, No. 8:24-cv-01730, 2025 U.S. Dist. LEXIS 127402, 2025 WL 1820116, at *4 (C.D.C.A. June 9, 2025) (motion to dismiss entire case granted with prejudice); *Button v. McCawley*, 24:cv-60911, 2025 U.S. Dist. LEXIS 3634, 2025 WL 50431, at *12 (S.D.F.L. Jan 8, 2025) (motion to dismiss granted with

Defendant, also proceeding *pro se*, now moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendant's motion is GRANTED.

## FACTUAL BACKGROUND[2]

### I. The Parties

Dusty Button is a former ballet dancer, and Taylor Button is a former custom automotive designer. AC ¶¶ 28, 34. Defendant runs [*2] three relevant social media accounts: (1) "@Real_World_Ballerina," an Instagram account dedicated to a variety of dance-related content ("@Real_World_Ballerina"); (2) "@mjbreshears," a personal Instagram account ("Personal Account"); and (3) "@embresh," a TikTok account ("TikTok Account"). AC ¶¶ 42, 94. At the time of the alleged posts, @Real_World_Ballerina had "nearly twenty thousand followers." *See* AC ¶¶ 16, 67-68, 312. Non-party Sage Humphries is a woman with whom Plaintiffs previously had a relationship. AC ¶ 196.

### II. The Relationship Between Plaintiffs, Defendant, and Sage Humphries

According to the Amended Complaint, Defendant has known Sage Humphries since childhood. AC ¶ 190. The pair share a mutual friend named Hannah Stolrow. AC ¶ 190. At some point in 2017, Plaintiffs began a consensual, three-way romantic relationship with Sage Humphries, who was "nearly twenty years old" at the time. AC ¶ 196. Both Plaintiffs allege that while Humphries' parents approved of the relationship at first, their view on the arrangement soured in May 2017. AC ¶¶ 208-13. Plaintiffs further allege that Humphries' parents took steps to end the relationship including (1) making false statements to [*3] the Boston Ballet, Dusty Button's employer at the time, that lead to her termination, including that Plaintiffs "had over fifty automatic weapons, hand grenades, and land mines in their apartment"; (2) forcefully taking their daughter to California to be "converted"; (3) telling Stolrow that Plaintiffs had drugged and raped Humphries; and (4) falsely telling law enforcement officers that "[Taylor Button had] boarded a flight, was coming to kidnap [Sage Humphries] and take her back to Boston, [and] that Plaintiffs were going to harm Sage [Humphries] and her family." AC ¶¶ 213, 216, 221, 230, 232, 238-39. Police reports from the period indicate that law enforcement considered the reports filed by Ms. Humphries' parents "unfounded." *See* AC ¶ 260. Throughout this period, Humphries stayed in contact with Plaintiffs by using Snapchat on various peoples' phones, through which Humphries "begg[ed]" Plaintiffs to "come save her" and to "come get her," claimed that "her parents were performing exorcisms on her," had kidnapped her, and were forcing her to go to therapy. AC ¶¶ 235, 242. The

---

prejudice in part and without prejudice in part); *Button v. Roe*, No. 24-cv-220, 2024 U.S. Dist. LEXIS 227468, 2024 WL 5136694, at *1 (D.N.H. Dec. 17, 2024) (motion to dismiss case in its entirety granted); *Button v. Doherty*, No. 1:24-cv-05026-JPCKHP (S.D.N.Y.) (motion to dismiss pending, Report & Recommendation suggests granting motion to dismiss case in its entirety).

[2] The Court draws the facts recited in this Opinion from the Amended Complaint [ECF No. 17 ("AC")], the well-pleaded facts of which are accepted as true for purposes of resolving this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

tumultuous relationship ended on July 18th, 2017, allegedly through a message sent by Ms. Humphries' parents [*4] from her Snapchat account. AC ¶ 258.

In August 2017, Humphries filed an application for a temporary restraining order against the Plaintiffs. AC ¶ 263. Shortly thereafter, Humphries was granted a permanent restraining order against Plaintiffs following an *ex-parte* hearing. AC ¶ 283. Plaintiffs allege that Humphries "perjured herself in Court" and "committed fraud upon the Court" at the hearing regarding this restraining order and similarly used false police statements to procure the permanent restraining order. AC ¶¶ 266, 284. Humphries later admitted that she applied for the restraining order to prevent Plaintiffs from "blackmailing" her using photographs that she had unintentionally uploaded to Plaintiffs' hard drive some time in 2017. AC ¶ 268. Plaintiffs allege that these photographs show evidence of a relationship between Daryl Katz, a public figure and owner of the Edmonton Oilers, and Ms. Humphries, part of which included Katz allegedly sending money to Humphries' "in exchange for sexual favors." AC ¶ 271.

Plaintiffs maintain that Defendant had personal knowledge of their relationship with Humphries, who had allegedly told Defendant that "she had 'never been happier' than she [*5] was while in the relationship with Plaintiffs." AC ¶¶ 199, 289-94. They also allege that Defendant had personal knowledge that Humphries was an adult at the time of her relationship with the Buttons, that Humphries wanted to stay in a relationship with the Buttons, and was forced to sign the restraining order against the Buttons against her will. AC ¶ 287-96.

Defendant allegedly disregarded this information and posted the below-described allegedly defamatory content to her social media to "eliminate Plaintiffs' ability to work" as part of a coordinated effort to harm their ability to defend the yet-to-be-filed Nevada Litigation and "forc[e] Plaintiffs to destroy evidence that federally incriminates [Sage Humphries] and one of the wealthiest and most prominent men in the country Daryl Katz, for illegal prostitution." AC ¶ 301.

### III. The May 2021 Social Media Posts

On May 13, 2021, Defendant comment on one of Dusty Button's Instagram posts using her Personal Account, @mjbreshears, on which she posted "stop preying on young girls" and "feel like y'all should know she can't keep a ballet job [because] she grooms young girls into sex acts with herself and her husband." AC ¶¶ 58-59. Dusty Button [*6] was teaching a class to nearly 300 students, at least some of whom were children, when these comments were posted. AC ¶ 58. Over the course of nearly three hours, Plaintiffs deleted these comments and Defendant reposted them. AC ¶ 65. Plaintiffs eventually blocked Defendant's Personal Account from commenting on Dusty Button's profile. AC ¶ 65.

Immediately after Defendant's Personal Account was blocked, Defendant began uploading content about the Plaintiffs to her other account, @Real_World_Ballerina. AC ¶¶ 66, 69. Defendant posted the following statements:

• A post that reads "PSA: DUSTY BUTTON IS A SEXUAL PREDATOR" (the "Original Post")

• A story containing one of Dusty Button's posts showing her dancing with a text overlay that reads "This keeps getting removed" and "And she blocked me. But if you follow Dusty Button, you should know that she can't keep a ballet job because she grooms young girls to engage in sex acts with herself and her husband."

• A post that reads: "[I]f u or someone u know has been victimized by dusty_button, u aren't alone. She can't keep a ballet job because she grooms young dancers for sex acts with herself and her husband. This will probably get removed, she [*7] has managed to block and remove my other posts, but I hope at least someone can see this."

• A story that reads: "I have friends who have personally been victimized, or known someone victimized by @dusty_button," and "Don't give her a platform."

• A story that reads: "I don't expect anyone to take my word on faith! This is a serious accusation, and you are justified in being skeptical. From my end, knowing what I know (but am unable to disclose in detail) I feel like the right thing to do is at least warn you guys. If anyone is at least a little more careful or cautious around her, it's worth it to me[,]" as well as "Believe victims doesn't even apply here, IM NOT A VICTIM. I'm here to say keep asking questions. stay alert, stay safe, I love u [heart emoji]"

• A story that includes an image of a comment apparently left on one of Defendant's posts by an Instagram user that reads "@real_world_ballerina this is slander and unless you have actual proof, expect to be sued." Defendant overlays text that reads "I'm being threatened by dusty button's henchman?"

• A post containing an image of a woman dressed in knight's armor and captioned "[N]ot afraid. [N]ot even a little."

AC ¶¶ 69, 74. Over [*8] the same few hours, Defendant continued to engage with third party Instagram users who commented on her own prior posts. AC ¶ 70. Some of her comment responses include:

• "[I]f she's innocent she can say so. Like u said, I haven't produced evidence so there's no reason anyone should believe me over her. She's a famous, successful dancer. I know what libel is. I'm a law student. This isn't it, sorry."

• "[A]lso u have no clue what proof I have. But go off."

• "[B]ruh . . . I literally have no reason to randomly ruin someone's life for no reason. Why tf would I do that. I know defamation law. I wouldn't say this if I didn't have legit reason."

• "[M]ind ur own business. U know if things aren't happening behind the scenes? No? Then stfu. If one person exercises caution bc of this it's worth it. Bye [waving emoji]"

• "[K]eep an eye out" in response to an Instagram user asking for her source.

• "It's true" in response to an Instagram user commenting that "I really hope you're is making this up, purely because that is next level [expletive] up if it's true."

• "I know, little girls idolize her [crying emoji]" in response to an Instagram user saying "Oh my god . . ."

• "[A]ll I can say is multiple [*9] ppl have responded to this post alone saying they also know victims"

AC ¶¶ 74, 75. These comments were added to the posts by @Real_World_Ballerina, none were alleged to have been added to Taylor Button's Instagram account, and only Defendant's initial comments—"stop preying on young girls" and "feel like y'all should know she can't keep a ballet job [because] she grooms young girls into sex acts with herself and her husband"—were added to Dusty Buttons's posts. AC ¶¶ 59, 69, 74, 75. Nevertheless, Plaintiffs allege that all of Defendant's posts and comments were spread to and viewed by "all" of Dusty Button's "nearly half a million" Instagram followers and "all" of Taylor Button's "nearly half a million" Instagram followers. *See* AC ¶¶ 80, 83. Defendant also allegedly made several similar posts to her TikTok Account. AC ¶ 94. Plaintiffs do not identify specific posts or statements made from the TikTok Account. AC ¶ 94. Plaintiffs also allege that the night of May 13, 2021, several anonymous Instagram accounts were created by Defendant and her followers, such as "@dusty_button_hatepage," and were dedicated to disseminating demeaning content about Plaintiffs. AC ¶ 108.

All of the posts and [*10] comments made by @Real_World_Ballerina have since been taken down before the filing of the complaint, and Defendant has issued no corrections or qualifications. AC ¶ 101, 364. Plaintiffs maintain that neither of them has been terminated for grooming young dancers for sex acts. AC ¶ 87, 88.

## IV. The Fallout After the May 13, 2021 Social Media Posts

The night of May 13, 2021, Plaintiffs received a deluge of messages on social media and comments on their posts referencing the allegations. AC ¶ 105-07. Some examples include:

• "Hey Dusty! I hope prison is everything you hope for! Maybe those tilts and competition tricks will come in handy behind bars?! Best of luck!"

• "[Taylor Button] and the missus have been too busy BF'n little girls to make social media posts it would appear."

• "According to a recent post by @real_world_ballerina, dusty button is a predator who is not someone people should be looking up to! Just spreading the word."

• "#dustybutton You child rap1st P#S. You need to be thrown in a wood chipper."

• "Child rapist POS. You need to be thrown in a wood chipper"
AC ¶ 107.

The next day, the owner and director of Artists Simply Human told Dusty Button that she would not be allowed to [*11] teach the rest of her scheduled classes during the weekend dance convention. AC ¶¶116-18. Three weeks later, Dusty Button's contract with Artists Simply Human was "terminat[ed]" indefinitely. AC ¶ 119. Shortly thereafter, users created online fora on other social media platforms, including Facebook and Reddit, dedicated to discussing the content of Defendant's posts and other allegations. AC ¶ 130, 131. Plaintiffs allege, without detail, that some of the commentary on these forums was posted by "'anonymous' users associated with Madison Breshears, non-party Cat Cogliandro, and Sage Humphries."[3] AC ¶ 131.

Plaintiffs allege that they "lost any and all business immediately and for the foreseeable future" as a result of Defendant's posts. AC ¶ 325, 338-39. All of Plaintiffs' contractual partners terminated their relationships with the Plaintiffs, resulting in "millions of dollars lost in revenue." AC ¶¶ 102, 103. One of these partners cited "some social media posts" as the reason for termination of their continued relationship. AC ¶ 128. Dusty Button was forced to cease all dance-related activity, including teaching, choreography, modeling, dancing, and speaking engagements. AC ¶ 328. Taylor [*12] Button was similarly forced to stop any automotive design work. AC ¶ 329. Furthermore, Plaintiffs' personal brands, including Button Brand, Button Built, and Bravado by Dusty Button, "[lost] hundreds of thousands of dollars in revenue and costs." AC ¶ 349. Plaintiffs allege that they "nearly" took their own lives as a result of the allegedly defamatory comments made about them, believing that they would "never recover" even if the world "learned the truth, that they were exemplary models for those who idolized them." AC ¶¶ 125, 372.

## V. The Nevada Litigation

On July 28, 2021, several plaintiffs filed a civil lawsuit against Taylor Button, alleging sexual abuse, and later added Dusty Button as a defendant. *See* Complaint, at ¶¶ 148-54, *See Humphries v. Button*, No. 21-cv-01412, (D. Nev. July 28, 2021); Third Amended Complaint, *Humphries v. Button*, No. 21-cv-01412, (D. Nev. August 2, 2023), (the "Nevada Litigation").[4] Plaintiffs allege that they did not know who operated @Real_World_Ballerina until the fall of 2023 "by way of the discovery process in the Nevada litigation." AC ¶¶ 97, 375.

## VI. The May 2024 Social Media Posts

---

[3] Plaintiffs name Hannah Stolrow and Sage Humphries as "non-party co-conspirators" who "intentionally conspired together to ruin Plaintiffs' lives, crippling Plaintiffs' ability to work as their reputations, careers, business and livelihood were completely destroyed." AC ¶¶ 158, 190, 384.

[4] The Court takes judicial notice of the Nevada Litigation to establish the facts of the proceedings, not for the truth of any facts asserted by parties or factual findings in the case. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

On May 13, 2024, exactly three years after Defendant posted the allegedly defamatory statements, Plaintiffs filed the initial Complaint in this case. AC ¶ 308. On the same day, they sent [*13] Defendant a text message that read "Madison, happy three year anniversary. May the odds be ever in your favor." AC ¶ 308. The message included a photo of Defendant's May 13, 2021 post that read "PSA: DUSTY BUTTON IS A PREDATOR." AC ¶ 308. Defendant replied, "[i]f you still have a lawyer at this point, I'd consider running any further late night mafioso-style test [sic] blasts by him/her first:)." AC ¶ 308.

The next day, Defendant posted a story to @Real_World_Ballerina including screenshot of the text message that Plaintiffs had sent the previous evening with the following text overlaid: "Received ominous message from unknown number late Monday night." AC ¶ 311. One of the Buttons' phone numbers was visible. AC ¶ 311. Defendant also posted a story of a screenshot of a May 14, 2024 email sent by "The Buttons" that contained the same image and text as their May 13, 2024 text message. AC ¶ 311. Defendant overlaid the words "Oh. Well OK then." AC ¶ 311. The email address from which the email was sent was visible. AC ¶ 311.



AC ¶ 311. The same day, Defendant uploaded additional story posts to @Real_World_Ballerina, including:

- A screenshot of an internet search for the phone number from which [*14] the text messages were sent. One of the search results from PacerMonitor.com was circled and titled "Humphries_et_al_v_Button__nv." The post included an eye rolling emoji.

- A close-up screenshot of the phone number associated with the text messages sent by Plaintiffs on May 13, 2024, with a text overlay reading, "HMM WONDER WHO THIS COULD BE."

AC ¶ 311. Following these posts, Plaintiffs received several intimidating calls and messages from unknown parties. AC ¶ 314.

**VII. The May 27, 2024 Phone Call**

Plaintiffs and Defendant called each other on May 27, 2024. AC ¶¶ 318-20 (the "May 27, 2024 Phone Call"). On the call, Defendant stated that she had not spoken to Humphries prior to making the May 13, 2021 social media posts. AC ¶ 320. Defendant also stated that she did not intend for her posts to make a big "splash" or cause "damage." AC ¶ 320. While explaining her assessment of the merits Plaintiffs' claims, Defendant stated the following: "I just want to tell you that it's gonna be bad if you sue me"; "[i]t's not worth your time and energy or mine"; "[t]here is [*sic*] consequences to filing frivolous or not legally viable lawsuits"; "[a]s a lawyer, going through your complaint the causes [*15] of action that you are listing with the facts that even just based on I'm gonna [*sic*] write my motion to dismiss, I'm not going to be arguing the facts I'm going to be arguing the law and based on the law and the claims that you've made you haven't stated a claim upon which relief can be granted so . . . and that's sanctionable"; "[y]ou shouldn't be filing frivolous lawsuits'"; "I don't think it's worth your time, it's not gonna [*sic*] end well for you." *See, e.g.*, AC ¶¶ 12, 320, 580(2). Plaintiffs responded to Defendant with the following—"Are you warning us?" "So you're doing this out of the graciousness of your heart to help us?" and "I appreciate your advice" while warning Defendant not to provide "unsolicited legal advice." *See* AC ¶ 320.

## PROCEDURAL HISTORY

Plaintiffs first filed a complaint on May 13, 2024. [ECF No. 1 ("Compl.")]. Defendant filed a letter motion seeking leave to file a motion to dismiss. [ECF No. 14]. The Court entered a scheduling order that included an opportunity for Plaintiffs to file an Amended Complaint in response to the issues raised by Defendant in connection with her contemplated motion to dismiss. [ECF No. 16]. Thereafter, Plaintiffs filed the operative [*16] Amended Complaint, [ECF No. 17], which asserts ten separate claims: (1) Injurious Falsehood ("Claim One"); (2) Defamation *per se* ("Claim Two"); (3) Libel *per se* (Claim Three"); (4) Slander *per se* ("Claim Four"); (5) Cyber Harassment ("Claim Five"); (6) Intentional Infliction of Emotional Distress

("IIED" or "Claim Six"); (7) *Prima Facie* Defamation ("Claim Seven"); (8) Civil Conspiracy ("Claim Eight"); (9) Defamation *pro quod* ("Claim Nine"); and (10) Tortious Interference with Business Relations ("Claim Ten"). *See* AC ¶¶ 386-610. This case is before the Court under the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). *See* AC ¶¶ 23-25.

Defendant moved to dismiss all ten claims pursuant to Federal Rule of Civil Procedure 12(b)(6) on timeliness grounds and filed a memorandum in support of her motion. [ECF No. 22, 21 ("Def Mem.")]. Plaintiffs opposed the motion. [ECF No. 25 ("Pl. Opp.")].[5] Defendant filed a reply. [ECF No. 32 ("Def. Reply")]. Thereafter, Defendant submitted a letter advising the Court of orders granting motions to dismiss two other cases brought by the Buttons. [ECF No. 36]. The Buttons also filed a letter advising the Court of developments in the Nevada Litigation and a letter advising the Court of an order in another [*17] case that found Plaintiffs claims were "sufficient to survive the 'low threshold' set for *sua sponte* screening." [ECF Nos. 39, 40].

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. The Court "must accept as true all of the [factual] allegations contained in a complaint," but the Court is not required to accept "legal conclusions," and mere "conclusory statements" are not factual allegations. *Id.*

*Pro se* parties are entitled to "special solicitude." *Tewari v. Sattler*, No. 23-36-cv, 2024 U.S. App. LEXIS 1046, 2024 WL 177445, at *1 (2d Cir. Jan. 17, 2024) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006)). The Court must "liberally construe pleadings and briefs submitted by pro se litigants." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017). A district court is not, however, tasked with "scouring obscure bodies of law in order to come up with novel claims on behalf of pro se litigants." *Id.* at 158. Even a *pro se* complaint must give the defendant "fair notice of [the] claim and the grounds upon which it rests." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008); *see also Twombly*, 550 U.S. at 545.

## DISCUSSION

---

[5] Plaintiffs request oral argument in their Opposition. *See* Pl. Opp. Since oral argument is not needed to rule on the motion to dismiss, Plaintiffs' request is denied. *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 226 (2d Cir. 1999) (*per curiam*) (noting that "a district court's decision whether to permit oral argument rests within its discretion" (citing *Katz v. Morgenthau*, 892 F.2d 20, 22 (2d Cir. 1989)); *see also Henderson v. Lagoudis*, No. 3:12cv1688 (JBA), 2014 U.S. Dist. LEXIS 26346, 2014 WL 813120, at *1 n.1 (D. Conn. Feb. 28, 2014) (denying request for oral argument because it was not necessary to decide pending motion).

## I. The Defamation Claims, IIED Claims, and Claims Sounding [*18] in Defamation are Time-Barred

Plaintiffs' defamation claims, (Counts Two, Three, Four, Seven, Nine), as well as those that sound in defamation, (Counts One, Six, and Ten), are subject to a one-year statute of limitations and are time-barred.[6] Separately, the claims that sound in defamation must be dismissed on the additional ground that they improperly are duplicative of the defamation claims.

### A. Defamation Claims

Under New York law[7], defamation claims are subject to a one-year statute of limitations. N.Y. C.P.L.R. § 215(3); *see, e.g., Kuang v. Zhou*, 212 A.D.3d 579, 580, 180 N.Y.S.3d 900, 901 (1st Dep't 2023) (noting that defamation claims are subject to a one-year statute of limitations); *McKenzie v. Dow Jones*, 355 F. App'x 533, 535 (2d Cir. 2009) ("Under New York law, the statute of limitations for a defamation claim is one year"). Slander and libel are forms of defamation—slander refers to oral defamatory statements and libel refers to written defamatory statements. *See Apionishev v. Columbia Univ. in N.Y.*, No. 09-civ-6471 SAS, 2012 U.S. Dist. LEXIS 8160, 2012 WL 208998, at *8 (S.D.N.Y. Jan. 23, 2012) (citing *Villacorta v. Saks Inc.*, 32 Misc. 3d 1203(A), 932 N.Y.S.2d 764, 2011 NY Slip Op 51160(U), 2011 WL 2535058, at *8 n. 7 (Sup. Ct. 2011) ("[B]oth terms—'slander,' *i.e.*, oral defamatory statements and 'libel,' *i.e.*, written defamatory statements,—are encompassed in the term of 'defamation.'")).

Slander and libel are therefore also subject to the one-year statute of limitations for defamation. *See Nussenzweig v. diCorcia*, 9 N.Y.3d 184, 188, 878 N.E.2d 589, 590, 848 N.Y.S.2d 7 (N.Y. 2007) ("Pursuant to CPLR 215(3), 'an action to recover damages for . . . libel, [or] slander . . . must [*19] be brought within one year."). Accordingly, Plaintiffs' Claims Two, Three, Four, Seven, Nine (collectively, the "Defamation claims") are subject to the one-year statute of limitations. *See, e.g.*, N.Y. C.P.L.R. § 215(3); *D'Arata v. New York Post*, 226 A.D.3d 560, 210 N.Y.S.3d 384, 385 (1st Dep't 2024) ("The statute of limitations for a libel claim is measured one year from the date of publication, not discovery . . . .").

#### *i. The May 2021 Social Media Posts*

---

[6] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015).

[7] The parties do not dispute that New York law applies in this case, and both parties apply New York law in their briefing on this motion. *See* Def. Mem.; Pl. Opp. Accordingly, the Court applies New York law to the claims. *See Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (explaining that the parties' "implied consent . . . is sufficient to establish choice of law"); *see also Valentini v. Grp. Health Inc.*, No. 20-cv-9526 (JPC), 2021 U.S. Dist. LEXIS 112081, 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law.").

Under the "single publication rule, . . . a cause of action for defamation accrues on the date the offending material is first published." *See Nussenzweig*, 9 N.Y.3d at 188, 878 N.E.2d at 590; *Firth v. State*, 98 N.Y.2d 365, 371, 747 N.Y.S.2d 69, 775 N.E.2d 463 (N.Y. 2002); *Sarkar v. City of New York*, 24-1219, 2025 U.S. App. LEXIS 16032, 2025 WL 1793733, at *3 (2d Cir. June 30, 2025) (summary Order). Accordingly, the defamation claims that are based on social media posts Defendant initially made in May 2021 are time-barred as of May 2022. *See* Compl. (filed on May 13, 2024); AC ¶¶ 59-75.

*ii. The May 2024 Social Media Posts*

Plaintiffs allege that Defendant "reinstated" Plaintiffs' claims of defamation *per se*, libel *per se*, and injurious falsehood with her May 2024 post that included an image of one of her May 2021 posts that said, "Dusty Button is a sexual predator." *See* AC ¶¶ 426, 452, 470.[8] New York courts have recognized an exception to the "single publication rule" where the allegedly defamatory statements were "republished." *Enigma Software Group USA, LLC v. Beeping Computer LLC*, 194 F. Supp. 3d 263, 276-77 (S.D.N.Y. 2016) (quoting *Firth*, 98 N.Y.2d at 371, 474 N.Y.S. 2d 69, 775 N.E.2d 463). Because Plaintiffs, who are *pro [*20] se*, are entitled to special solicitude, the Court construes this argument liberally. *Tewari*, 2024 U.S. App. LEXIS 1046, 2024 WL 177445, at *1; *McLeod*, 864 F.3d at 156. The Court construes Plaintiffs' argument about "reinstatement" as an argument for republication. Republication "retrigger[s] the period of limitations" when it "occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely 'a delayed circulation of the original edition.'" *Hoesten v. Best*, 34 A.D.3d 143, 150, 821 N.Y.S.2d 40, 46 (1st Dep't 2006) (quoting *Firth*, 98 N.Y.2d at 371, 474 N.Y.S. 2d 69, 775 N.E.2d 463). This "republication" exception to the single publication rule is "justified" only when "the subsequent publication is intended to and actually reaches a new audience." *See Firth*, 98 N.Y.2d at 371, 474 N.Y.S. 2d 69, 775 N.E.2d 463. A "classic example[]" of republication is the republication of a hardcover book in a paperback edition. *See Etheredge-Brown v. America Media, Inc.*, 13 F. Supp. 3d 303, 306 (S.D.N.Y. 2014). In such a case, a New York court found that the publisher's "decision to release [the book] in paperback was a conscious attempt to reach an entirely new market of readers through a different format at a different price." *Rinaldi v. Viking Penguin, Inc.*, 101 Misc. 2d 928, 934, 422 N.Y.S.2d 552, 556 (N.Y. Sup. Ct. 1979), *modified on different grounds*, 73 A.D.2d 43, 425 N.Y.S.2d 101 (1st Dep't 1980), *aff'd*, 52 N.Y.2d 422, 420 N.E.2d 377, 438 N.Y.S.2d 496 (N.Y. 1981).[9]

Defendant's May 2024 posts that included images of one of her May 2021 posts did not amount to a republication for several reasons. Though Defendant published them on "an occasion distinct

---

[8] Plaintiffs do not argue that any other allegedly defamatory statements were made within a year of the filing of this case. *See* Pl. Opp.

[9] It is well-settled that the single publication rule applies to websites, and unrelated modifications to the website do not constitute republications of the allegedly defamatory material. *Firth*, 98 N.Y.2d at 371, 474 N.Y.S. 2d 69, 775 N.E.2d 463. Moreover, "continuous access . . . via hyperlinks to a website is not a republication." *Martin v. Daily News L.P.*, 121 A.D.3d 90, 103, 990 N.Y.S.2d 473, 483 (1st Dep't 2014). Accordingly, the continued existence of any of Defendant's posts online does not, by itself, constitute republication.

from the initial one," the posts were [*21] "merely a delayed circulation of the original," rather than a "republication" because the allegedly defamatory post was not "modified in form or in content," and Plaintiffs do not allege that it was intended to or did in fact reach a new audience. *See Hoesten*, 34 A.D.3d at 150, 821 N.Y.S.2d at 46 (collecting cases).

First, the May 2024 posts were published from the same account, @real_world_ballerina, on the same website, and in the same form (an Instagram story) as the May 2021 post. AC ¶¶ 69, 308, 311; *contra Firth v. State*, 306 A.D.2d 666, 667, 761 N.Y.S.2d 361, 362 (3d Dep't 2003) ("[C]laimant's allegations that the report was moved to a different Internet address are sufficient to state a cause of action for republication to a new audience akin to the repackaging of a book from hard cover to paperback."); *Etheredge-Brown*, 13 F. Supp. 3d at 306-07 ("Plaintiffs have at least a plausible argument that the initial online publication of the article on the National Enquirer's website on March 26, 2012—several days after the paper edition had been sent to subscribers' homes and sold at newsstands and supermarkets—was a republication.").

Further, Plaintiffs do not allege that "the subsequent publication [was] intended to" reach a new audience nor do they allege that the posts "actually [did] reach[] a new audience" *Firth*, 98 N.Y.2d at 371, 474 N.Y.S. 2d 69, 775 N.E.2d 463. Defendant's Instagram stories [*22] generally reached the same audience in May 2024 as they did in May 2021, her Instagram followers. AC ¶¶ 69, 308-12. Indeed, Plaintiffs themselves allege that the number of accounts following @Real_World_Ballerina was unchanged between the two dates—alleging that there were "nearly twenty thousand" followers at the time of both the 2021 and the 2024 stories. *Compare* AC ¶¶ 67-68 *with* AC ¶ 312. Moreover, even if the May 2024 posts did reach a new audience, Plaintiffs have not alleged in the Amended Complaint nor argued in their Opposition that Defendant intended to reach a new audience, and they have not alleged any facts supporting such an inference. *See* AC; Pl. Opp. at 17, 25, 29. None of the text added to either May 2024 story—"Received ominous message from unknown number late Monday night" and "Oh. Well ok then."—modified the alleged by defamatory post in a "substantial way" thus indicating that Defendant intended to reach a new audience. *See* AC ¶ 311; *Martin*, 121 A.D.3d at 104, 990 N.Y.S.2d at 484; *see also Sarkar*, 2025 U.S. App. LEXIS 16032, 2025 WL 1793733, at *2 ("Because the subsequent postings did not target new audiences and the content of the report did not change, the republication exception does not apply here."); *Thomas v. City of New York*, No. 17-cv-06079, 2018 U.S. Dist. LEXIS 189305, 2018 WL 5791965, at *7 (E.D.N.Y. Nov. 5, 2018) (quoting *Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 430, 420 N.E.2d 377, 438 N.Y.S.2d 496 (N.Y. 1981)) (finding that "most courts require that [the requisite] [*23] change [in republished material] be 'substantial'").

The alleged facts here are similar to those in *Martin v. Daily News L.P.*, in which a New York Appellate Court found there was not a republication that triggered the statute of limitations anew. *See* 121 A.D.3d at 103-04, 990 N.Y.S.2d at 483-84. In *Martin*, the Court held that allegedly defamatory news articles, which had been reposted after they were inadvertently deleted, "actually reached a new audience [because they] included new hyperlinks to social media and networking sites." *Id.* The Court nonetheless held that the second posting of the articles did not

constitute a republication because they were posted to the same website where the initial articles were published, because the second posting "was not geared toward reaching a new audience," and because the articles were not "modified in any substantial way." *Id.*

Here too, even if the May 2024 Instagram stories reached a different audience than the May 2021 story, there are no allegations that Defendant intended to reach a new audience with the posts. *See* AC; Pl. Opp. Moreover, the May 2024 posts lack substantial modifications that would plausibly suggest that Defendant was trying to expose the allegedly defamatory statement to a new audience similar to [*24] a publisher "repackaging of a book from hard cover to paperback." *See Firth*, 306 A.D.2d at 667, 761 N.Y.S.2d at 362; AC ¶ 311. In fact, the vague language Defendant included in the May 2024 posts—"Received ominous message from unknown number late Monday night" when she received a text including the original post, and later, "Oh. Well ok then." when she received the same message from an email account associated with "The Buttons"—suggests that Defendant intended to reach the same audience as the original post, that would understand the context of the original Instagram story and know who the Buttons were.

The May 2024 posts did not constitute a republication, and accordingly, the period of limitations did not begin anew.[10]

**B. Claims Sounding in Defamation**

"In determining which statute of limitations is applicable to a cause of action, it is the essence of the action and not its mere name that controls." *Koplinka-Loehr v. Cnty. of Tompkins*, 189 A.D.3d 2039, 2041, 139 N.Y.S.3d 661, 664 (3d Dep't 2020). As such, any torts that sound in defamation are subject to defamation's one-year statute of limitations. *Kartiganer Assocs., P. C. v. Town of Newburgh*, 57 A.D.2d 857, 857, 394 N.Y.S.2d 262, 263 (2d Dep't 1977) ("Plaintiff cannot circumvent the one-year limitation period applicable to defamation actions 'by misdescribing the tort as . . . interference with economic relations'"); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 224 (S.D.N.Y. 2013) ("[C]ourts in New York have also kept a watchful eye for [*25] claims sounding in defamation that have been disguised as other causes of action"). Claims based on harm "stemming from injury to reputation" sound in defamation, even if the injury to reputation results in economic damages. *Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (summary order) (citing *Morrison v. Nat'l Broad. Co.*, 19 N.Y.2d 453, 458, 227 N.E.2d 572, 573, 280 N.Y.S.2d 641 (N.Y. 1967) (holding that, despite the pecuniary damages alleged, "[a] communication is defamatory . . . 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'")); *see also Ramsay v. Mary Imogene Bassett Hosp.*, 113 A.D.2d 149, 151, 495 N.Y.S.2d 282 (3d Dep't 1985) ("[D]efamation is defined in terms of the injury, damage to reputation, and

---

[10] The allegation of republication did not exist in the original complaint, since the purportedly offending post occurred the day after this case was initiated. AC ¶ 311. The Court also notes that there would appear to be some unfairness in allowing Plaintiffs to allege that after they filed their initial complaint, the publication of a statement included in their own messages defamed them, thereby restarting the statute of limitations clock for their Amended Complaint.

not in terms of the manner in which the injury is accomplished."); *Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (finding that tort claims sounded in defamation where the harms complained of by the plaintiff, including termination of employment, "all [flowed] from the effect on his reputation cause by defendants' alleged defamatory statements"); *Lesesne*, 918 F. Supp. 2d at 224 (finding that claims based on statements harming the Plaintiffs' reputation leading to a loss of business sounded in defamation).

Plaintiffs bring claims for injurious falsehood, intentional infliction of emotional distress, and tortious interference. *See* AC ¶¶ 386-424, 503-526, 585-610. The gravamen [*26] of each of those claims is the alleged injury to Plaintiffs' "reputation" resulting from Defendant's allegedly "defamatory" statements, and the alleged injury flowing therefrom, including loss of contracts and business relations. *See, e.g.*, AC ¶ 398 (discussing loss of business due to harm to their "reputations"), ¶ 409 ("[T]he statements tend to so harm the reputation of Plaintiffs as to lower their professional reputation in the community or deter third persons from associating or dealing with them, . . . and, as such, constitute *injurious falsehood*."), ¶ 412 ("As a proximate result of the maliciously false and defamatory publication of statements to third parties by Defendant, Plaintiffs have been severely damaged."), ¶ 504 ("Defendant reinstated Plaintiffs['] timely claim of Intentional Infliction of Emotional Distress by posting false and defamatory statements . . . ."), ¶ 522 ("[T]he statements and publication prior to the service of the complaint on Plaintiffs tend to so harm the reputation of Plaintiffs as to lower their professional reputation in the community . . . and, as such, constitutes *intentional infliction of emotional distress*."), ¶ 602 (alleging Defendants' social [*27] media posts "[tended] to so harm the reputation of Plaintiffs as to lower their professional reputation in the community or deter third persons from associating or dealing with them"), ¶ 604 ("[The] defamatory statements *immediately* destroyed Plaintiffs' ability to work and to generate income, disseminating [*sic*] any and all contractual agreements with third-parties," which amounted to tortious interference) (emphases in the original).

Accordingly, Plaintiffs' injurious falsehood, intentional infliction of emotional distress, and tortious interference claims, which sound in defamation, are time barred just as their defamation claims.[11] *See, e.g., Ent. Partners Grp., Inc. v. Davis*, 198 A.D.2d 63, 64, 603 N.Y.S.2d 439, 440 (1st Dep't 1993) ("[I]t is well settled that a plaintiff may not circumvent the one-year statute of limitations applicable to defamation actions (CPLR § 215[3]) by denominating the action as one for . . . injurious falsehood if, in fact, the claim seeks redress for injury to reputation" nor may a Plaintiff "cast its defamation claim as tortious interference with business relations" to avoid the one-year statute of limitations); *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 260 (S.D.N.Y. 2023) (finding that an injurious falsehood claim sounded in defamation where statements concerned a plaintiff's "general reputation" rather than the "quality [*28] of [the

---

[11] Claims for intentional infliction of emotional distress are generally subject to a one-year statute of limitations, which begins to accrue on the date of the injury. *See, e.g., Barbetta v. Facchini*, 236 A.D.3d 623, 625, 230 N.Y.S.3d 276, 278 (2d Dep't 2025) ("Causes of action to recover damages for intentional infliction of emotional distress are governed by a one-year statute of limitations"); *Wilson v. Erra*, 94 A.D.3d 756, 756, 942 N.Y.S.2d 127, 129 (2d Dep't 2012) (a claim of intentional infliction of emotional distress accrues "on the date of injury."). Thus, the intentional infliction of emotional distress claims are separately time-barred on that basis.

plaintiff's] goods or services"); *Bah v. Apple Inc.*, 2020 U.S. Dist. LEXIS 22867, 2020 WL 614932, at *18 (S.D.N.Y. Feb. 10, 2020) (finding that "[a plaintiff's] claims of intentional and negligent infliction of emotional harm sound in defamation because these claims merely allege additional emotional injuries resulting from defendant's [statements], which are the basis of [his defamation claims]"); *Croskey v. Med. & Tech. Servs. Inc.*, No. 05 CIV.6641 (LMM), 2006 U.S. Dist. LEXIS 56466, 2006 WL 2347816, at *3 (S.D.N.Y. Aug. 10, 2006) (citing *Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 111 A.D.2d 807, 808, 490 N.Y.S.2d 553, 555 (2d Dep't 1985) *aff'd*, 66 N.Y.2d 988, 489 N.E.2d 1297, 499 N.Y.S.2d 395 (N.Y. 1985)) ("Even if the facts as the plaintiff presents them could be construed as . . . intentional infliction of emotional distress, it is well established that where the crux of the complaint sounds in defamation, [the] court will refuse to allow a cause of action for emotional distress [because] [w]ithout such a rule, any defective defamation or libel claim could be revived by pleading it as one for intentional infliction of emotional distress, circumventing the restrictions on defamation claims."); *Katz v. Travelers*, 241 F. Supp. 3d 397, 407 (E.D.N.Y. 2017) (citation omitted and alterations in the original) (finding tortious interference claims were time-barred because "the gravamen of Plaintiff's alleged injury in each of the [ ] counts is either harm to [his] reputation or harm that flows from the alleged effect on Plaintiff's reputation" including "loss of contracts and business relationships."). Separately, Plaintiffs' [*29] claims for injurious falsehood, intentional infliction of emotional distress, and tortious interference must be dismissed as duplicative of their defamation claims.

The alleged conduct underlying these claims is identical to that underlying the five defamation claims, as are the injuries suffered. AC ¶¶ 386-424, 503-544, 585-610. Moreover, these claims seek the same damages as the defamation claims. *See, e.g., Perez v. Violence Intervention Program*, 116 A.D.3d 601, 601, 984 N.Y.S.2d 348, 349 (1st Dep't 2014) (finding claims of injurious falsehood, tortious interference with prospective contractual or business relations, and intentional infliction of emotional distress "should have been dismissed as duplicative of the defamation claim, as they allege no new facts and seek no distinct damages from the defamation claim"); *Herlihy v. Metropolitan Museum of Art*, 214 A.D.2d 250, 263, 633 N.Y.S.2d 106 (1st Dep't 1995) (finding that an IIED claim "fails because it falls within the ambit of other traditional liability which, in this case, is reflected in plaintiff's causes of action sounding in defamation"); *Goldman*, 733 F.App'x at 571 (finding that a tortious interference claim was properly dismissed as duplicative of a defamation claim because "Plaintiffs [had] not alleged an independent source of harm" and because "any economic damages [were] derive[d] from defamatory statements"); *Rapaport v. Iyer*, 23-cv-6709, 2025 U.S. Dist. LEXIS 61460, 2025 WL 966275, at *34-35 (S.D.N.Y. Mar. 31, 2025) (dismissing [*30] injurious falsehood and IIED claims that "[relied] on the same allegations and conduct as the defamation claim").

### C. Plaintiffs' Equitable Tolling and Estoppel Arguments Are Meritless

Plaintiffs argue that the statute of limitations "must be tolled" and that Defendant should be "equitably estopped from asserting statute of limitations as a defense [because] allowing

Defendant to do so would be unjust." *See* AC ¶¶ 380, 381, 417, 421, 422, 427, 442, 443, 427, 454, 523, 529, 559, 579, 580, 605, 606.

However, "the doctrine of equitable tolling is not available in state causes of action." *Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 553 (S.D.N.Y. 2017), *aff'd*, 726 Fed. Appx. 27 (2d Cir. 2018) (quoting *Jang Ho Choi v. Beautri Realty Corp.*, 135 A.D.3d 451, 22 N.Y.S.3d 431, 432 (1st Dep't 2016)); *Busher v. Barry*, No. 20-3587-cv, 2021 U.S. App. LEXIS 32561, 2021 WL 5071871, at *4 (2d Cir. Nov. 2, 2021) (summary order). Where, as here, Plaintiffs assert "state causes of action, not federal ones . . .the applicable doctrine is equitable estoppel," not equitable tolling. *See Raphael v. Vintage Grape & Grog, Ltd.*, 187 A.D.3d 672, 672, 131 N.Y.S.3d 558 (1st Dep't 2020). Accordingly, equitable tolling cannot render timely Plaintiffs' untimely claims, all of which are for causes of action under New York law.

The potentially available doctrine, equitable estoppel, is an "extraordinary remedy," *see Clark v. Ravikumar*, 90 A.D.3d 971, 972, 935 N.Y.S.2d 633, 635 (2d Dep't 2011), which should be invoked "sparingly and only under exceptional circumstances." *See Sanchez v. Jericho Sch. Dist.*, 180 A.D.3d 828, 830, 120 N.Y.S.3d 163, 165 (2d Dep't 2020) (quoting *Ceely v. New York City Health & Hosps. Corp.*, 162 A.D.2d 492, 493, 556 N.Y.S.2d 694, 695 (2d Dep't 1990)). In order to successfully argue for equitable estoppel, a plaintiff must show that he or she: [*31] (1) was "induced by fraud, misrepresentations, or deception to refrain from filing a timely action"; (2) "reasonably relied on the defendants' misrepresentations"; and (3) exercised "[d]ue diligence" to bring the action within a "reasonable period of time after the facts giving rise to the . . . equitable estoppel claim 'have ceased to be operational.'" *Endemann v. Liberty Ins. Corp.*, No. 22-1217, 2023 U.S. App. LEXIS 15466, 2023 WL 4102245, at *1 (2d Cir. June 21, 2023) (quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 674, 849 N.E.2d 926, 816 N.Y.S.2d 703 (N.Y. 2006) and quoting *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)) (alterations in the original).

Plaintiffs assert that Defendant should be equitably estopped from asserting the statute of limitations defense for four reasons.[12] AC ¶¶ 417, 427, 454, 523, 529, 559, 580. None of them adequately establish the requisite elements for equitable estoppel.

First, Plaintiffs argue that, because the Nevada Litigation involves the subject matter of the allegedly defamatory posts, they are entitled to tolling during the pendency of the "related lawsuit." *See, e.g.*, AC ¶ 580(1); *see also* AC ¶ 156. Plaintiffs do not provide any authority for this contention, and the Court is not aware of any rule allowing Plaintiffs to toll a statute of limitations because they are defendants in another suit.

Second, Plaintiffs argue that Ms. Breshears's "[t]hreats" prevented them from timely filing their lawsuit. [*32] *See, e.g.*, AC ¶ 580(2). Plaintiffs allege the following statements—which were published on Instagram amidst the allegedly defamatory statements on Defendant's social media

---

[12] Plaintiffs confuse the doctrines of equitable estoppel and equitable tolling and frame their arguments as reasons the statute of limitations "must be tolled." AC ¶¶ 417, 422, 443, 427, 454, 523, 529, 559, 580, 606. Since equitable tolling is unavailable and Plaintiffs' only argument in favor of equitable estoppel is that dismissing Plaintiffs' claims would be "unjust," the Court analyzes whether Plaintiffs' four arguments in favor of equitable tolling counsel in favor of equitable estoppel. AC ¶¶ 380-81, 421, 442, 579, 605.

accounts—were threats that prevented them from initiating this suit: "I'm a law student, I know libel and slander and this isn't it," and "Not afraid. Not even a little." *See, e.g.*, AC ¶¶ 74, 580(2). The other two statements Plaintiffs call threats allegedly were made to Plaintiffs during the May 27, 2024 phone call—after this lawsuit was filed—during which Defendant explain[ed] her assessment of the merits Plaintiffs' claims—"[This lawsuit] isn't going to end well for you," and "I just want to tell you that it's gonna be bad if you sue me." *See, e.g.*, AC ¶¶ 320, 580(2).[13] Since the call occurred after this case was filed these two statements are not relevant to an analysis of equitable estoppel. *See Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 539 (S.D.N.Y. 2017) (quoting *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 341 (E.D.N.Y. 2012)) ("[O]nly misrepresentations occurring during the limitations period are relevant; equitable estoppel cannot revive a claim that is already time-barred."). Regardless, Plaintiffs do not explain how any of these purported threats amount to "fraud, misrepresentations, or deception." *See Endemann*, 2023 U.S. App. LEXIS 15466, 2023 WL 4102245, at *1. Further, in context these [*33] statements regarding Defendant's assessment of Plaintiffs' claims could not reasonably be construed as threatening, especially considering that Plaintiffs responded by telling Defendant that they "appreciate[ed] [her] advice" and warned her not to provide "unsolicited legal advice." *See* AC ¶ 320. Moreover, the cited statements are clearly Defendant's opinion about Plaintiffs' claims that cannot form the basis for a charge of fraud. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179, 944 N.E.2d 1104, 1108, 919 N.Y.S.2d 465 (N.Y. 2011); *MAFG Art Fund, LLC v. Gagosian*, 123 A.D.3d 458, 459, 998 N.Y.S.2d 342, 343 (1st Dep't 2014).

Third, Plaintiffs argue that "a continuing wrong such as Defendants' May 14, 2024 reposting" restarts the statute of limitations. *See, e.g.*, AC ¶ 580(3). However, defamation claims are subject to the single publication rule, *see supra* at 14-15, and, as previously discussed, the "continuing violation" exception is inapplicable. *See Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 571 (S.D.N.Y. 2016).

Fourth, Plaintiffs argue that Defendant's online anonymity prevented them from timely filing their claims. AC ¶¶ 580(4). Plaintiffs argue that Defendant "intentionally hid behind an anonymous account to make her defamatory statements," and cite to New York Civil Practice Law and Rule § 214 for the proposition that "[i]f the defendant fraudulently conceals the defamatory statement, the statute of limitations may be tolled until the plaintiff discovers [*34] the truth." *See* AC ¶ 417 n.30 (citing N.Y. C.P.L.R. § 214). Section 214 does not stand for the proposition that Plaintiffs posit. *See* N.Y. C.P.L.R. § 214 (listing actions subject to a three-year statute of limitations). Moreover, Plaintiffs do not allege that Defendant concealed the defamatory statements, only that she concealed her identity when making the statements.

---

[13] Plaintiffs separately allege that in the same call Defendant made the following statements, which Plaintiffs construe as threats: "[i]t's not worth your time and energy or mine"; "[t]here is [*sic*] consequences to filing frivolous or not legally viable lawsuits"; "[a]s a lawyer, going through your complaint the causes of action that you are listing with the facts that even just based on im gonna [*sic*] write my motion to dismiss, im [*sic*] not going to be arguing the facts im [*sic*] going to be arguing the law and based on the law and the claims that you've made you haven't stated a claim upon which relief can be granted so and that's sanctionable"; "[y]ou shouldn't be filing frivolous lawsuits'"; "I don't think it's worth your time, it's not gonna [*sic*] end well for you." AC ¶ 12, 320.

Importantly, Plaintiffs do not explain how the anonymity of the @Real_World_Ballerina Instagram account reasonably induced them to refrain from filing a timely lawsuit, *see* Pl. Opp. at 29, when they could have filed a suit against a "Jane Doe" defendant and thereafter sought discovery to learn the defendant's identity, *see, e.g., Mirza v. Yelp*, No. 21 Misc. 621, 2021 U.S. Dist. LEXIS 160961, 2021 WL 3772039, at *1 (S.D.N.Y. Aug. 25, 2021) (discussing third-party discovery to determine the identity of a "John Doe" in a case to recover for allegedly defamatory Yelp reviews posted anonymously online); *GSB Gold Standard Corp. AG v. Google LLC*, 227 A.D.3d 613, 614, 213 N.Y.S.3d 8 (1st Dep't 2024) (discussing third-party discovery to determine the identity of an anonymous defendant who posted allegedly defamatory material online). New York courts have held that "mere anonymity" of the author of defamatory statements does not warrant equitable estoppel of the statute of limitations. *Gleason v. Spota*, 194 A.D.2d 764, 765, 599 N.Y.S.2d 297, 299 (2d Dep't 1993)). Indeed, "[w]here concealment without actual misrepresentation is claimed to have prevented [*35] a plaintiff from commencing a timely action, the plaintiff must demonstrate a fiduciary relationship . . . which gave the defendant an obligation to inform him or her of facts underlying the claim." *Zumpano*, 6 N.Y.3d at 675 (quoting *Gleason*, 194 A.D.2d at 765, 599 N.Y.S.2d at 299). Plaintiffs have alleged no such fiduciary relationship here.

Moreover, even if Plaintiffs had demonstrated how the anonymity of the @Real_World_Ballerina Instagram account improperly induced them to refrain from filing a timely lawsuit, Plaintiffs made no showing that they "exercised due diligence in bringing an action within a reasonable period of time" after they became aware of Defendant's identity. *See Endemann*, 2023 U.S. App. LEXIS 15466, 2023 WL 4102245, at *1; *see also Rite Aid Corp. v. Grass*, 48 A.D.3d 363, 364-65, 854 N.Y.S.2d 1, 2 (1st Dep't 2008) (citing *Gleason*, 194 A.D.2d at 765, 599 N.Y.S.2d at 299) (equitable estoppel "will not toll a limitations statute where plaintiffs possessed timely knowledge sufficient to have placed them under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable statute of limitations."). The first allegedly defamatory comments were made by Breshears from her personal, non-anonymous account and thus, as of May 2021, Plaintiffs were aware that Defendant was the speaker behind at least some portion of the allegedly defamatory statements. *See* AC ¶ 59. Moreover, Plaintiffs allege [*36] that they learned who operated @Real_World_Ballerina on Instagram in the fall of 2023 "by way of the discovery process in the Nevada litigation." AC ¶¶ 97, 375. Documents filed in the Nevada Litigation suggest that Plaintiffs knew that Defendant ran @Real_World_Ballerina as early as February 2023.[14] And yet, Plaintiffs waited at least several months, and possibly more than a year, after they learned that Defendant operated @Real_World_Ballerina before filing this suit in May 2024.

---

[14] *See* Plaintiffs' Supplement to Emergency Cross-Motion for Protective Order, at 157-58, 301-02, *Humphries v. Button*, No. 21-cv-01412, (D. Nev. March 10, 2023) (requesting that a plaintiff "[p]roduce any and all Communications between you and Madison Breshears regarding Dusty Button and/or Taylor Button including but not limited to communications with the Instagram user @Real_World_Ballerina."). The Court takes judicial notice of this filing in the Nevada Litigation to establish the matter of the proceedings, not for the truth of any facts asserted by parties or factual findings in the case. *See Staehr*, 547 F.3d at 425.

As a result, the Plaintiffs have not met their burden of demonstrating that they reasonably relied on "fraud, misrepresentations, or deception" by Defendant or that they "exercised due diligence in bringing an action within a reasonable period of time." *Endemann*, 2023 U.S. App. LEXIS 15466, 2023 WL 4102245, at *1. Accordingly, Defendant is not equitably estopped from asserting a statute of limitations defense here.

## II. Cyber Harassment is Not an Independently Cognizable Tort Under New York Law

In support of their purported Cyber Harassment claim, Count Five, *see* AC ¶¶ 485-502, Plaintiffs cite to New York Penal Code section 240.30 and also state that the claim is a "form of intentional infliction of emotional distress." *See* N.Y. Penal Law § 240.30 (McKinney 2024). The Court has searched for, but has not found, such a civil [*37] claim in the annals of Federal or New York law. If the claim is construed as a violation of Section 240.30, Plaintiffs do not have standing to bring because there is no private right of action provided by the penal law. *See Cruz v. New York City Transit*, No. 24-cv-89, 2025 U.S. Dist. LEXIS 8503, 2025 WL 209598, at *10 (S.D.N.Y. Jan. 16, 2025), *report and recommendation adopted sub nom. Cruz v. New York City Transit Auth.*, No. 24-cv-89, 2025 U.S. Dist. LEXIS 34391, 2025 WL 618557 (S.D.N.Y. Feb. 26, 2025) (citing *Johnson v. Allick*, 2019 U.S. Dist. LEXIS 22752, 2019 WL 569106, at *5 (E.D.N.Y. Feb. 12, 2019) ("As a general matter . . . crimes are prosecuted by the government, not by private parties.")). If the claim is construed as a "form of intentional infliction of emotional distress," it must be dismissed as duplicative of the IIED claim since the allegations supporting both claims are the same. *See, e.g., Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 613 (S.D.N.Y. 2013) (finding a claim must be dismissed because "the allegations in support of [the] claim are entirely duplicative of Plaintiffs' IIED claim"). Moreover, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *See M.Q. v. United States*, 776 F. Supp. 3d 180, 198 (S.D.N.Y. 2025). Here the underlying conduct clearly lies in defamation. Accordingly, the purported Cyber Harassment (Count Five) claim is dismissed.

## III. Plaintiffs' Civil Conspiracy Claim Cannot Stand on its Own

Plaintiff purports to state as its Eighth Count, a claim for civil conspiracy. AC ¶¶ 545-64. However, "New York does [*38] not recognize civil conspiracy to commit a tort as an independent cause of action." *Whitfield v. Law Enforcement Employees Benevolent Association*, 237 A.D.3d 1139, 1140-1141, 233 N.Y.S.3d 615, 619 (2d Dep't 2025); *see also Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli*, 215 A.D.3d 699, 703, 187 N.Y.S.3d 702, 707 (2d Dep't 2023) ("Under New York law, in order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of an agreement"). Since each of the Plaintiffs' other tort claims have been dismissed, the civil conspiracy claim must be dismissed as well. *See, e.g., Mamoon v. Dot Net Inc.*, 135 A.D.3d 656,

658, 25 N.Y.S.3d 85, 88 (1st Dep't 2016) (dismissing civil conspiracy claim after other tort claims were dismissed).

## CONCLUSION

For the reasons stated above, each of Plaintiffs' claims is time-barred or otherwise facially deficient as a matter of law, and Defendant's motion to dismiss [ECF No. 22] is GRANTED. The case is dismissed with prejudice.[15]

The Clerk of Court respectfully is requested to terminate the motion pending at docket [*39] entry 22 and to close this case.

**SO ORDERED**.

**Date: September 26, 2025**

**New York, NY**

/s/ Mary Kay Vyskocil

**MARY KAY VYSKOCIL**

**United States District Judge**

---

End of Document

[15] The Court does not grant Plaintiffs leave to amend the Amended Complaint. Plaintiffs were granted an opportunity to amend their complaint in response to issues raised in Defendant's initial pre-motion letter requesting leave to file a motion to dismiss. [ECF Nos. 16]. Plaintiffs took that opportunity and did not remedy the defects described above. *See* AC. Further, Plaintiffs did not request leave to amend in their opposition to the pending motions to dismiss and thus did not demonstrate to the Court that the opportunity to amend would not be futile. *See, e.g., Treiber v. Aspen Dental Mgmt.*, Inc., 635 F. App'x 1, 4 (2d Cir. 2016).

# EXHIBIT 4

# EXHIBIT 4

**Button v. N.Y. Times Co.**

United States District Court for the Southern District of New York

September 15, 2025, Decided; September 15, 2025, Filed

1:24-cv-05888-MKV

**Reporter**
2025 U.S. Dist. LEXIS 180601 *; 2025 LX 329384; 2025 WL 2643674

DUSTY BUTTON and MITCHELL TAYLOR BUTTON, Plaintiffs, -against- THE NEW YORK TIMES COMPANY, JULIA JACOBS, LINDSEY RUFF, SABINA MARIELLA, DAWN SCHNEIDER, DEMETRI BLAISDELL, and DAVID MCCRAW, Defendants.

**Prior History:** Button v. N.Y. Times Co., 2024 U.S. Dist. LEXIS 181983, 2024 WL 4751363 (Oct. 4, 2024)

**Counsel:** [*1] Dusty Button, Plaintiff, Pro se, Myrtle Bech, SC.

Mitchell Taylor Button, Plaintiff, Pro se, Myrtle Beach, SC.

For The New York Times Company, Julia Jacobs, Defendants: Al-Amyn Shiraz Sumar, LEAD ATTORNEY, The New York Times Company, Washington, DC; Dana Robinson Green, The New York Times Company (10018), New York, NY.

For Lindsey Ruff, Sabina Mariella, Defendants: Eric Brenner, Peter M. Skinner, Boies Schiller Flexner LLP, New York, NY.

For Dawn Schneider, Defendant: David S. Stone, LEAD ATTORNEY, Berkeley Heights, NJ.

For Demetri Blaisdell, David McCraw, Defendants: Al-Amyn Shiraz Sumar, LEAD ATTORNEY, The New York Times Company, Washington, DC; Dana Robinson Green, The New York Times Company (10018), New York, NY.

**Judges:** MARY KAY VYSKOCIL, United States District Judge.

**Opinion by:** MARY KAY VYSKOCIL

## Opinion

**ORDER & OPINION GRANTING MOTIONS TO DISMISS & DENYING ATTORNEYS' FEES**

MARY KAY VYSKOCIL, United States District Judge:

Plaintiffs Dusty Button and Mitchell Taylor Button (together, "Plaintiffs" or "The Buttons"), proceeding *pro se*, assert a number of claims in this Diversity action[1] alleging that Defendants New York Times Company (the "Times"), Julia Jacobs, Lindsey Ruff, Sabina Mariella, Dawn Schneider, Demetri Blaisdell, [*2] and David McCraw (together, "Defendants") have engaged in a wide-ranging conspiracy to defame Plaintiffs and destroy their personal and professional lives. [ECF No. 34 ("AC") at ¶¶ 1-28]. This case centers around a separate lawsuit filed against the Buttons (the "Nevada Litigation") and an article published by the Times about the case (the "Times Article). AC ¶ 65. On July 29th, 2024, exactly three years after the Times Article was published, Plaintiffs commenced this action. [ECF No. 1]. This action is one in a series of several suits brought by the Buttons against various parties associated with the Nevada Litigation and the allegations underlying the suit, including one other case before this Court.[2]

Defendants Times, Jacobs, Blaisdell, and McCraw, (collectively, "Times Defendants"), Defendants Ruff and Mariella, (collectively, "Boies Schiller Defendants" or "Ruff and Mariella"), and Defendant Schneider move to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF Nos. 36, 38, 41]. The Times Defendants additionally request reasonable attorneys' fees pursuant to New York Civil Rights Law section 70-a. [ECF No. 41 (citing N.Y. Civ. Rights L. § 70-a(a)]. For the following reasons, Defendants' motions to dismiss are GRANTED [*3] and the Times Defendants request for attorneys' fees is DENIED.

## FACTUAL BACKGROUND[3]

### I. The Parties

---

[1] Plaintiffs allege that all defendants are citizens of New York, that they are citizens of South Carolina, and that their damages exceed $75,000. [ECF No. 34 ("AC") at ¶¶ 29-37].

[2] *See Button v. Lopresti*, No. 25-CV-867-DMS-DDL, 2025 U.S. Dist. LEXIS 135898, 2025 WL 1953272, at *3 (S.D. Cal. July 16, 2025) (service pending); *Button v. Melcher*, 771 F.Supp.3d 76, 80 (D. Mass. 2025) (motion to dismiss entire case granted); *Button v. Thonis*, No. 24-cv-220, 2025 U.S. Dist. LEXIS 69368, 2025 WL 1092636, at *5 (D.N.H. Apr. 11, 2025) (motion to dismiss entire case granted); *Button v. Humphries*, No. 8:24-cv-01730, 2025 U.S. Dist. LEXIS 127402, 2025 WL 1820116, at *4 (C.D.C.A. June 9, 2025) (motion to dismiss entire case granted with prejudice); *Button v. McCawley*, 24:cv-60911, 2025 U.S. Dist. LEXIS 3634, 2025 WL 50431, at *12 (S.D.F.L. Jan 8, 2025) (motion to dismiss granted with prejudice in part and without prejudice in part); *Button v. Roe*, No. 24-cv-220, 2024 U.S. Dist. LEXIS 227468, 2024 WL 5136694, at *1 (D.N.H. Dec. 17, 2024) (motion to dismiss case in its entirety granted); *Button v. Doherty*, No. 1:24-cv-05026-JPC-KHP (S.D.N.Y.) (motion to dismiss pending, Report & Recommendation suggests granting motion to dismiss case in its entirety); *Button v. Breshears*, No. 1:24-cv-03757-MKV (S.D.N.Y) (motion to dismiss pending).

[3] The Court draws the facts recited in this Opinion from the Amended Complaint [ECF No. 34 ("AC")], the well-pleaded facts of which are accepted as true for purposes of resolving this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The facts are also drawn from documents incorporated into the pleading by reference, including the New York Times article titled "Former Dance Instructor Accused of Sexual Assault in Lawsuit" that is at the heart of this dispute. *See* Times Article; *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 147 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The Court also takes judicial notice of the Nevada Litigation to establish the facts of the proceedings, not for the truth of any facts asserted by parties or factual findings in the case. *See Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Plaintiff Dusty was a ballet dancer who danced in several ballet theatres, including the Boston Ballet at which she was a principal ballerina in 2014. AC ¶¶ 45-47. Mitchell Taylor Button ("Taylor Button") was a Ferrari and military vehicle designer and builder. AC ¶ 51. Julia Jacobs is a journalist who wrote the subject Times Article, and Demetri Blaisdell and David McCraw are attorneys who represent the Times. AC ¶¶ 31, 36-37; Times Article. Lindsey Ruff and Sabina Mariella are Boies Schiller Flexner LLP attorneys representing the Nevada Litigation Plaintiffs in the Nevada Litigation and several other civil suits. AC ¶¶ 11-12, 33-34. Dawn Schneider is a public relations and communications director working with the Boies Schiller Defendants. AC ¶¶ 35-37, 66.

## II. The Nevada Litigation

On July 28th, 2021, Sage Humphries, Gina Menichino, Rosemarie DeAngelo, Danielle Gutierrez, Jane Doe 1, and Jane Doe 2, ("together, the "Nevada Plaintiffs"), represented by Ruff and Mariella, non-party Sigrid McCawley, and another attorney, filed a complaint in Nevada District Court ("Nevada [*4] Complaint") naming Mitchell Taylor Button ("Taylor Button") as a defendant and accusing him of sexual abuse, and naming Dusty Button as a "non-party co-conspirator." *See Humphries v. Button*, No. 21-cv-01412, 2024 U.S. Dist. LEXIS 139076, 2024 WL 3673079, at *1 (D. Nev. Aug. 5, 2024); Complaint, at ¶¶ 43-54, *Humphries*, No. 21-cv-01412, (D. Nev. July 28, 2021).[4] The Buttons filed counterclaims against the Nevada Plaintiffs for defamation, abuse of process, and civil conspiracy. *See Humphries*, 2024 U.S. Dist. LEXIS 139076, 2024 WL 3673079, at *1.

Buttons allege that, in that case, Ruff and Mariella engaged in various acts of misconduct including that they are in possession of evidence that exculpates the Buttons, including "various text messages and therapy records." AC ¶ 91. The Buttons claim that despite this evidence, Ruff and Mariella have allegedly lied to a variety of federal and local law enforcement agencies by telling officers that the Buttons have sexually abused the Nevada Plaintiffs. AC ¶ 197. The Buttons also allege that Ruff and Mariella failed to share certain information about discovery with their own clients. AC ¶ 182.

Furthermore, Plaintiffs assert that Ruff and Mariella have "intentionally and willfully lied to the courts" about a litany of other conduct by the Buttons. AC ¶ 180 (including stating that the Buttons "witness tampered," "stole [*5] data," "harassed and intimidated loved ones of their clients by filing lawsuits," "refused to take a lie detector test," "created an alias for their name," "assisted in evasion of a subpoena," made YouTube videos [the Buttons] did not make, "sent harassing emails," "did not confer," "violated the Boston abuse prevention orders" and "disclosed Jane Doe 1's identity"). Ruff and Mariella allegedly mischaracterized some of Taylor Button's actions, including characterizing his move to London as an attempt to flee the consequences of the

---

[4] After several amendments, the operative complaint in the Nevada Litigation includes Dusty Button as a defendant. *See* Third Amended Complaint, *Humphries*, No. 21-cv-01412, (D. Nev. August 2, 2023).

Nevada Plaintiffs' allegation and construing his taking of Dusty Button's last name as taking an "alias." AC ¶ 182, 183, 191. Moreover, Ruff and Mariella alleged on behalf of Plaintiffs in the Nevada Complaint that the Buttons "abused another young girl" named Lena Mathews, an allegation that the now-adult woman has denied and that was stricken from the Nevada Complaint by the Nevada Court. AC ¶ 184-188. Ruff and Mariella also allegedly falsely stated that one of the plaintiffs in the Nevada Litigation was a minor at the time of the alleged abuse. AC ¶ 207. The Buttons further allege that Ruff and Mariella brought claims on behalf of Jane Doe 1 despite knowing [*6] that her allegations were wholly false. AC ¶ 92. It is further alleged that, at some point during the Nevada Trial, "[Ruff and Mariella's] conduct even caused a convicted felon of 19 years, Anthony Pellicano, to harass the Buttons and break into their home." AC ¶ 176.

The Buttons allege that Nevada District Court admonished Ruff and Mariella that they should "'seriously consider' their clients' claims," and that the Nevada District Court has not set a trial date. *See* AC ¶ 181. However, the Court notes that Nevada District Court denied the Buttons' motion to dismiss in full and dismissed the Buttons' abuse of process and civil conspiracy counterclaims. *See Humphries*, 2024 U.S. Dist. LEXIS 139076, 2024 WL 3673079, at *7. Moreover, since the motion to dismiss briefing was filed in this case, Plaintiffs advised the Court that the Nevada District Court denied the Buttons' motion for summary judgment on the Nevada Plaintiffs' claims and granted in part and denied in part the Nevada Plaintiffs' motion for summary judgment on the Buttons' defamation counterclaims. [ECF Nos. 62-64]; Order, *Humphries*, No. 21-cv-01412, 2025 U.S. Dist. LEXIS 162472 (D. Nev. August 20, 2025).

### III. The July 29th, 2021 Article

On July 29th, 2021, before the Buttons were served with the Nevada Complaint, the Times published an article written by Jacobs titled "Former [*7] Dance Instructor Accused of Sexual Assault in Lawsuit." AC ¶¶ 62-63; Julia Jacobs, *Former Dance Instructor Accused of Sexual Assault in Lawsuit*, N.Y. TIMES, July 29, 2021 (the "Times Article"). The article reported primarily on the Nevada Complaint, with a particular focus on the allegations brought by Humphries and Menichino and included statements from Humphries, Menichino, and their attorney. *See* Times Article. The article also stated that "[a] lawyer for the couple said that they denied the charges," and attributed the following quote to the Buttons' attorney: "Taylor and Dusty Button categorically deny these baseless claims and look they forward to the opportunity through court proceedings to disprove all of the plaintiffs' false and fraudulent allegations." *See* Times Article.

The Buttons assert in the Complaint here that the Times Article was published before they were aware of the Nevada Litigation, and they were not given an opportunity to comment. AC ¶¶ 141-42. The Buttons further allege that Jacobs "intentionally deceived the public" by referring to Plaintiff Taylor Button as a "former dance teacher" in order to "create a false narrative of two sexually abusive dance teachers [*8] to purposefully lead readers to believe this narrative and to destroy the careers and reputations of the Plaintiffs while knowing that Mr. Button was not

involved in dance at all."[5] AC ¶ 97. The Buttons also allege that Jacobs purposefully used the word "charges" when describing their attorney's statement rather than "allegations" to "intentionally [mislead] readers to believe Plaintiffs had been 'charged' with a crime." AC ¶ 108.

The Buttons further allege that Jacobs intentionally disregarded "factual documentation" purportedly adverse to the allegations in the Nevada Complaint that was either publicly available or provided to her by the Boies Schiller attorneys. AC ¶¶ 143, 204. Jacobs never issued any corrections to her article though the Buttons provided her with "evidence of false police reports filed by Sage Humphries." AC ¶ 265. The Buttons separately allege that Humphries provided to her attorneys "photo evidence and documents proving Sage Humphries' allegations to be entirely false and fraudulent" prior to Humphries' interview with Jacobs, but do not allege specifically that this evidence was provided to Jacobs. AC ¶¶ 155-57, 201.

## IV. The Alleged Conspiracy

The Buttons allege [*9] that Jacobs did not "'find' this lawsuit and then write, edit and publish her article hours after the complaint was filed." *See* AC ¶ 117. The Buttons claim that instead, before the Nevada Complaint was filed, Jacobs entered into an agreement with Ruff, Mariella, and non-party attorney McCawley arranging for the Jacobs to interview some of the future plaintiffs who filed the Nevada Litigation. *See* AC ¶¶ 66, 117. It is alleged that Schneider, the public relations director working on behalf of Ruff and Mariella, played a role in brokering this agreement. AC ¶¶ 8, 66. Plaintiffs allege that Ruff, Mariella, and Schneider "knew their narrative to be false but colluded with Julia Jacobs to produce and publish a 'story' which would corroborate their clients' false allegations and further, support their false narrative against Plaintiffs . . . ." AC ¶ 100.

They allege that the Nevada Complaint was purposely "defamatory" and "sensationalized," consisted of "perjured statements and lies," and was "published to a mass audience." AC ¶¶ 188, 189. According to the Buttons, the goal of the conspiracy was to "cripple [the Buttons'] defense against the [Nevada Litigation] as they knew . . . the misleading [*10] title of the article would destroy [the Buttons'] reputations and that it would result in the complete dissemination [*sic*] of [the Buttons'] careers and business relations. . . ." *See* AC ¶¶ 8, 146. The Buttons allege that attorneys Ruff, Mariella, and non-party Schneider, and Times journalist Jacobs contacted several of the Buttons' employers and urged these employers to stop working with the Buttons because that they had "been charged with a crime." AC ¶ 179. In particular, the Buttons allege "upon information and belief" that Schneider contacted "numerous media sources" including Pointe Magazine, to arrange for the Nevada Plaintiffs to be interviewed while knowing their allegations were false, and "upon belief" that Schneider told Pointe Magazine the Buttons had been charged with a crime. AC ¶¶ 308-09.

---

[5] Two paragraphs earlier, Plaintiffs state that "Mitchell Taylor Button has not danced or been involved in the dance industry since 2010." AC ¶ 95.

The Buttons also allege that Ruff, Mariella, Schneider, Jacobs, and non-party McCawley "conspired" with another non-party, Madison Breshears, "to publish defamatory statements about the Buttons prior to the article being published in the New York Times." *See* AC ¶¶ 70, 75-76.[6] The Buttons allege that attorneys Ruff and Mariella interviewed Breshears as a potential witness in the Nevada [*11] Litigation. AC ¶¶ 80, 83. After the interview and about three months before the Times Article was published, Breshears posted on social media calling Dusty Button a "predator" who "grooms young dancers for sex acts with herself and her husband." AC ¶¶ 75-77.[7]

Years later, on October 1, 2023, the Buttons called Jacobs to discuss the contents of the Times Article and Jacobs told them to direct any future communications to her attorney David McCraw, a Defendant in this case. AC ¶¶ 113-19. The Buttons emailed McCraw, informing him of their intent to serve a subpoena on Jacobs in furtherance of their counterclaims in the Nevada Litigation. AC ¶ 120. In reply, they received an email from Demetri Blaisdell—another Defendant in this case—in which he requested a phone call, stated that he represents Jacobs, and requested that future communication be directed to him rather than Jacobs. AC ¶¶ 121. A later email from Blaisdell indicated that he represented both Jacobs and the Times. AC ¶¶ 122.

Blaisdell was a former associate at Boies Schiller & Flexner LLP and worked at the same New York office as the Ruff, Mariella and non-party Schneider when the Times Article was published about the Plaintiffs [*12] and when Ruff and Mariella first represented Nevada Plaintiffs, Humphries and Menichino. AC ¶ 121.[8] Blaisdell, Ruff and Mariella each confirmed to the Buttons that they had spoken to each other about the Plaintiffs and their intent to subpoena the New York Times. AC ¶¶ 125-26.

On a phone call, Blaisdell told the Buttons about "shield laws in New York and Nevada" that, in his view, would make it difficult for the Buttons to get information that Jacobs gathered in the course of her duties and urged them to "reconsider" serving a subpoena on Jacobs. AC ¶ 128. He also reiterated that he represents Jacobs. AC ¶ 128. A later communication from Blaisdell indicated that he would oppose any attempt to seek discovery form Jacobs and directed the Buttons to serve on him any subpoena of Jacobs. AC ¶ 129. Later, Plaintiffs allege that Blaisdell refused to set a time to discuss Jacob's retraction of the Times Article. AC ¶ 134.[9]

Plaintiffs allege that on July 22nd, 2024, the Buttons contacted Blaisdell once more and asked if he was still active counsel on behalf of Jacobs. AC ¶ 162. In his response, Blaisdell informed the

---

[6] Though Plaintiffs allege that Sigrid McCawley and Madison Breshears were part of the conspiracy, they do not bring any claims against them here. The Buttons bring claims against Breshears individually in a separate case pending before this Court. *See* Amended Complaint, *Button v. Breshears*, No. 24-cv-03757 (S.D.N.Y. August 4, 2024).

[7] The Buttons allege that these posts used nearly the "exact verbiage of what would soon be written in the Nevada complaint filed by Boies Schiller Defendants and published by Julia Jacobs three months later." AC ¶ 77.

[8] The Buttons do not directly allege where McCraw and Blaisdell worked while representing the Times. *See* AC. However, copied emails from Blaisdell indicate that McCraw could be served at a Times office, suggesting that they both may have represented the Times as in-house counsel. AC ¶ 167.

[9] Plaintiffs do not specify what the "proposed redaction" actually entailed.

Buttons that McCraw and he represent the Times and Jacobs, informed them that [*13] both are authorized to accept service on behalf of the Times and Jacobs but would not accept service by email, and reminded them that the discovery period in the Nevada Litigation had closed and thus no additional subpoenas could be served. AC ¶ 163. Blaisdell later replied that the Times and Jacobs could be served through service on McCraw at a New York Times office. AC ¶ 167. Plaintiffs allege that this caused confusion to the Buttons and "[delayed] the onset of this litigation" by an undisclosed period. AC ¶ 269.

The Buttons assert that, in collusion with McCraw, Ruff, Mariella, Schneider, Jacobs and non-party McCawley, Blaisdell intentionally impeded the Button's defense and their ability to discover relevant information and intentionally delayed their ability to bring this suit by "intentionally intimidat[ing]" and convincing them that they would not be successful against "large and powerful corporations. *See* AC ¶¶ 131, 132, 165, 170, 171. Moreover, the Buttons allege that Blaisdell and McCraw's directions to contact or serve one another "was an intentional scheme against the Plaintiffs." AC ¶ 169.

## V. The Alleged Fallout after the Times Article

Prior to the publication of the Times [*14] Article, the Buttons worked as freelance contractors and managed several brands which used their name, image, and likeness, including Button Built, Button Brand, and Bravado by Dusty Button. AC ¶¶ 222, 235-37. Specifically, Dusty Button worked as a dance teacher, choreographer, and performer, while Taylor Button worked in the custom automotive industry. AC ¶¶ 235-237. The Buttons had contractual relationships with sponsors and event organizers in their industries, including BLOCH Inc., Tiger Friday, Capezio, Yumiko, MPG Sport, Fenti, Volcom, Discount Dance, RedBull, and others (together, "Sponsors"). AC ¶ 239.

The Buttons allege that on an unspecified date, attorneys Ruff and Mariella, public relations director Schneider, and journalist Jacobs, all contacted some of the Sponsors "falsely claiming the Plaintiffs had been charged with a crime and that they should no longer work with them. . . ." AC ¶ 179. The Buttons assert that these communications directly caused the termination of Plaintiffs' relationship with those Sponsors. AC ¶ 179. The Buttons separately allege that, immediately following publication of the Times Article, each of their Sponsors terminated all contracts with the [*15] Buttons. AC ¶¶ 239, 245-46. Furthermore, Dusty Button's prescheduled engagements to teach, choreograph, or perform were canceled not long after the publication of the Times Article, as were Taylor Button's "pre-planned design builds." AC ¶ 220, 221 226, 236-39. "Button Brand," the Buttons' business, was shuttered and the Buttons allege that they were "forced to refund consumers for items already sold." AC ¶¶ 240-41. The Buttons allege Ruff, Mariella, Schneider, and Jacobs "knew that their statements were false" nevertheless intentionally caused that the downfall of their business and ability to generate income. AC ¶ 228, 234. The Buttons allege that they have been unable to find any work after the publication of the Times Article. AC ¶ 214.

## PROCEDURAL HISTORY

Plaintiffs, proceeding *pro se*, filed a complaint initiating this action on July 29, 2024. [ECF No. 1 ("Compl.")]. Thereafter, Defendants filed letter motions seeking leave to file motions to dismiss. [ECF Nos. 22, 24, 25]. The Court entered a scheduling order which included an opportunity for the Buttons to file an Amended Complaint in response to the issues raised by Defendants in connection with their contemplated motions to dismiss. [*16] [ECF No. 32]. The Buttons filed the operative Amended Complaint, [ECF No. 34 ("Amended Complaint") or ("AC")], which asserts five claims against various combinations of Defendants:

- Injurious Falsehood ("Claim One") against the Times, Ruff, Mariella, Schneider, Jacobs
- Tortious Interference ("Claim Two") against the Times, Ruff, Mariella, Schneider, Jacobs
- Negligent Infliction of Emotional Distress ("NIED") ("Claim Three") against all Defendants
- Civil Conspiracy ("Claim Four") against all Defendants[10]
- Fraud and Fraudulent Misrepresentation ("Claim 5 and 6") against Ruff and Mariella

AC ¶¶ 281-419.

Defendants, in three separate groups, moved to dismiss, [ECF Nos. 36, 38, 41], and filed memoranda of law and a declaration in support of their motions. [ECF Nos. 37 ("Boies Schiller Mem."), 39 ("Schneider Mem."), 42 ("Times Mem."), 43 ("Times Decl.")]. Plaintiffs opposed the motions, [ECF Nos. 46 ("Opp. to Ruff"), 47 ("Opp. to Times"), 48 ("Opp. to Schneider")], and Defendants filed replies. [ECF Nos. 49 ("Boies Schiller Reply"), 50 ("Times Reply"), 51 ("Schneider Reply")].[11] Ruff and Mariella twice submitted letters advising the Court of orders issued in various other cases brought by the [*17] Buttons. [ECF Nos. 52, 54]. The Buttons opposed the Court's consideration of each letter and filed two notices of supplemental authority of their own. [ECF Nos. 53, 55, 56, 62]. Ruff and Mariella submitted a response to each Plaintiffs' notices of supplemental authority, to which Plaintiffs replied. [ECF No. 57, 60, 63, 64].

## LEGAL STANDARD

---

[10] Plaintiffs bring only claims of Negligent Infliction of Emotional Distress and Civil Conspiracy against Defendants Blaisdell and McCraw. AC ¶¶ 355-402.

[11] Plaintiffs also improperly requested oral argument in the operative Amended Complaint. *See* AC. Construing Plaintiffs' request as a request for oral argument on the pending motions, Plaintiffs' request is denied since oral argument is not needed. *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 226 (2d Cir. 1999) (per curiam) (noting that "a district court's decision whether to permit oral argument rests within its discretion" (citing *Katz v. Morgenthau*, 892 F.2d 20, 22 (2d Cir. 1989)); *see also Henderson v. Lagoudis*, No. 3:12cv1688 (JBA), 2014 U.S. Dist. LEXIS 26346, 2014 WL 813120, at *1 n.1 (D. Conn. Feb. 28, 2014) (denying request for oral argument because it was not necessary to decide pending motion).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The Court "must accept as true all of the [factual] allegations contained in a complaint," but the Court is not required to accept "legal conclusions," and mere "conclusory statements" are not factual allegations. *Id.* "[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference," "matters of which judicial notice may be taken," and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers*, 282 F.3d at 152-53 (internal [*18] quotation marks omitted) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). "A document is incorporated by reference if the complaint 'makes a clear, definite and substantial reference to [it],'" *Hagan v. City of New York*, 39 F. Supp. 3d 481, 494 (S.D.N.Y. 2014) (quoting *Helprin v. Harcourt, Inc.*, 277 F.Supp.2d 327, 330-31 (S.D.N.Y.2003).

The Court must "liberally construe pleadings and briefs submitted by *pro se* litigants." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017). A district court is not, however, tasked with "scouring obscure bodies of law in order to come up with novel claims on behalf of *pro se* litigants." *Id.* at 158. Even a *pro se* complaint must give the defendant "fair notice of [the] claim and the grounds upon which it rests." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008); see also *Twombly*, 550 U.S. at 545.

## DISCUSSION

### I. Motion to Dismiss

Plaintiffs' claims of injurious falsehood, tortious interference, and negligent infliction of emotional distress against the Times, Ruff, Mariella, Schneider, and Jacobs are all time-barred. Moreover, Plaintiffs fail to state a claim for any of their causes of action against any of the Defendants.

### A. Plaintiffs' Claims Sounding in Defamation are Time-Barred

Under New York law,[12] "[i]n determining which statute of limitations is applicable to a cause of action, it is the essence of the action and not its mere name that controls." *Koplinka-Loehr v. Cty. of Tompkins*, 189 A.D.3d 2039, 139 N.Y.S.3d 661, 664 (3d Dep't 2020). Claims based on harm "stemming from injury to reputation" sound in defamation, even if the injury to reputation [*19] results in economic damages. *Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (citing

[12] The parties agree that New York law applies.

*Morrison v. Nat'l Broad. Co.*, 19 N.Y.2d 453, 458, 227 N.E.2d 572, 573, 280 N.Y.S.2d 641 (N.Y. 1967)); *see also Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (finding that tort claims sounded in defamation where all of the harms complained of by the plaintiff, including termination of employment, "all [flowed] from the effect on his reputation cause by defendants' alleged defamatory statements"); *Lesesne* 918 F.Supp.2d at 224 (finding that claims based on statements harming the Plaintiffs' reputation leading to a loss of business sounded in defamation).

As such, defamation and any torts that sound in defamation are subject to a one-year statute of limitations.[13] *See* N.Y. C.P.L.R. § 215(3); *D'Arata v. New York Post*, 226 A.D.3d 560, 210 N.Y.S.3d 384, 385 (1st Dep't 2024) ("The statute of limitations for a libel claim is measured one year from the date of publication. . . . "); *Lancaster v. Town of E. Hampton*, 54 A.D.3d 906, 907, 864 N.Y.S.2d 537, 538 (2d Dep't 2008); *Lesesne v. Brimecome*, 918 F. Supp.2d 221, 224 (S.D.N.Y. 2013) ("[C]ourts in New York have also kept a watchful eye for claims sounding in defamation that have been disguised as other causes of action"). The one-year statute of limitations accrues "at publication, which is the earliest date on which the work was placed on sale or became generally available to the public." *Jay Sarkar v. City of New York*, 24-1219, 2025 U.S. App. LEXIS 16032, 2025 WL 1793733, at *3 (2d Cir. June 30, 2025) (citation omitted).

The Buttons bring claims for injurious falsehood, tortious interference, and negligent infliction of emotional distress against the Times, Ruff, Mariella, Schneider, and Jacobs. Each of those claims is predicated primarily [*20] on the allegedly defamatory statements made in the Times Article published on July 29, 2021 regarding accusations that Plaintiffs sexually assaulted minors and on various other allegedly defamatory statements made before the article was published. *See* AC ¶¶ 18 n.1, 179, 197, 281-402.[14] Exactly three years after the Times Article was published, on July 29, 2024, Plaintiffs initiated this lawsuit. *See* Compl. Even reading the Amended Complaint in the light most favorable to Plaintiffs, as required, the Court finds that these claims are all time-barred.

### *i. Plaintiffs' Injurious Falsehood Claims Sound in Defamation*

The tort of injurious falsehood, also known as "trade libel," involves "the knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff, to its demonstrable detriment." *See, e.g., Leonardo v. Wells Fargo Bank, N.A.*, 21-CV-04949, 2024 U.S. Dist. LEXIS 179041, 2024 WL 4485608, at *68 (E.D.N.Y. Aug. 1, 2024) (quoting *Banco Popular N. America v. Lieberman*, 75 A.D.3d 460, 905 N.Y.S.2d 82, 82 (N.Y. App. Div. 2010).

---

[13] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015).

[14] To the extent the Times, Ruff, Mariella, Schneider, and Jacobs made any of the other allegedly defamatory statements within a year of the filing of this lawsuit, the claims still fail because, as further described below, Plaintiffs do not adequately state a claim as a matter of law. *See* AC ¶¶ 179, 183, 197.

Plaintiffs' injurious falsehood claims are premised on allegedly defamatory statements in the Times Article. *See* AC ¶¶ 281-317. Plaintiffs allege that the Times Article contained "defamatory" statements that "tend[ed] to so harm the reputation of Plaintiffs as to lower their professional reputation [*21] in the community" and "Defendants [otherwise] made statements that alluded to the Plaintiffs being charged with a crime amongst other statements which led those third parties to disassociate from the Plaintiffs." AC ¶¶ 289-85, 294-301. At their essence, Plaintiffs' injurious falsehood claims sound in defamation and are subject to a one-year statute of limitations. *See, e.g., Ent. Partners Grp., Inc. v. Davis*, 198 A.D.2d 63, 64, 603 N.Y.S.2d 439, 440 (1st Dep't 1993) ("it is well settled that a plaintiff may not circumvent the one-year statute of limitations applicable to defamation actions (CPLR § 215[3]) by denominating the action as one for . . . injurious falsehood if, in fact, the claim seeks redress for injury to reputation."); *Ramsay v. Mary Imogene Bassett Hosp.*, 113 A.D.2d 149, 151, 495 N.Y.S.2d 282, 284 (3d Dep't 1985) (citing *Noel v. Interboro Mut. Indem. Ins. Co.*, 31 A.D.2d 54, 55, 295 N.Y.S.2d 399, 400 (1968), *aff'd*, 29 N.Y.2d 743, 276 N.E.2d 232, 326 N.Y.S.2d 396 (N.Y. 1971)) (same); *Verschleiser v. Frydman*, 2023 U.S. Dist. LEXIS 158963, 2023 WL 5835031, at *9 (S.D.N.Y. Sept. 7, 2023) ("The plaintiff's injurious falsehood claim is subject to a one-year statute of limitations.") (citing N.Y. C.P.L.R. § 215(3) and citing *Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 80 (S.D.N.Y. 1995); *Korova Milk Bar of White Plains, Inc. v. PRE Properties*, LLC, 2013 U.S. Dist. LEXIS 14937, 2013 WL 417406, at *16 (S.D.N.Y. Feb. 4, 2013) ("Injurious falsehood is governed by a one-year statute of limitations.").

***ii. Plaintiffs' Tortious Interference Claims Largely Sound in Defamation***

Plaintiffs' tortious interference claims are similarly largely premised on statements made within or in connection with the Times Article, which Plaintiffs allege "[tended] to so harm the reputation of Plaintiffs as to lower their professional reputation in the community [*22] or deter third persons from associating with them including termination of any and all business, contracts, or employment, inducing third-parties through mass publication to sever contractual agreements . . . ." AC ¶ 345; *see also id.* ¶¶ 326-27 (referring to "defamatory" statements within tortious interference allegations), 337 (alleging that Defendants "expos[ed] Plaintiffs to ridicule . . . which reflected negatively on Plaintiffs' characters, morality and integrity"). Here too, Plaintiffs allege that their injuries flow from reputational harm. As a result, their tortious interference claims sound in defamation and are subject to a one-year statute of limitations. *See Ent. Partners Grp.*, 198 A.D.2d 63, 64, 603 N.Y.S.2d 439 (1993) (finding Plaintiff may not "cast its defamation claim as tortious interference with business relations" to avoid the one-year statute of limitations); *Katz v. Travelers*, 241 F. Supp. 3d 397, 407 (E.D.N.Y. 2017) (cleaned up) (citation omitted) (finding tortious interference claims were time-barred because "the gravamen of Plaintiff's alleged injury in each of the counts is either harm to his reputation or harm that flows from the alleged effect on Plaintiff's reputation, such as . . . loss of contracts and business relationships."); *Lesesne*, 918 F.Supp.2d at 223-225 (finding claims arising from allegedly defamatory [*23] statements made online "sound[ed] in defamation rather than tortious interference" even though they resulted in economic harm).

However, Plaintiffs also complain of other conduct by Defendants in which they allegedly tortiously interfered with Plaintiffs' contracts. For example, Defendants allegedly "contacted employers of the Plaintiffs including but not limited to [the Sponsors] falsely claiming that Plaintiffs had been charged with a crime and that they should no longer work with them, which terminated the Plaintiffs' relationship with those businesses, employers, and sponsors." AC ¶ ¶ 179, 331-32. To the extent this claim is predicated on pure economic harm and not reputational harm, the claims cannot be dismissed at the pleading stage on statute of limitations grounds. The three-year statute of limitations for tortious interference applies when "the gravamen of a complaint is economic injury, rather than merely reputational harm." *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 48, 888 N.Y.S.2d 489, 494 (1st Dep't 2009). Put differently, the First Department has emphasized that where a "complaint does not rely merely on generalized reputational harm," and instead relies on economic injury, the claim "sounds in tortious interference." *See id.* at 495; *see also Glob. Supplies NY, Inc. v. Electrolux Home Prods. Inc.*, No. 21-674, 2022 U.S. App. LEXIS 7108, 2022 WL 815795, at *2 (2d Cir. Mar. 18, 2022). Though the allegation [*24] is vague, Plaintiffs have arguably alleged more than generalized reputational harm. They appear to allege a concerted effort to terminate Plaintiffs' business relationships with various businesses. Nevertheless, even if a three-year statute of limitations is applied, as described further below, Plaintiffs fail to state a claim for tortious interference.

### *iii. Plaintiffs' NIED Claims against the Times, Ruff, Mariella, Schneider, and Jacobs Sound in Defamation*

Plaintiffs' NIED claims against all Defendants other than Blaisdell and McCraw similarly sound in defamation. The injury which the Plaintiffs allege is essentially distress caused by the reputational harm inflicted by "false and defamatory statements" found in the "defamatory article." AC ¶ 360, 376. While negligent infliction of emotional distress may otherwise be recognized as an independent cause of action, subject to its own three-year statute of limitations, *see Barbetta v. Facchini*, 236 A.D.3d 623, 625, 230 N.Y.S.3d 276, 278 (2d Dep't 2025), Plaintiffs do not allege any injury arising from allegedly wrongful conduct separate from the reputational harm cause by the Times Article. AC ¶ 360, 376. Accordingly, Plaintiffs' NIED claims are subject to a one-year statute of limitations and time-barred. *See, e.g., [*25] Bah v. Apple Inc.*, 19-cv-3539, 2020 U.S. Dist. LEXIS 22867, 2020 WL 614932, at *18 (S.D.N.Y. Feb. 10, 2020) ("[Plaintiff's] claims of . . . negligent infliction of emotional harm sound in defamation because these claims merely allege additional emotional injuries resulting from defendant's [statements], which are the basis of [his defamation claims]").

### *iv. Plaintiffs are not Entitled to Equitable Estoppel or Equitable Tolling*

Plaintiffs argue in the Amended Complaint and in their opposition to Schneider's motion to dismiss that "[e]ach Defendant is equitably estopped from asserting a statute of limitations

defense," and any relevant statute of limitations "must be tolled" based on the doctrine of "equitable tolling." *See* AC ¶¶ 347-49; Opp. to Schneider at 15-18.[15]

The doctrine of equitable tolling does not apply to state causes of action. *Sejin Precision Indus. Co. v. Citibank, N.A.*, 235 F. Supp. 3d 542, 553 (S.D.N.Y. 2017), *aff'd*, 726 Fed. Appx. 27 (2d Cir. 2018) (quoting *Jang Ho Choi v. Beautri Realty Corp.*, 135 A.D.3d 451, 22 N.Y.S.3d 431, 432 (1st Dep't 2016)); *Busher v. Barry*, No. 20-3587-CV, 2021 U.S. App. LEXIS 32561, 2021 WL 5071871, at *4 (2d Cir. Nov. 2, 2021) (summary order). Where, as here, the plaintiff asserts "state causes of action, not federal ones," the proper doctrine to apply is "equitable estoppel," not equitable tolling. *See Raphael v. Vintage Grape & Grog, Ltd.*, 187 A.D.3d 672, 672, 131 N.Y.S.3d 558 (1st Dep't 2020). Accordingly, equitable tolling cannot render timely Plaintiffs' time-barred claims, all of which plead causes of action under New York law.

Equitable estoppel is an "extraordinary remedy," *Clark v. Ravikumar*, 90 A.D.3d 971, 972, 935 N.Y.S.2d 633, 635 (2d Dep't 2011), which should be invoked "sparingly and only under [*26] exceptional circumstances." *See Sanchez v. Jericho Sch. Dist.*, 180 A.D.3d 828, 830, 120 N.Y.S.3d 163, 165 (2d Dep't 2020) (quoting *Ceely v. New York City Health & Hosp. Corp.*, 162 A.D.2d 492, 493, 556 N.Y.S.2d 694, 695 (2d Dep't 1990)). In order to successfully argue for equitable estoppel, a plaintiff must show "(1) the plaintiff was induced by fraud, misrepresentations, or deception to refrain from filing a timely action (2) the plaintiff reasonably relied on the defendants' misrepresentations; and (3) the plaintiff exercised due diligence in bringing an action within a reasonable period of time after the facts giving rise to the equitable estoppel claim have ceased to be operational." *Endemann v. Liberty Ins. Corp.*, No. 22-1217, 2023 U.S. App. LEXIS 15466, 2023 WL 4102245, at *1 (2d Cir. June 21, 2023) (cleaned up) (quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 674, 849 N.E.2d 926, 816 N.Y.S.2d 703 (N.Y. 2006) and quoting *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)).

Plaintiffs have not plead facts sufficient to estop the Defendants from asserting a statute of limitations defense. To be sure, Plaintiffs present many reasons to justify why they did not timely file a complaint. The Buttons allege that Defendants used "the threat of a law degree, the connections between the New York Times and Boies Schiller & Flexner, the ability to silence the Plaintiffs, and their ability to manipulate the Court of public opinion and the Court" to mislead Plaintiffs and make them believe that "legal recourse would be an impossibility against such powerful corporations." *See* AC ¶ 267-272. With respect to Ruff and Mariella, Plaintiffs [*27] allege that they failed to timely file suit because they were "afraid" of and "intimidated by" Mariella and Ruff's "legal reach and internal networking," AC ¶¶ 12, 314, "believe[ed] they would

---

[15] Plaintiffs respond only to Schneider's arguments regarding equitable estoppel and tolling, and do not address the issue in their oppositions to the other Defendants. *See* Opp. to Schneider at 15-18; Opp. to Times; Opp. to Ruff. Accordingly, the Buttons have waived their arguments in favor of tolling the statute of limitations except regarding their claims against Schneider. *See Coker v. Goldberg & Assocs. P.C.*, 2024 U.S. Dist. LEXIS 36390, 2024 WL 869412, at *7 (S.D.N.Y. Feb. 29, 2024) ("Defendants are deemed to have conceded these arguments by failing to address them in their opposition brief. Even if Defendants had not so conceded, the Court agrees with these arguments."). However, to "liberally construe pleadings and briefs submitted by *pro se* litigants," the Court considers Plaintiff's equitable estoppel and tolling arguments as against all Defendants. *See McLeod*, 864 F.3d at 156.

not be successful," AC ¶ 170, knew filing this lawsuit would put them at risk of "sanctions," AC ¶¶ 267, 270, and feared Ruff and Mariella's ability to make "the Courts to believe the Plaintiffs are harassing everyone who has harmed them by appropriately seeking legal recourse," AC ¶ 270. The Buttons allege further that they "could not afford to file claims" and were unable to "generate income." AC ¶ 313. They allege that Schneider's alleged conduct caused them to experience "depression" and that they experience "severe trauma and PTSD as a direct result of Defendant Jacobs's published article." AC ¶¶ 263, 361. In their opposition to Scheider's motion to dismiss, Plaintiffs state, without support, that tolling is warranted because of "defendants' pattern of defamation, harassment, and intimidation." *See* Opp. to Schneider at 17-18. Finally, the Buttons assert that applying the statute of limitations would be "unjust." AC ¶¶ 275, 315, 348, 399. None of this establishes that the Defendants induced [*28] Plaintiffs to refrain from filing a timely action by fraud, misrepresentations, or deception or that Plaintiffs reasonably relied on Defendants' misrepresentations. *Zumpano*, 6 N.Y.3d at 674 (holding that it is "fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit."); *see also Springs v. Bd. of Educ.*, 2010 U.S. Dist. LEXIS 111091, 2010 WL 4068712, at *3 (S.D.N.Y. Oct. 14, 2010) ("allegations of depression and anxiety" are "too vague to support a finding of extraordinary circumstances that would warrant equitable tolling"); *Wang v. Palmisano*, 157 F. Supp. 3d 306, 322 (S.D.N.Y. 2016) (stating that "[a] plaintiff[']s limited financial means and inability to afford a lawyer are not 'extraordinary circumstances' that support equitably tolling the limitations period.").

Moreover, Plaintiffs do not plead that they made any diligent efforts to timely file their case that were thwarted by misdirection on the part of any Defendant. *See Koral*, 36 F.4th at 411 (declining to apply equitable estoppel despite clearly alleged fraud on the part of the defendant because the plaintiff did not adequately demonstrate that due diligence would not have uncovered the fraud). Ultimately, Plaintiffs have not demonstrated that they are entitled to the extraordinary remedy of equitable estoppel. [*29] [16]

### B. Plaintiffs Fail to State Any Claim On Which Relief Can Be Granted

#### *i. Plaintiffs to State a Claim for Injurious Falsehood*

---

[16] Plaintiffs assert that the Times Article was reposted on Instagram by "various other third-party Instagram accounts" and republished to various other social media cites, without specifying the date of republication. AC ¶¶ 148, 149. New York courts have recognized an exception to the statute of limitations where the allegedly defamatory statements were republished, if that republication "occurs upon a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition and which is intended to reach a new audience." *Enigma Software Group USA, LLC v. Beeping Computer LLC*, 194 F.Supp.3d 263, 276-77 (S.D.N.Y. 2016) (quoting Firth v. State, 98 N.Y.2d 365, 371, 747 N.Y.S.2d 69, 775 N.E.2d 463 (2002)). However, continuous access to an online article is not a republication and a plaintiff may not recover for a republication by a third party "absent a showing that the original author was responsible for or ratified the republication." *Martin v. Daily News L.P. (Martin II)*, 121 A.D.3d 90, 990 N.Y.S.2d 473, 483 (1st Dep't 2014); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (citing *Macy v. New York World-Telegram Corp.*, 2 N.Y.2d 416, 422-23, 161 N.Y.S.2d 55, 141 N.E.2d 566 (1957)).

To state a claim for injurious falsehood, Plaintiffs must allege "(1) the falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages." *See, e.g., Computech Int'l v. Compaq Computer Corp.*, 2002 U.S. Dist. LEXIS 20307, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002); *see also Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670, 422 N.E.2d 518, 522, 439 N.Y.S.2d 858 (N.Y. 1981) (holding that plaintiff states a disparagement[17] claim when the "statement is confined to denigrating the quality of the business' goods or services" and special damages and malice are proven); *BCRE 230 Riverside LLC v. Fuchs*, 59 A.D.3d 282, 283, 874 N.Y.S.2d 34, 36 (2d Dep't 2009) (holding that special damages are "a necessary element of an action for injurious falsehood that must be pleaded with particularity."). Injurious falsehood differs from defamation in that injurious falsehood is limited to statements "denigrating the quality of the [plaintiff's] business' goods or services." *Henneberry* 415 F. Supp. 2d at 470 (quoting *Ruder*, 52 N.Y.2d at 670); *see also Cunningham v. Hagedorn*, 72 A.D.2d 702, 704, 422 N.Y.S.2d 70, 74 (1st Dep't 1979) ("[The statements] do not concern themselves with plaintiff's property. Hence, they may not be the subject of an action for injurious falsehood.").

Plaintiffs claim fails as a matter of law. Plaintiffs do not plead any false statement denigrating their goods or service, nor do they adequately plead malice or special damages. Moreover, statements attributed [*30] to certain Defendants are privileged.

As such, to the extent not barred by the statute of limitations, Plaintiff's injurious falsehood claim in Count I is discussed on the merits. First, Plaintiffs' injurious falsehood claim fails because the statements alleged by Plaintiffs to be injurious falsehoods concern Plaintiff's "behavior [at work and] not the quality of any 'goods or services' that [they] provided." *See Pasternack v. Lab'y Corp. of America.*, 27 N.Y.3d 817, 37 N.Y.S.3d 750, 59 N.E.3d 485, 2014 WL 4832299, at *20 (S.D.N.Y. 2014), *aff'd sub nom. Pasternack v. Lab/y Corp. of America Holdings*, 839 F.3d 151 (2d Cir. 2016); *see also Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*, 27 Misc. 3d 1238(A), 910 N.Y.S.2d 765, 2010 WL 2519631, at *9 (N.Y. Sup. Ct. May 28, 2010) (dismissing injurious falsehood claim where the statement that plaintiff engaged in a "pattern of sexual harassment" concerned his "integrity" rather than the "quality of a party's goods or services" as an attorney).

Dusty Button's business is teaching, choreographing, and performing dance and Taylor Button's business is designing cars. *See* AC ¶¶ 236-38. Plaintiffs also sold tangible goods, such as dancewear. AC ¶ 245. Nothing in the Times Article concerns the quality of the Buttons' goods or services. *See* Times Article. No other alleged statement made by any of the Defendants regards the quality of their goods or services. AC ¶¶ 179, 183, 197, 298-99, 308-09 (statements that the Buttons had been charged with a crime and that Buttons sexually abused [*31] the Nevada Plaintiffs). While the Plaintiffs claim that "[their] reputation and their own person was their business, goods and services," *see, e.g.*, AC ¶¶ 210-216, and one might extrapolate that, if true,

---

[17] Injurious falsehood is also referred to as "trade libel," and "product disparagement." *Henneberry v. Sumitomo Corp.*, 415 F. Supp. 2d 423, 470 (S.D.N.Y. 2006).

Dusty Button's sexual abuse of pupils would impact her ability to provide quality teaching services, this does not mean that the statements are assertions about the quality of her services. *See Pasternack*, 27 N.Y.3d 817, 37 N.Y.S.3d 750, 59 N.E.3d 485, 2014 WL 4832299, at *20. "Even if these statements had a downstream impact on [their] ability to work . . . this does not transform them into statements about the quality of [their] services in those capacities." *Id.*

Second, Plaintiffs fail to adequately plead malice. Plaintiffs argue that they do not need to show malice because they are not public figures.[18] *See* Opp to Times at 24-26; Opp. to Schneider at 21-22. This is not true. Malice is a necessary element of an injurious falsehood claim without a showing of public figure status. *See, e.g., Kasada, Inc. v. Access Cap., Inc.*, 2004 U.S. Dist. LEXIS 25257, 2004 WL 2903776, at *16 (S.D.N.Y. Dec. 14, 2004). Plaintiffs assert, only in a conclusory fashion, that Defendants "knew" that the Nevada Plaintiffs' allegations were "false," *see, e.g.*, AC ¶¶ 22, 100, 253, 300, 308-09, but they provide no factual support for this allegation. *See, e.g., Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 2024 WL 4893277, at *8 (S.D.N.Y. 2024) (holding that conclusory assertions [*32] about knowledge of falsity is insufficient to establish malice); *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 822-24 (S.D.N.Y. 2021) (finding no malice where complaint "alleges no nonconclusory facts that support the proposition that [the defendant] knew that it was reporting falsities."), *aff'd*, No. 21-CV-1097, 2022 U.S. App. LEXIS 5351, 2022 WL 598973 (2d Cir. Mar. 1, 2022). Plaintiffs' allegations that various defendants were in possession of unspecified evidence, or "various text messages and therapy records" proving falsity, without any particularization or any explanation of how they prove falsity, is insufficient to render their allegations more than merely conclusory. *See, e.g.*, AC ¶¶ 22, 91, 203-04.

Third, Plaintiffs failed to adequately allege special damages. "[A] motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity." *Kasada*, No. 01 CIV. 8893 (GBD), 2004 U.S. Dist. LEXIS 25257, 2004 WL 2903776, at *16 (citing *Drug Research Corp. v. Curtis Publishing Co.*, 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (N.Y. 1960); *see also BCRE 230 Riverside LLC v. Fuchs*, 59 A.D.3d 282, 283, 874 N.Y.S.2d 34, 36 (2d Dep't 2009) (special damages "must be pleaded with particularity"); *Wasserman v. Maimonides Med. Ctr.*, 268 A.D.2d 425, 426, 702 N.Y.S.2d 88, 89 (2d Dep't 2000) (same). [G]eneral allegations of lost sales from unidentified customers are insufficient" and "[r]ound figures or a general allegation of a dollar amount . . . will not suffice." *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15 Civ. 8775, 2016 U.S. Dist. LEXIS 149139, 2016 WL 6310777, at *6 (S.D.N.Y. Oct. 27, 2016). Plaintiffs do not assert even a "general allegation of a dollar amount" and instead assert broadly that "Plaintiffs claim special damages to be proven through contractual [*33] agreement, financial records and messages" and "Plaintiffs suffered actual damages and special damages, proven by bank statements, email and text communications, approval of government assistance programs, loss of counsel, loss of employment and other economic and financial evidence of damages." *See* AC ¶¶ 288, 297.

---

[18] The Amended Complaint describes Dusty Button as a "world-renowned ballet dancer." AC ¶ 45.

Plaintiffs argue, without support, that they need not articulate particularized special damages because they have stated a claim for injurious falsehood "*per se*." *See* Opp. to Schneider at 23. Plaintiffs did not plead this in their Amended Complaint and there is no cause of action titled "injurious falsehood *per se*" in New York. *See, e.g., In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 484 n.30 (S.D.N.Y. 2013), *adhered to on denial of reconsideration*, 2013 U.S. Dist. LEXIS 168185, 2013 WL 6182949 (S.D.N.Y. Nov. 18, 2013), and *aff'd*, 788 F.3d 98 (2d Cir. 2015), and *aff'd*, 788 F.3d 98 (2d Cir. 2015) ("A claim for injurious falsehood, unlike a claim for defamation per se requires the pleading of special damages."). Plaintiffs fail to allege several necessary elements of their injurious falsehood claim, and thus it must be dismissed.

***ii. Plaintiffs Fail to State a Tortious Interference Claim***

New York recognizes two separate "tortious interference" causes of action: tortious interference with contract and tortious interference with prospective business relations. *See, [*34] e.g., Law Offices of Ira H. Leibowitz v. Landmark Ventures, Inc.*, 131 A.D.3d 583, 583, 15 N.Y.S.3d 814 (2d Dep't 2015) (referencing both types of tortious interference). While Plaintiffs do not specify which of these they intend to pursue, their arguments appear to center on the termination of existing contracts. *See* AC ¶¶ 319-54 (citing the termination of "contractual agreements" and alleging that "[e]ach Defendant *intentionally* induced innumerable third parties to break their contracts") (emphasis in original). However, to "liberally construe" *pro se* Plaintiffs' pleadings, the Court will analyze both forms of tortious interference. *See McLeod*, 864 F.3d at 156.

Plaintiffs allege that Ruff and Mariella "contacted business associates, employers and sponsors of the Plaintiffs" and told them about the allegations underlying the Nevada Complaint, that there were more victims not named in the complaint, and that Plaintiffs had been charged with a crime. AC ¶¶ 321-24. They allege that "Schneider knew of the Plaintiffs' contractual agreements with certain employers because Ms. Mariella and Ruff relayed the information to her," that "Schneider knew that Plaintiff Dusty Button was Red Bull's first and only ballet athlete" and "Schneider knew that Plaintiff Taylor Button was sponsored by Toyo Tires and was invited to events [*35] such as SEMA in Las Vegas" before contacting Red Bull, TOYO, and SEMA "for comments on the allegations pertaining to the Buttons and stating that the Plaintiff had been charged with a crime." AC ¶¶ 330-32. Plaintiffs allege that Jacobs "contacted numerous third-parties for comment on the allegations regarding the Buttons including but not limited to Boston Ballet, ASH productions, BLOCH Dance USA, Toyo Tires, Red Bull, Master Ballet Academy and others" to "warn them of the allegations against the Plaintiffs and to lead them to believe the Plaintiffs had been charged with crimes of sexual assault. . . ." AC ¶ 334. Though Plaintiffs do not specifically tie this allegation to their tortious interference claim, the Court construes it as an allegation supporting the tortious interference claim: "Defendants Ruff, Mariella, Schneider and Jacobs contacted employers of the Plaintiffs including but not limited to Bloch Dance USA, ASH productions, SEMA, Bellamoxi, Toyo Tires, Pointe Magazine, the Dallas Conservatory, Master Ballet Academy and Red Bull falsely claiming that Plaintiffs had been charged with a crime and that they should no longer work with them, which terminated the Plaintiffs' [*36] relationship

with those businesses, employers, and sponsors." AC ¶ 179. These allegations fail to sufficiently plead the several elements in either tortious interference claim.

The claim of tortious interference with a contract under New York law requires a Plaintiff to plead "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (N.Y. 1996)). Plaintiffs fail to allege these elements.

Plaintiffs do not adequately allege specific valid contracts that were purportedly breached. *See Martian Ent., LLC v. Harris*, 12 Misc. 3d 1190(A), 824 N.Y.S.2d 769 (Sup. Ct. 2006) (dismissing a tortious interference with a contract claim where the complaint does not "expressly reference any provisions of . . . an alleged agreement" or attach a copy of the agreement); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F.Supp.3d 763, 791 (S.D.N.Y. 2019) (dismissing a tortious interference claim due to Plaintiffs' failure to plead the terms of the contract or the terms that were supposedly breached); *WorldHomeCenter.Com, Inc. v. Franke Consumer Prods. Inc.*, No. 10 civ. 3205 (BSJ), 2011 U.S. Dist. LEXIS 67798, 2011 WL 2565284, at *6 (S.D.N.Y. June 22, 2011) ("Under New York law, although such claims are to be construed liberally, a plaintiff must specifically plead the existence of [*37] a valid contract and provide some details about its terms and its breach to sustain a claim at the motion to dismiss stage."); *Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606, 2006 U.S. Dist. LEXIS 55638, 2006 WL 2320544, at *35 (S.D.N.Y. Aug. 10, 2006) (finding that Plaintiff failed to adequately plead tortious interference by failing to plead the terms of the contract that was allegedly interfered with).

Plaintiffs also do not adequately plead knowledge. They allege only that Schneider, Mariella, and Ruff knew the Buttons were sponsored by Red Bull and Toyo Tires. AC ¶¶ 330-32. The Court also infers knowledge of some sponsorships or business relationships based on the allegation that Ruff, Mariella, Schneider and Jacobs contacted "Bloch Dance USA, ASH productions, SEMA, Bellamoxi, Toyo Tires, Pointe Magazine, the Dallas Conservatory, Master Ballet Academy and Red Bull" and stated that those companies "should no longer work with [Plaintiffs]." AC ¶ 179. Plaintiffs make no allegations that Defendants knew about "specific contract[s]," they make no allegations about Defendants' knowledge of other sponsorships, and they make no allegations pertaining to the Times's knowledge at all. *See, e.g., Greer v. Fox Corp.*, No. 20-CV-5484-LTS-SDA, 2022 U.S. Dist. LEXIS 161617, 2022 WL 4093155, at *8 (S.D.N.Y. Sept. 7, 2022), *aff'd sub nom. Greer v. Fox News Media*, No. 22-1970-CV, 2023 U.S. App. LEXIS 7407, 2023 WL 2671796 (2d Cir. Mar. 29, 2023) (holding that the complaint must allege that Defendant had "actual knowledge of the specific contract [*38] . . . a defendant's general awareness that the plaintiff did business with third parties is not enough").

Furthermore, Plaintiffs do not allege a breach of any provision of any contract. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 (2d Cir. 2006) (holding that allegations that a third party

"abandoned" and "walked away" from a contract was insufficient to establish an "actual breach"). Plaintiffs merely allege that: (1) "Plaintiffs both immediately lost any and all contracts with sponsors, endorsements and event appearances in their respective industries. . . ," listing several alleged sponsors; and (2) Defendants' statement cause the "termination of any and all business, . . ., contracts or employment, inducing third-parties through mass media publication to sever contractual agreements and disassociate from Plaintiffs." *See* AC ¶¶ 238, 239, 243, 245, 345. Plaintiffs have failed to plead several elements of tortious interference with a contract.

To the extent Plaintiffs intend to plead tortious interference with a prospective business relationship, that claim fares no better. To state a claim for tortious interference with a prospective business relationship must allege that the Defendant (1) knew about the business relationship or prospective [*39] business relationship between the plaintiff and a third party; (2) intentionally interfered with the relationship; and (3) acted using "wrongful means or with the sole purpose of malice"; and (4) resulting injury to the business relationship. *See 534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick*, 90 A.D.3d 541, 542, 935 N.Y.S.2d 23, 24 (1st Dep't 2011).

Plaintiffs fail again to adequately plead the knowledge element of this form of tortious interference for the Times. *See, e.g., 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 546-47 (S.D.N.Y. 2014) ("[B]ecause the Amended Complaint fails to provide any factual allegations that the defendants had actual knowledge of any specific business relationships . . . plaintiffs have failed to state a claim"). As explained above, they make no allegations about the Times's knowledge, and they allege only that Schneider, Mariella, and Ruff knew the Buttons were sponsored by Red Bull and Toyo Tires. *See* AC ¶¶ 330-32. The Court will again infer that Plaintiffs intended to allege Ruff, Mariella, Schneider and Jacobs had knowledge of Plaintiffs' business relationship with "Bloch Dance USA, ASH productions, SEMA, Bellamoxi, Toyo Tires, Pointe Magazine, the Dallas Conservatory, Master Ballet Academy and Red Bull." AC ¶ 179.

Plaintiffs fail to adequately plead that any Defendants acted using "wrongful means or with the sole purpose [*40] of malice." *See 534 E. 11th St. Hous. Dev. Fund*, 90 A.D.3d at 542. Generally, to satisfy this element a defendant's conduct must amount to a crime or an independent tort or be driven by the "sole purpose of malice." *L. Offs. of Ira H. Leibowitz v. Landmark Ventures, Inc.*, 131 A.D.3d 583, 585, 15 N.Y.S.3d 814 (2d Dep't 2015) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 785 N.Y.S.2d 359 (N.Y. 2004)). Plaintiffs allege neither. Indeed, the alternative purposes for the alleged conversations with sponsors are clear from the Complaint. Plaintiffs allege that Ms. Schneider reached out to Red Bull, Toyo Tires, and SEMA "for comment[]." *See* AC ¶¶ 331-32. Plaintiffs also allege that Ruff, Mariella, and Schneider's actions "were motivated by a desire to . . . continue the fame and notoriety acquired by their colleague Sigrid McCawley's representation of Virginia Guthrie in the Epstein case." AC ¶ 344. Moreover, Jacobs was a journalist investigating a story about the Plaintiffs and the Boies Schiller Defendants were attorneys litigating a case against Plaintiffs who attempting to learn more about Plaintiffs. *See* AC ¶¶ 17, 177, 384 (Boies Schiller Defendants allegedly hired two private investigators to learn more about Plaintiffs).

Finally, Plaintiffs fail to allege that Defendant's outreach to their alleged sponsors were the "but for" cause of the termination of their business relationships. See, e.g., *Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d 265, 741 N.Y.S.2d 20, 23 (1st Dep't 2002) ("Tortious [*41] interference with prospective economic relations requires an allegation that plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct."); *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009) (same). Indeed, Plaintiffs provide several alternative causes for the termination of their business relationships. They allege that "as a direct result of the publication in the New York Times and later, in other publications and interviews such as Good Morning America, that Plaintiffs would suffer financial harm and never be capable of generating revenue using their names again." AC ¶ 234. Further, one business associate states that it ended its business relationship with the Buttons because "some concerned parents [came] forward with some social media posts." AC ¶ 221. To the extent Plaintiff's tortious interference claims are not time-barred, Plaintiffs have failed to plead the several elements of either tortious interference claim, and as such, the claim is dismissed.

### *iii. Plaintiffs Fail to State a Negligent Infliction of Emotional Distress Claim*

To plead an NIED claim under New York law, a plaintiff must allege "(1) a breach of duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection [*42] between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 n.57 (2d Cir. 2021) (citing *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 10 N.Y.3d 1, 6, 852 N.Y.S.2d 1, 881 N.E.2d 1187 (N.Y. 2008) and citing *Taggart v. Costabile*, 131 A.D.3d 243, 252-53, 14 N.Y.S.3d 388 (2d Dep't 2015)). To establish "some guarantee of genuineness of the harm," the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety. *Id.* (citing *Taggart v. Costabile*, 131 A.D.3d 243, 253, 14 N.Y.S.3d 388, 396 (N.Y. 2015)).

Plaintiffs generally allege that "[e]ach and every Defendant named herein caused the Plaintiffs emotional distress as for their reckless disregard of evidence in their possession and of the truth." AC ¶ 356. They allege that Schneider's arrangement of interviews for the Nevada Plaintiffs "furthered [their] depression" and, along with Ruff and Mariella, "continued to push the false narrative against the Plaintiffs." AC ¶ 361. They allege that Ruff and Mariella attempted to silence them in court. AC ¶ 367. They allege Blaisdell "is responsible for making the Plaintiffs believe they could not seek legal recourse, again leading the Plaintiffs to depression" and "attempted to persuade the Plaintiffs that their legal recourse was unlawful." AC ¶¶ 362, 366. They allege that McCraw "condoned" a conspiracy between Blaisdell, Ruff, Mariella, Schneider and [*43] the Times and attempted to persuade Plaintiffs not to pursue litigation against the Times and Jacobs. AC ¶¶ 363, 373. Finally, they allege Jacobs published her statements negligently, with knowledge of the falsity of the statements, malice, and/or with reckless disregard of their truth or falsity. AC ¶ 369. These allegations are insufficient to plausibly suggest a claim for NIED.

First, Plaintiffs fail to allege any specific duty owed to them by the Defendants. *See LaRussa v. LaRussa*, 232 A.D.2d 297, 298, 648 N.Y.S.2d 567, 568 (1st Dep't 1996) ("The cause of action for negligent infliction of emotional distress was also properly dismissed since plaintiffs failed to establish that defendant owed them a special duty. . . ."); *Corley v. Vance*, 365 F.Supp.3d 407, 454 (S.D.N.Y. 2019), *aff'd sub nom. Corley v. Wittner*, 811 F.App'x 62 (2d Cir. 2020) (finding that plaintiff had insufficiently pled NIED by failing to "allege any special duty owed to him by any of the defendants"); *see also Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) ("The duty in [an NIED claim] must be specific to the plaintiff, and not some amorphous, free-floating duty to society."); *Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 526-27, 478 N.Y.S.2d 838, 467 N.E.2d 502 (N.Y. 1984) ("The duty in [NIED cases] must be specific to the plaintiff, and not some amorphous, free-floating duty to society"). Plaintiffs argue that Blaisdell, McCraw, Ruff, and Mariella—all attorneys—owe them a duty because an attorney may owe a duty to a third-party if [*44] hired for the purpose of benefitting a third party. *See* Opp. to Times at 29. But the attorney Defendants here were clearly not hired for that purpose. In fact, they were hired to litigate *against* the Buttons, either representing the Nevada Plaintiffs or representing the Times and Jacobs. AC ¶¶ 9, 11, 15. While Plaintiffs generally allege emotional harm, *see, e.g.*, AC ¶ 263 (alleging "severe trauma and PTSD"), AC ¶¶ 361, 362 (alleging "depression"), they fail to allege a causal connection between their distress and Defendants' breach of any duty to them. Given the lack of alleged duty that had been breached, the third element requiring "a direct causal connection between the breach [of duty] and the emotional harm" is also not satisfied. *Francis*, 992 F.3d at 81 n.57.

Plaintiffs also fail to plead the fourth element, "some guarantee of genuineness of the harm," because they did not plead that any purported breach endangered their physical safety or caused them to fear for their physical safety. *Francis*, 992 F.3d at 81 n.57 (citing *Taggart*, 131 A.D.3d at 253). Indeed, Plaintiff allege no danger to their physical safety or reason to fear for their physical safety.

Finally, Plaintiffs fail to allege that Defendants acted negligently. In their original complaint, Plaintiffs [*45] alleged intentional infliction of emotional distress and in their Amended Complaint, apparently relabeled this claim as a claim for negligent infliction of emotion distress. *Compare* Compl. ¶ 271-90 *with* AC ¶¶ 355-77. In the Amended Complaint, Plaintiffs now allege Defendants acted with "negligence" and "recklessness" when publishing the Times Article and making other allegedly defamatory statements. *See* AC ¶¶ 74, 106, 299, 300, 324, 369. Perhaps to circumvent the clear one-year statute of limitations barring an intentional tort claim, *see Barbetta*, 236 A.D.3d at 625, Plaintiffs decided to claim a negligence tort but the claim continues to impermissibly rely on *intentional* conduct. Their factual allegations remained essentially the same as those in the original complaint, leaving the NIED claim premised primarily on allegedly intentional conduct. *See, e.g.*, AC ¶¶ 204, 219, 221, 373 (alleging that Defendants "intentionally published the defamatory article . . . knowing there was falsity to the allegations," participated in an "intentional collusion and conspiracy," and "intentionally attempted to persuade the Plaintiffs not to pursue legal recourse."). Faced with "internally inconsistent" allegations, the Court [*46] "is neither obligated to reconcile nor accept" them "as true." *Hurckes v. JPMorgan Chase Bank,*

*N.A.*, No. 22-CV-4616 (JMF), 2023 U.S. Dist. LEXIS 53308, 2023 WL 2664080, at *2 (S.D.N.Y. Mar. 28, 2023), *aff'd*, No. 23-749-CV, 2024 U.S. App. LEXIS 8202, 2024 WL 1478575 (2d Cir. Apr. 5, 2024) (*In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 424 n.1 (S.D.N.Y. 2021)). Accordingly, Plaintiffs have not established that Defendants acted negligently.

New York courts are clear that intentional conduct cannot form the basis of an NIED claim. *See, e.g., Mahn v. Allegis Group, Inc.*, 24-cv-8326, 2025 U.S. Dist. LEXIS 100337, 2025 WL 1504812, at *17 (S.D.N.Y. May 24, 2025) (finding that and NIED claim "premised on intentional conduct and not negligence" must be dismissed); *Scifo v. Taibi*, 198 A.D.3d 704, 706, 156 N.Y.S.3d 40, 43 (2d Dep't 2021) (finding that, where a complaint only pleads intentional conduct, there is no cause of action for NIED); *Offor v. Mercy Medical Center*, 171 A.D.3d 502, 503; 98 N.Y.S.3d 69, 70 (1st Dep't 2019) (same). Furthermore, Plaintiffs do not provide any unique allegations to support their NIED claim, relying almost entirely on the same allegedly defamatory statements that form the basis of their other claims. AC ¶¶ 334-337. "[Plaintiffs] cannot make out a separate claim for NIED based on allegations that are essentially duplicative of [their] other tort causes of action." *Mahn*, 2025 U.S. Dist. LEXIS 100337, 2025 WL 1504812, at *17 (internal citations omitted). For these reasons, Plaintiffs fail to state an NIED claim and the third cause of action is dismissed.

***iv. Plaintiffs Do Not State a Claim for Fraud or Fraudulent Misrepresentation***

Plaintiffs' fraud claims against Ruff and Mariella boil down to allegations that the pair "committed fraud on the Court in multiple Courts" by providing [*47] "false evidence" and otherwise "[lying] to the Court." AC ¶¶ 404, 405, 412. The gravamen of Plaintiff's claim is that the Boies Schiller Defendants filed a lawsuit containing claims they knew were false and have continued litigating it despite this knowledge. *See id.* As an initial matter, under New York law, there is an "absolute privilege applicable to the statements of participants in judicial proceedings." *See, e.g., Kelly v. Albarino*, 485 F.3d 664, 666 (2d Cir. 2007); *TRB Acquisitions LLC v. Yedid*, 215 A.D.3d 40, 43, 187 N.Y.S.3d 164, 168 (1st Dep't 2023) ("It is well-settled that statements made in the course of litigation are entitled to absolute privilege."). Plaintiffs separately fail to plead the elements of fraud.

To state a claim for fraud or fraudulent misrepresentation, a plaintiff must plead (1) material misrepresentation of a fact; (2) knowledge of its falsity; (3) an intent to induce reliance; (4) justifiable reliance by the plaintiff; and (3) damages. *See Sneider v. Great South Bay Surgical Associates*, 235 A.D.3d 685, 687, 228 N.Y.S.3d 195, 199 (2d Dep't 2025) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976 (N.Y. 2009) (stating elements for fraud)); *see also Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 944 N.E.2d 1104, 1108, 919 N.Y.S.2d 465 (N.Y. 2011) ("Generally, in a claim for fraudulent misrepresentation, a plaintiff must allege 'a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the

misrepresentation [*48] or material omission, and injury.'"). Under Federal Rule of Civil Procedure 9(b), Plaintiffs must plead those elements with particularity. Fed. R. Civ. P. 9(b); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994) (upholding the dismissal of a fraud claim for failing to plead fraud with particularity).

Plaintiffs fail to plead the third and fourth elements of fraud. Plaintiffs allege that Ruff and Mariella defrauded the Nevada District Court, not the Plaintiffs themselves, and as such, Plaintiffs nowhere allege that they relied on Defendants' allegedly fraudulent statements or that Defendants intended to induce their reliance. *See, e.g.*, AC ¶¶ 404-412; *see also Nineteen New York Properties Limited Partnership v. 535 5th Operating Inc.*, 211 A.D.2d 411, 412-13, 621 N.Y.S.2d 42, 43 (1st Dep't 1995) ("The only fraud alleged is with respect to statements made in the complaint and in support of Plaintiffs motion; there could be no detrimental reliance on such statements."); *Brownstone Inv. Grp., LLC. v. Levey*, 468 F. Supp. 2d 654, 659 (S.D.N.Y. 2007) (holding that plaintiff failed to allege fraud when he failed to allege reliance on an alleged misrepresentation which was made in the course of this litigation); *Kashelkar v. Rubin & Rothman*, 97 F.Supp.2d 383, 395 (S.D.N.Y. 2000) ("Plaintiff does not and cannot plead reliance because all of the alleged 'misrepresentations' appeared in legal papers in the course of adversary litigation; they were not statements made by [the defendant] upon which Plaintiff relied or changed his position in reliance therein.").

Further, [*49] Plaintiffs fail to plead their claim with particularity. The Buttons allege that Ruff and Mariella "possessed evidence . . . that proved their clients were lying," but fail to identify the evidence with particularity or explain why it proves the falsity of the Nevada Plaintiffs' allegations. AC ¶ 409. Plaintiffs merely describe the allegedly exculpatory evidence as "various text messages and therapy records," "photo evidence and documents proving Sage Humphries' allegations to be entirely false and fraudulent," and "evidence of Sage Humphries prostituting herself to Edmonton Oilers hockey team[.]" *See, e.g.*, AC ¶¶ 91, 155. None of this explains why the allegations in the Nevada Litigation were false. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) ("A complaint making [fraud] allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (cleaned up)); *Winter v. American Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 226 (S.D.N.Y. 2017) (finding that plaintiff fails to meet the 9(b) particularity requirements because "short of stating these claims are patently false, Plaintiff fails to explain why these statements were fraudulent.").

Moreover, since [*50] this claim is based on the allegation that Ruff and Mariella "fil[ed] . . . a lawsuit in bad faith, with knowledge that the complaint contained false statements, the claim must be dismissed." *Brownstone Inv. Grp., LLC v. Levey*, 468 F.Supp.2d 654, 659 (S.D.N.Y. 2007). The proper remedy for such conduct would be a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. *See id.* ("[T]he appropriate remedy for such a violation . . . would be a motion for sanctions."); *see also Papworth*, 2007 U.S. Dist. LEXIS 72864, 2007 WL 2903944, at *12 (same). Indeed, the Buttons have unsuccessfully sought sanctions in Nevada District Court several times. *See Humphries*, No. 21-cv-01412, (D. Nev.) [ECF Nos. 220, 305,

327, 360]. For the reasons stated, Plaintiffs failed to state a claim of fraud or fraudulent misrepresentation, and the fifth cause of action is dismissed.

***v. Plaintiffs' Civil Conspiracy Claim Cannot Stand on its Own***

"New York does not recognize civil conspiracy to commit a tort as an independent cause of action." *Whitfield v. Law Enforcement Employees Benevolent Association*, 237 A.D.3d 1139, 1140-1141, 233 N.Y.S.3d 615, 619 (2d Dep't 2025); *see also Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli*, 215 A.D.3d 699, 703, 187 N.Y.S.3d 702, 707 (2d Dep't 2023) ("Under New York law, in order to properly plead a cause of action to recover damages for civil conspiracy, the plaintiff must allege a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of an agreement"). Since each of the Buttons' other tort claims [*51] have been dismissed, the civil conspiracy claim must be dismissed as well. *See Mamoon v. Dot Net Inc.*, 135 A.D.3d 656, 658, 25 N.Y.S.3d 85, 88 (1st Dep't 2016) (dismissing civil conspiracy claim when other tort claims were dismissed).

**II. The Times Defendants' Request for Attorneys' Fees**

The Times Defendants assert that pursuant to the New York anti-SLAPP law, they are owed attorneys' fees and costs associated with their motion to dismiss. *See* Times Mem. at 21. Plaintiffs do not contest the Times Defendants' argument regarding the New York anti-SLAPP law, arguably conceding that they owe attorneys' fees. *See* Opp. to Times; *Coker*, 2024 U.S. Dist. LEXIS 36390, 2024 WL 869412, at *7. In their opposition, Plaintiffs merely argue that their case is not frivolous and include a footnote that cites to an order in their Florida District Court case against McCawley that denies her request for attorneys' fees pursuant to a *Florida* Anti-SLAPP law. *See* Opp. to Times at 8-9 n.5 (citing *Button v. McCawley*, 24:cv-60911, 2025 U.S. Dist. LEXIS 3634, 2025 WL 50431, at *11 (S.D.F.L. Jan 8, 2025)). Nevertheless, considering the special solicitude owed to Plaintiffs as *pro se* parties, the Court considers the Times Defendants' request for attorneys' fees on the merits. *See Quadir v. New York State Dep't of Lab.*, 39 F. Supp. 3d 528, 536 (S.D.N.Y. 2014) (quoting *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994)) ("Courts must afford pro se plaintiffs 'special solicitude'" in reviewing their filings.). For the reasons below, the Times Defendants' motion is denied.

**A. New York Civil Rights Law Section 70-a(1) Applies** [*52] **in Federal Court**

Pursuant to the New York anti-SLAPP statute, New York Civil Rights Law Section 70-a, an award of attorneys' fees is mandatory if a lawsuit "involving public petition and participation" was "commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification, or reversal of existing law." *See* N.Y. Civ. Rights L. § 70-a(1); *see also Reeves v. Associated Newspapers, Ltd.*, 232 A.D.3d 10, 12, 218 N.Y.S.3d 19, 22 (1st Dep't 2024) (describing the fees and costs as a "mandatory award of

attorneys' fees to the prevailing defendant"). This provision is automatically triggered by a dismissal pursuant to New York Civil Practice Law and Rules subdivision 3211(g) or subdivision 3212(h). *See Id.* These two provisions create special standards for dismissal and summary judgment in cases involving "public petition and participation." *See* N.Y. C.P.L.R. §§ 3211(g), 3212(h); Fed. R. Civ. P. 12(b)(6), 56.

This suit qualifies as an "action involving public petition and participation" because it involves a claim based upon "[a] communication in a place open to the public or a public forum in connection with an issue of public interest." *See* N.Y. Civ. Rights Law § 76-a (McKinney); *Sweigert v. Goodman*, No. 118CV08653VECSDA, 2021 U.S. Dist. LEXIS 77704, 2021 WL 1578097, at *2 (S.D.N.Y. Apr. 22, 2021). The term "public interest" must be "construed broadly" and is defined as "any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d); *Bobulinski v. Tarlov*, 758 F. Supp.3d 166, 177 (S.D.N.Y. 2024) *appeal withdrawn*, No. 25-17, 2025 U.S. App. LEXIS 8108, 2025 WL 1009663 (2d Cir. Mar. 31, 2025). Accordingly, the Buttons' claims against the New York Times and Jacobs, which are based on statements in the Times Article reporting [*53] on a civil lawsuit are claims involving "public petition and participation."

Courts in this District disagree on the question of whether the provision applies in federal court. *See Coritsidis v. K'hal Bnei Torah of Mount Ivy*, No. 22-cv-10502, 2024 U.S. Dist. LEXIS 2440, 2024 WL 37122, at *15 (S.D.N.Y. Jan 3, 2024) (finding that the attorneys' fees provision of the New York anti-SLAPP statute does not apply in federal court "because its standard conflicts with Federal Rules of Civil Procedure 12 and 56" and collecting cases to that effect). While several courts have held that it does not, *see id.*, more recently a well-reasoned minority has come to the opposite conclusion. *See Heilbut v. Cassava Sciences, Inc.*, 778 F. Supp. 3d 551, 2025 WL 919654, (S.D.N.Y. 2025) (finding that the mandatory award of attorneys' fees in section 70-a is purely substantive and thus must be applied in federal court); *Bobulinski*, 758 F. Supp.3d at 189 (holding that § 70-a applies in Federal Court on *Erie* grounds and that defendant is entitled to attorneys' fees); *see also Murchinson Ltd. v. Nano Dimension Ltd.*, 2025 U.S. Dist. LEXIS 92192, 2025 WL 1397615, at *16 (S.D.N.Y. May 14, 2025) (citing *Bobulinski*). The Times Defendants ask the Court to resolve this split in their favor, apply section 70-a, and award them reasonable attorneys' fees pursuant to the statute. *See* Times Mem. at 21.

The question of the applicability of section 70-a centers on whether it is procedural in nature and conflicts with Federal Rules 12(b)(6) and 56. The courts that have declined to apply the statute have done so on the basis that the statute's "substantial basis" standard is procedural and conflicts [*54] with Rule 12(b)(6) and Rule 56 standards, meaning the Federal Rule governs. *See Coritsidis*, 2024 U.S. Dist. LEXIS 2440, 2024 WL 37122, at *15; *Kesner v. Buhl*, 590 F.Supp.3d 680, 701 (S.D.N.Y. 2022); *accord Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010). The courts that have applied the statute, on the other hand, have found that the rule, which entitles a defendant to receive attorneys' fees in a defamation action when it is "without substantial basis in fact and law," is substantive, not procedural and thus under *Erie*, applies in federal court. *Bobulinski*, 758 F. Supp.3d at 183-88

(quoting *Shady Grove*, 559 U.S. at 398); *see also Heilbut*, 778 F. Supp. 3d 551, 2025 WL 919654, at *25.

This Court agrees with *Bobulinski* and *Heilbut*. "The test is whether a Federal Rule of Civil Procedure answers the same question as the [anti-SLAPP statute]." *La Liberte v. Reid*, 966 F.3d 79, 87 (2d. Cir. 2020). In *La Liberte*, the Second Circuit determined that the relevant question regarding whether to apply a special motion to strike in California's anti-SLAPP law was the "circumstances under which a court must dismiss a plaintiff's claim before trial, a question that is already answered differently by Federal Rules 12 and 56." *La Liberte*, 966 F.3d at 87. On the other hand, in *Adelson*, the Second Circuit found that a Nevada anti-SLAPP statute concerning the mandatory award of attorneys' fees did not conflict with any federal rules. *See Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (quoting *Cotton v. Slone*, 4 F.3d 176, 180 (2d Cir.1993) ("Attorney's fees mandated by state statute are available when a federal court sits in diversity.")).

Similar to *Adelson*, here the New York anti-SLAPP fee-shifting provision [*55] answers the question of whether a party is entitled to attorneys' fees, a question that the pleading standard of Rule 12(b)(6) does not answer.[19] *Compare* N.Y. Civ. Rights L. § 70-a *with* Fed. R. Civ. P. 12(b)(6); *see also Heilbut*, 778 F. Supp. 3d 551, 2025 WL 919654, at *9; *Bobulinski*, 758 F. Supp. 3d at 186. Since the state statute allowing for attorneys' fees and the pleading standard of Rule 12(b)(6) answer different questions, the Court must determine whether the law in question is substantive or procedural. *Shady Grove*, 559 U.S. at 398. If the state law is substantive, the Court is bound to apply it. *See Gasperini v. Ctr. For Humanities*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)). The entitlement to attorneys' fees is substantive. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) ("We apply New York substantive law to resolve the dispute regarding plaintiff's entitlement to attorney's fees"); *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992). As *Bobulinski* outlines, twin aims of *Erie*, as outlined in *Hanna*, support this conclusion. *See Bobulinski*, 758 F. Supp.3d at 186. First, declining to apply the statute in federal court would encourage forum shopping, as plaintiffs with borderline defamation cases would flock to federal court to skirt the risk of paying their adversary's attorneys' fees in case of dismissal. *Id.* Second, different outcomes in federal and state court for cases of identical merit would have a substantially negative impact on the equal administration of justice. *See Bobulinski*, 758 F. Supp.3d at 186 (citing *Hanna v. Plumer*, 380 U.S. 460, 468, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965) (defining the twin aims of *Erie* as the equitable administration of justice and preventing [*56] forum shopping)). Because there is no conflict with existing rules and the state statute governs an established substantive right, section 70-a applies in federal court.

**B. Attorneys' Fees In This Action**

---

[19] The only Federal Rule that relates to attorneys' fees in any significant capacity is Rule 54, which sets the procedure for filing a motion for fees rather than the substantive standard for entitlement to such fees. *See* Fed. R. Civ. P. 54.

Having found that the substantive right to attorneys' fees in Section 70-a applies in federal court, the Court must determine whether Section 70-a applies and requires the award of attorneys' fees in this case. Section 70-a(1) states that "[a] defendant . . . may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action". *Bobulinski* holds that this means Defendants need not bring a separate action or counterclaim to demand attorneys' fees. *See* N.Y. Civ. Rights L. *Bobulinski*, 758 F. Supp. 3d at 188 ("'[M]aintain[ing] an action' includes defendants' continuing to litigate in an original action filed against them."); *see also Heilbut*, 778 F. Supp. 3d 551, 2025 WL 919654, at *10 (party requesting attorneys' fees filed a separate cause of action seeking such fees). However, according to the *Erie* analysis laid out above, this Court must apply the federal procedural Rule 54(d) to determine the question of how parties may move for attorneys' fees. *See Zhang v. Zhang*, No. 22-CV-02745-WFK-JRC, 2024 U.S. Dist. LEXIS 160946, 2024 WL 4267790, at *3 (E.D.N.Y. Sept. 6, 2024), *report and recommendation adopted*, No. 22-CV-2745 (WFK) (JRC), 2024 U.S. Dist. LEXIS 171495, 2024 WL 4266272 (E.D.N.Y. Sept. 23, 2024) ("Rule 54(d) of the Federal Rules of Civil Procedure is a procedural rule."); *Cameau v. Nat'l Recovery Agency, Inc.*, No. CV 15-2861 (DRH) (AKT), 2018 U.S. Dist. LEXIS 132993, 2018 WL 4522104, at *4 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted [*57]* , No. 15CV2861(DRH) (AKT), 2018 U.S. Dist. LEXIS 168227, 2018 WL 4853050 (E.D.N.Y. Sept. 28, 2018) ("Rule 54(d)(2) is a procedural guide to be utilized where attorneys' fees are elsewhere authorized."); *Latin Am. Fin. Grp., Inc. v. Pareja*, No. 04 CIV. 10082 (DLC), 2007 U.S. Dist. LEXIS 24550, 2007 WL 1009506, at *1 (S.D.N.Y. Apr. 2, 2007) (referring to Rule 54 as an "unambiguous procedural rule.").

Rule 54(d) states that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." *See* Fed. R. Civ. P. 54(d)(2)(A). It requires further that "[u]nless a statute or a court order provides otherwise" that the motion "state the amount sought or provide a fair estimate of it." *See* Fed. R. Civ. P. 54(d)(2)(B). The Times Defendants do not state any amount sought or any estimate. Accordingly, the Times Defendants' motion is denied. *See Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 629 (S.D.N.Y. 2016), aff'd, 683 F. App'x 33 (2d Cir. 2017) (denying a motion for attorneys' fees because it did not "state the amount sought or provide a fair estimate of it."); *Bartels v. Inc. Vill. of Lloyd Harbor*, No. 10 CV 5076 PKC, 2015 U.S. Dist. LEXIS 94611, 2015 WL 4459403, at *2 (E.D.N.Y. July 21, 2015) (denying a motion for attorneys' fees because the motion failed to state the amount sought or provide an estimate explaining that "[b]y failing to provide any figure or estimate as to the fees sought, Defendants essentially ask the Court to approve a blank check for Plaintiff to write.").

## CONCLUSION

For the reasons stated above, each of Plaintiffs' claims is time-barred or otherwise facially deficient, and the Defendants' motions [*58] to dismiss [ECF Nos. 36, 38, 41] are GRANTED.

Accordingly, Plaintiffs' case is dismissed with prejudice.[20] The Times Defendant's request for attorneys' fees is DENIED without prejudice.

The Clerk of Court respectfully is requested to terminate the motions pending at docket entries 36, 38, and 41, and to close this case.

**SO ORDERED**.

**Date: September 15, 2025**

**New York, NY**

/s/ Mary Kay Vyskocil

**MARY KAY VYSKOCIL**

**United States District Judge**

---

End of Document

[20] The Court does not grant Plaintiffs leave to amend the Amended Complaint. Plaintiffs were granted an opportunity to amend their complaint in response to issues raised in Defendants' initial pre-motion letters requesting leave to file a motion to dismiss. [ECF Nos. 32]. Plaintiffs took that opportunity and did not remedy the defects as described above. *See* AC. Second, Plaintiffs did not request leave to amend in their oppositions to the pending motions to dismiss and did not demonstrate to the Court that the opportunity to amend would not be futile. *See, e.g., Treiber v. Aspen Dental Mgmt.*, Inc., 635 F. App'x 1, 4 (2d Cir. 2016).

# EXHIBIT 5

# EXHIBIT 5

# Button v. Lopresti

United States District Court for the Southern District of California

December 31, 2025, Decided; December 31, 2025, Filed

Case No.: 25-cv-00867-DMS-BJW

**Reporter**
2025 U.S. Dist. LEXIS 268481 *; 2025 LX 661737; 2025 WL 3771465

MITCHELL TAYLOR BUTTON; DUSTY BUTTON, Plaintiffs, v. CRAIG LOPRESTI, Defendant.

**Prior History:** Button v. Lopresti, 2025 U.S. Dist. LEXIS 135898, 2025 WL 1953272 (July 16, 2025)

**Counsel:** [*1] Mitchell Taylor Button, Plaintiff, Pro se, Myrtle Beach, SC.

Dusty Button, Plaintiff, Pro se, Myrtle Beach, SC.

**Judges:** Hon. Dana M. Sabraw, United States District Judge.

**Opinion by:** Dana M. Sabraw

## Opinion

**ORDER**:

**(1) GRANTING DEFENDANT'S MOTION TO DISMISS [ECF No. 16]**;

**(2) DENYING DEFENDANT'S REQUEST FOR JUDICIAL NOTICE [ECF No. 22]; and**

**(3) DENYING PLAINTIFFS' MOTION TO STRIKE [ECF No. 23]**

Pending before the Court is Defendant's motion to dismiss Plaintiffs' Complaint ("Motion to Dismiss"). (MTD, ECF No. 16). Plaintiffs Mitchell and Dusty Button, proceeding pro se, filed a response in opposition ("Opposition"). (Opp'n, ECF No. 20). Defendant filed a reply ("Reply"), (Reply, ECF No. 21), and a request for judicial notice, (Req., ECF No. 22). Also pending before the Court is Plaintiffs' motion to strike Defendant's Reply and request for judicial notice, or in the alternative, to file a sur-reply ("Motion to Strike"). (Mot. to Strike, ECF No. 23). Defendant did

not respond to the Motion to Strike. This matter is suitable for resolution without oral argument pursuant to Civil Local Rule 7.1(d)(1). (ECF No. 24). For the following reasons, the Court grants Defendant's Motion to Dismiss; denies Defendant's request for judicial notice; and denies Plaintiffs' [*2] Motion to Strike.

## I. BACKGROUND

### A. The Parties

The Court accepts Plaintiffs' allegations as true for purposes of resolving the Motion to Dismiss. Dusty Button was a world-renowned and well-known ballet dancer. (*See* Compl. ¶¶ 24-26). She accumulated nearly half a million followers and subscribers on Instagram up until December 2021, when she deleted her social media account "after succumbing to trauma from severe cyber bullying and harassment." (*Id.* ¶ 28). Mitchell Button was a part of "Button Built," a team and brand for automotive design, builds, and work in the automotive industry. (*Id.* ¶ 29). Mitchell Button also had nearly half a million followers and subscribers on his Instagram account, "@button_built." (*Id.* ¶ 32). He also deleted his social media account in 2021 after "succumbing to trauma from severe cyber bullying and harassment." (*Id.* ¶ 35). Plaintiffs' businesses, goods, and services were "directly sourced and provided from their good names, talent, expertise, reputations, skills, manufacturing and marketing capabilities, which were completely destroyed in 2021 by false allegations in a civil lawsuit" described below. (*Id.* ¶ 37 (emphasis omitted)).

Defendant operates a YouTube [*3] channel, "@TheCraig909," with nearly two hundred and thirty thousand subscribers and an Instagram page, "@thecraig909," with nearly one hundred and fifty thousand followers. (*Id.* ¶ 3). Defendant was a former competitor of Mitchell Button in the automotive industry, and was aware of Plaintiffs' reputation in the industry. (*Id.* ¶¶ 11, 53).

### B. The Nevada Lawsuit

In July 2021, Plaintiffs were sued in the United States District Court of Nevada for $131,000,000 ("Nevada Lawsuit"). (*Id.* ¶ 4). The Nevada Lawsuit involved allegations of sexual assault. (*See id.* ¶ 9). The Nevada Lawsuit was publicized in thousands of articles, televised on news and media outlets such as Good Morning America, and published on social media pages and channels. (*Id.* ¶ 5). The coverage of the Nevada Lawsuit states that Plaintiffs were sued in a civil action. (*Id.*). The Nevada Lawsuit does not state that Plaintiffs were arrested, charged, or incarcerated for the related allegations or any other crime. (*Id.* ¶ 6). Notably, Plaintiffs were not charged with any crime and never arrested. (*Id.* ¶¶ 6, 45). Further, publicly available filings in the Nevada Lawsuit state that multiple police departments refused to "entertain [*4] the factual allegations" against Plaintiffs because the "allegations were 'inconsistent' with evidence provided, that the statements made to the police . . . were unfounded and that even the Buttons themselves, had filed reports against themselves to prove that the allegations against them were false." (*Id.* ¶ 6). On January 6,

2025, Plaintiffs filed a motion for summary judgment in the Nevada Lawsuit. (*Id.* ¶ 7). Plaintiffs uploaded a redacted version of the motion for summary judgment to their Instagram page, "@WeTheButtons," which is "solely dedicated to providing anyone who follows the Buttons with accurate information about the [Nevada Lawsuit]." (*Id.*). Defendant followed Plaintiffs' Instagram page. (*Id.*).

**C. The Alleged Defamation**

A third-party Instagram page, "@trail.huntr," posted to Instagram a photo of Mitchell Button's automotive work. (*Id.* ¶¶ 54, 55). On January 27, 2025, Defendant posted a comment on the Instagram post, stating the Buttons were "locked up for some f*cked up stuff" and that it was a "shame they weren't good people." (*Id.* ¶¶ 8, 54). This post was "shared" at least three hundred and twenty two times. (*Id.* ¶ 56). Defendant's comments were posted to hundreds of [*5] thousands of people who follow him on social media. (*Id.* ¶ 8). At the time Defendant made his Instagram comments, Plaintiffs were "*finally* able to put the destruction of horrendous, false allegations behind them and continue business relationships with third parties which were previously broken due to those false allegations." (*Id.* ¶ 8 (emphasis added)). According to Plaintiffs, Defendant knew that his comments were "entirely and utterly false and defamatory" and he acted with "actual malice." (*Id.* ¶¶ 9, 39). Defendant soon after deleted his comments and blocked Plaintiffs on social media. (*See id.* ¶ 49). "Defendant has deleted related evidence which would prove that . . . Defendant further defamed . . . Plaintiffs on other platforms including his YouTube channel which has nearly two hundred and thirty thousand subscribers." (*Id.* ¶ 50).

Additionally, Defendant's comments "encouraged others to make false and defamatory statements about the Buttons including but not limited to a statement made by one of [Defendant's] followers which stated the Buttons were 'locked up for human trafficking.'" (*Id.* ¶ 57). Defendant's statements were made "for the purpose of intentionally misleading former [*6] sponsors, former employers and former business affiliates of the Buttons, and to prevent them from securing prospective contractual agreements, agreements which were already in place and which had been formerly broken due to the defamatory global media campaign waged against them in 2021 but were repaired." (*Id.* ¶ 58). Defendant intentionally interfered with contracts of Plaintiffs. (*Id.* ¶ 59). Because of Defendant's statements, Plaintiffs have been "deprived of work, prospective contracts and repaired business relationships." (*Id.* ¶ 61). Additionally, Defendant's "power and influence online" intentionally prevented Plaintiffs from repairing their reputations after they were "completely destroyed by a false and defamatory global media campaign waged against them in May and July of 2021." (*Id.* ¶ 11).

**D. Procedural History**

Plaintiffs allege (1) defamation per se and (2) tortious interference with contract and prospective economic advantage. (*Id.* at 13-15). Defendant moves to dismiss the entire action under facial and factual challenges pursuant to Federal Rule of Civil Procedure 12(b)(1). (MTD 3-4).

## II. DEFENDANT'S MOTION TO DISMISS

### A. Legal Standard

Plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance [*7] of the evidence. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Under Rule 12(b)(1), a party may move to dismiss for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A federal court must dismiss an action if it "determines . . . that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3).

Rule 12(b)(1) jurisdictional challenges can be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite*, 749 F.3d at 1121 (quoting *Safe Air for Everyone*, 373 F.3d at 1039). When a motion to dismiss makes a facial challenge, the court assumes the factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009). Conversely, "in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*(citation omitted). "The court need not presume the truthfulness of the plaintiff's allegations." *Id.*(citation omitted). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other [*8] evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.*(citation omitted).

### B. Discussion

Federal jurisdiction over this case is based on diversity pursuant to 28 U.S.C. § 1332(a). (Compl. ¶¶ 18-20). Under § 1332(a), jurisdiction exists in cases of complete diversity—where each of the plaintiffs is a citizen of a different state from each of the defendants—and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a); *see also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68, 117 S. Ct. 467, 136 L. Ed. 2d 437 (1996). Because the parties do no dispute that there is complete diversity, the only issue is whether the amount in controversy requirement is met.

"The amount in controversy alleged . . . controls so long as the claim is made in good faith." *Geographic Expeditions, Inc. v. Est. of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1106 (9th Cir.2010) (citation omitted). "To justify dismissal, it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.*(citation omitted). Under this standard, the good faith allegations in the complaint as to the amount in controversy "suffice to establish the jurisdictional amount unless it appears legally certain that the amount in dispute is $75,000 or less." *Id.* at 1107.

Here, "[a]lthough Plaintiffs' claims [*9] are based on the similar facts . . . they do not involve a single title or right in which all of the Plaintiffs share a common interest." *Travelers Indem. Co. of Conn. v. Pulte Grp., Inc.*, No. LACV1808994, 2019 U.S. Dist. LEXIS 74861, 2019 WL 1915760, at *7 (C.D. Cal. Apr. 26, 2019). Thus, Defendant correctly argues that Plaintiffs cannot aggregate their claims and "each [Plaintiff] must meet the jurisdictional threshold." (MTD 4-5 (citations omitted)). That is, the allegations must show that each Plaintiff has a claim for over $75,000.

Plaintiffs seek general and punitive damages and reasonable costs and expenses. (Compl., Prayer for Relief, ¶¶ I, ii). Plaintiffs argue in their Opposition that damages "far exceed[] $75,000 each." (Opp'n 25). However, Plaintiffs fail to allege any facts in their Complaint supporting that conclusion. While Plaintiffs allege that both Plaintiffs have been "deprived of work, prospective contracts and repaired business relationships" because of Defendant's statements, (Compl. ¶ 61), Plaintiffs do not detail the monetary value of these lost business opportunities. Plaintiffs do not provide any monetary amounts or calculation of harm suffered outside a single allegation that the "amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs." (*Id.* ¶ 20). [*10] Such an allegation does not demonstrate that *each* Plaintiff can support a claim for over $75,000. Thus, facially, there are insufficient allegations to show subject matter jurisdiction. Accordingly, the Court **GRANTS** Defendant's Motion to Dismiss. Plaintiffs' Complaint is **DISMISSED with leave to amend**.[1]

## III. DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

A court may consider "matters of judicial notice" in ruling on a motion to dismiss. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Defendant seeks judicial notice of "the existence, legal effect and status" of twelve cases in which Plaintiffs were parties to. (Req. 1). However, because the Court did not rely on these cases when deciding the Motion to Dismiss, the Court **DENIES** Defendant's request for judicial notice. *Mikulsky v. Noom, Inc.*, 23-cv-00285, 2024 U.S. Dist. LEXIS 11869, 2024 WL 251171, at *2 n.2 (S.D. Cal. Jan. 22, 2024) (denying the defendant's request for judicial notice of a privacy policy because the Court's analysis under Rule 12(b)(1) did not rely on that policy).

## IV. PLAINTIFFS' MOTION TO STRIKE

Plaintiffs argue Defendant's Reply "invents new factual and legal theories—claiming Plaintiffs are 'vexatious,' 'public figures,' and 'on government assistance,' and asserting that 'no jury on the planet would award these Plaintiffs anything.'" (Mot. to Strike 9 (citing Reply 10, 11, 17-18)). Plaintiffs [*11] also take issue with Defendant's arguments regarding Plaintiffs' other legal matters and Defendant's request for judicial notice. (*See* Mot. to Strike 11-12). Plaintiffs ultimately argue that, under Federal Rule of Civil Procedure 12(f), "the Court should either strike

[1] In light of this determination, the Court declines to consider Defendant's factual challenge to subject matter jurisdiction. (*See* MTD 6-9).

or disregard those portions of Defendant's filings and the New [request for judicial notice] Exhibits." (*See* Mot. to Strike 22). In the alternative, Plaintiffs move to submit a sur-reply. (Mot. to Strike 13-14).

Under Rule 12(f), a court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike under Rule 12(f) are directed to pleadings only." *Goodwin v. AT&T*, No. 2:23-CV-01950, 2024 U.S. Dist. LEXIS 100656, 2024 WL 2866895, at *2 (D. Nev. June 6, 2024). "Thus, a motion to strike is not available to strike material contained in motions and other briefs." *Id.*(citation omitted). Accordingly, Rule 12(f) is the not the appropriate legal basis for Plaintiffs' Motion to Strike. However, "district courts have inherent power to control their docket," including striking documents and improper filings. *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (internal citation omitted). In deciding whether to exercise that power, courts consider, in part, "whether striking the filing would 'further the overall resolution of the action.'" *Goodwin*, 2024 WL 2866895, at *2. The Court did not consider the specific arguments Plaintiffs challenge [*12] when ruling on the Motion to Dismiss. Thus, the Court finds it unnecessary to strike these portions of Defendant's Reply. Further, the Court denied Defendant's request for judicial notice, negating the need to strike it and the exhibits. Thus, the Court **DENIES** Plaintiffs' Motion to Strike, including their request to file a sur-reply.

## V. CONCLUSION

Based on the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss **with leave to amend**. Any amended complaint must be filed within **fourteen (14) days** of the entry of this Order. In addition, Defendant's request for judicial notice is **DENIED**, and Plaintiffs' Motion to Strike is **DENIED**.

**IT IS SO ORDERED**.

Dated: December 31, 2025

/s/ Dana M. Sabraw

Hon. Dana M. Sabraw

United States District Judge

---

End of Document